## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION

| | |
|---|---|
| **CORINA CAMACHO, Individually and on behalf of G.M., a Minor; TANISHA RODRIGUEZ Individually and on behalf of G.R., a Minor; and SELENA SANCHEZ Individually and on behalf of D.J., a Minor.** | Case No.   2:22-cv-00048 |
| **Plaintiffs,** | **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |
| **v.** | (1)   42 U.S.C. § 1983 – 14th Amendment |
| **THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT; PEDRO "PETE" ARREDONDO, an Individual; THE CITY OF UVALDE; MARIANO PARGAS, an Individual; MANDY GUTIERREZ, an Individual; DANIEL DEFENSE, LLC, a Limited Liability Company; OASIS OUTBACK, LLC, a Texas Limited Liability Company; FIREQUEST INTERNATIONAL, INC., a Arkansas Corporation; MOTOROLA SOLUTIONS, INC., a Delaware Corporation; SCHNEIDER ELECTRIC USA, INC., a Delaware Corporation; JOHN DOE COMPANY I,** | (2)   Negligence |
| | (3)   Negligent Entrustment |
| | (4)   Intentional Infliction of Emotional Distress |
| | (5)   Products Liability – Failure to Warn |
| | (6)   Products Liability – Manufacturing Defect |
| | (7)   Products Liability – Marketing Defect |
| | (8)   Nuisance |
| **Defendants.** | (9)   Punitive / Exemplary Damages |

PLAINTIFFS' ORIGINAL COMPLAINT

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**................................................................................................ **5**

**JURISDICTION AND VENUE** .................................................................... **6**

**THE PARTIES**............................................................................................ **6**

A.      GUN VIOLENCE IN AMERICA ........................................................ 11

B.      MOST SCHOOL SHOOTERS ARE YOUNG ADULT MALES ...................... 15

C.      ONSET OF MENTAL ILLNESS IN YOUNG ADULTS .................................. 16

D.      TEXAS SCHOOL AND FIREARMS SAFETY ACTION PLAN ..................... 18

**II. STATEMENT OF FACTS**.................................................................... **18**

A.      UVALDE, TEXAS ........................................................................ 18

B.      THE PLAINTIFFS, CHILDREN SURVIVORS.................................................. 19

C.      THE GUN MAKER – DANIEL DEFENSE ....................................... 21

      1.      DANIEL DEFENSE AGRESSIVELY MARKETS TO UNTRAINED
                  CIVILLIANS AND YOUNG ADULTS ..........................................................21

      2.      DANIEL DEFENSE KNOW THEIR WEAPONS ARE USED BY
                  CIVILIANS IN MASS SHOOTINGS..............................................................25

      3.      DANIEL DEFENSE DELIBERATELY STAYS IGNORANT OF THE
                  HUMAN HARMS AND LOSSES RESULTING FROM ITS RECKLESS
                  MARKETING PRACTICES. ..........................................................................26

D.      THE YOUNG UVALDE SCHOOL SHOOTER ................................................. 28

E.      THE UVALDE SCHOOL MASSACRE ON MAY 24, 2022.............................. 32

F.      THE SCHOOL DISTRICT'S AND LAW ENFORCEMENT'S FAILURE TO
          FOLLOW STATE ACTIVE SHOOTER MANDATES AND THEIR OWN
          WRITTEN POLICIES ............................................................................ 43

G.      THE GUN DEFENDANTS ARE NOT SHIELDED FROM LIABILITY BY THE
          PROTECTION OF LAWFUL COMMERCE IN ARMS ACT ("PLCAA"). ...... 49

**III. FIRST CAUSE OF ACTION** ................................................................ **50**

A.      THE SCHOOL DISTRICT'S LIABILITY UNDER 42 U.S.C. § 1983 ............... 51

PLAINTIFFS' ORIGINAL COMPLAINT

1.      The School District Created a Danger to Plaintiffs Whom They Had in Their Custody on May 24, 2022. ..................................................................52

2.      The School District Had a Policy, Practice, and Custom of Not Complying with its Own Security Procedures. ....................................................53

3.      The School District Had a Policy, Practice, and Custom of Not Repairing Broken Security Doors. ..........................................................................54

4.      The School District and Principal Gutierrez Failed to Utilize Alert Systems. 55

5.      The School District Had a Policy, Practice and Custom of Not Complying with State-Mandated Active Shooter Protocol Training. .................................56

6.      The School District's Law Enforcement Hiring and Supervision Policies and Procedures Were Constitutionally Inadequate. .................................................57

7.      The Individual Liability of Chief Arredondo's for Failure to Take Command and Execute Active Shooter Training Protocols. ..............................................58

8.      The Individual Liability of Principal Gutierrez for Failure to Comply with School Security Procedures. ...........................................................60

B.      UVALDE'S LIABILITY UNDER 42 U.S.C. § 1983 .......................................... 60

**IV. SECOND CAUSE OF ACTION: NEGLIGENCE ................................................. 63**

**V. THIRD CAUSE OF ACTION: NEGLIGENT ENTRUSTMENT ....................... 66**

**VI. FOURTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .......................................................................... 68**

**VII. FIFTH CAUSE OF ACTION: PRODUCTS LIABILITY – FAILURE TO WARN .................................................................................................. 69**

**VIII. SIXTH CAUSE OF ACTION: PRODUCTS LIABILITY – MANUFACTURING DEFECT ................................................................. 71**

**IX. SEVENTH CAUSE OF ACTION: PRODUCTS LIABILITY – MARKETING DEFECT ......................................................................... 72**

**X. EIGHT CAUSE OF ACTION: NUISSANCE ...................................................... 74**

**XI. PUNITIVE/EXEMPLARY DAMAGES ............................................................. 78**

**XII. RELIEF SOUGHT ............................................................................................. 79**

**XIII. DEMAND FOR JURY TRIAL ........................................................................ 80**

**XIV. SPOLIATION** ............................................................................................................. **80**

PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW Plaintiffs, CORINA CAMACHO, Individually and on behalf of G.M., a Minor; TANISHA RODRIGUEZ Individually and on behalf of G.R., a Minor; and SELENA SANCHEZ Individually and on behalf of D.J., a Minor, complaining of Defendants, THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, PEDRO "PETE" ARREDONDO, an Individual, THE CITY OF UVALDE, MARIANO PARGAS, an Individual, MANDY GUTIERREZ, an Individual, DANIEL DEFENSE, LLC, a Limited Liability Company, OASIS OUTBACK, LLC, a Texas Limited Liability Company, FIREQUEST INTERNATIONAL, INC. an Arkansas Corporation, MOTOROLA SOLUTIONS, INC., a Delaware Corporation, SCHNEIDER ELECTRIC USA, INC., a Delaware Corporation; and JOHN DOE COMPANY I and each of them, and allege as follows:

## INTRODUCTION

1.      On May 24, 2022, Uvalde, Texas had one of the worst school massacres in U.S. history. 19 children and two teachers were killed, and countless others injured and traumatized while school officials and hundreds of law enforcement personnel stood by failing to act. An 18-year-old Uvalde man with a history of mental disturbance, instability, and domestic issues legally purchased semi-automatic weapons, ammunition, high-capacity magazines, and a Hellfire trigger system to use in the massacre.  Due to the conduct of the school and police, and the deliberate choices of the gun makers and sellers to directly market their lethal weapons to young untrained civilians, the shooter bought and assembled a military grade assault weapon with 30-round magazines days after his 18th birthday and entered the Uvalde elementary school unabated, wearing tactical gear. The shooter was left with free range to shoot, terrorize, and kill children and teachers for over an hour.

## JURISDICTION AND VENUE

2.      This case is brought under 42 U.S.C. § 1983 and under state law. Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 and 1343. This Court also has supplemental jurisdiction over Plaintiffs' state law claims and over Defendants under 42 U.S.C. § 1367 because the state law claims are interrelated to the federal claims.

3.      Venue is proper within the Western District of Texas, Del Rio Division, under 28 U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district, Defendants regularly conduct business in this district, and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

## THE PARTIES

4.      **G.M.** is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother, Corina M. Camacho, in Uvalde, Texas.  G.M., a male, age 10 on the day of the massacre, was in Classroom 112 where he and other students were shot.  G.M. was shot in his right leg.

5.      **Corina Camacho** is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. Ms. Camacho is the legal and biological mother of G.M. and sues individually and on behalf of her son, G.M.

6.      **G.R.** is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided with her legal and biological mother, Tanisha Rodriquez in Uvalde, Texas.  G.M., a female, was age 9 on the day of massacre when the gunman entered the school campus, shooting near her where she was playing on the playground before G.R. was rushed inside.  The gunman entered the school, killing her friends and teachers.

7.      **Tanisha Rodriguez** is a resident of the State of Texas, and during the time of the

events giving rise to the lawsuit, resided in Uvalde, Texas. Ms. Rodriquez is the legal and

biological mother of G.R. and sues individually and on behalf of her daughter, G.R.

8.      **D.J.** is a resident of the state of Texas and during the time of the events giving

rise to the lawsuit, resided with his legal and biological mother Selena Sanchez.  D.J., a male,

was age 8 on the day of massacre, when he saw the gunman shooting towards the school as he

passed between buildings running for cover.  The gunman entered the school killing his friends

and teachers.

9.      **Selena Sanchez** is a resident of the State of Texas, and during the time of the

events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Sanchez is the legal and biological

mother of D.J. and sues individually and on behalf of her son, D.J.

10.     **The Uvalde Consolidated Independent School District (the "School District")**

is a public school district in Uvalde, Texas. Robb Elementary is within the School District. The

School District was, at all relevant times, responsible for the care, safety, management, and

security of all students, teachers, staff, campuses, and public-school business within its

jurisdiction, including Robb Elementary. The School District acted or failed to act, at all relevant

times, through its employees, agents, and/or chief policymakers, and is liable for such actions

and/or failure to act. The Uvalde Consolidated Independent School District Police Department

("UCISD PD") is an agency of the School District.  The School District is charged by law with

the administration and operation of UCISD PD, including the employment, control, supervision,

discipline, training, and practices of UCISD PD's personnel and employees, and with the

formulation of its policies, practices, and customs. The School District is legally responsible for

the acts and omissions of UCISD PD. The School District and UCISD PD's policies, practices,

and/or customs were moving forces in causing the constitutional violations of Plaintiffs and

Plaintiffs' resulting damages.  The School District may be served with process through its

Superintendent, Dr. Hal Harrell, at 1000 N. Getty Street, Uvalde, Texas 78801.

11.     **Pedro "Pete" Arredondo ("Chief Arredondo")** is an individual residing in

Uvalde, Texas. At all relevant times, Chief Arredondo was a council member of the City of

Uvalde and the Chief of Police for the UCISD PD. Chief Arredondo as the chief policymaker for

the School District and UCISD PD acted, or failed to act, with deliberate indifference to the

constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to

Plaintiffs. Chief Arredondo is sued in both his individual and official capacities and may be

served with process at 101 Larkspur Drive, Uvalde, Texas 78801.

12.     **The City of Uvalde ("Uvalde")** is a municipality organized under the laws of the

state of Texas. The Uvalde Police Department ("Uvalde PD") is an agency of Uvalde. Uvalde is

charged by law with the administration and operation of the Uvalde PD, including the

employment, control, supervision, discipline, training, and practices of Uvalde PD's personnel

and employees, and with the formulation of its policies, practices, and customs. Uvalde is legally

responsible for the acts and omissions of the Uvalde PD. Uvalde and Uvalde PD's policies,

practices, and/or customs were moving forces in causing the constitutional violations of

Plaintiffs and Plaintiffs' resulting damages. Uvalde may be served with process through Mayor

Don McLaughlin, at 101 E. Main Street, Uvalde, Texas 78801.

13.     **Mariano Pargas** is an individual residing in Uvalde, Texas. At all relevant times,

Mariano Pargas (or "Lt. Pargas") was a lieutenant with the Uvalde PD. Lt. Pargas was the acting

Chief of Uvalde PD during the massacre, in Uvalde PD Chief Daniel Rodriquez's absence. Lt.

Pargas, as the chief policymaker for Uvalde PD acted, or failed to act, with deliberate

indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law,

and is liable to Plaintiffs.  Lt. Pargas is sued in both his individual and official capacities and can be served with process at 964 W. Main Street, Uvalde, Texas 78801.

14.  **Mandy Gutierrez** is an individual residing in Uvalde, Texas. At all relevant times, Mandy Gutierrez (or "Principal Gutierrez") was the Principal at Robb Elementary School. Principal Gutierrez was an official policymaker for the School District and the official policymaker for Robb Elementary School.  Principal Gutierrez acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. Principal Gutierrez is sued in both her individual and official capacities and can be served with process at 1000 N. Getty Street, Uvalde, Texas 78801.

15.  **Daniel Defense, LLC a/ka Daniel Defense, Inc. ("Daniel Defense")** is a limited liability company with its principal office in Black Creek, Georgia.  At all relevant times, Daniel Defense was engaged in the business of researching, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising guns, including AR-15 style semi-automatic rifles, for use by untrained civilians and young adults. Daniel Defense may be served with process by serving its registered agent, Marvin C. Daniel, at 101 Warfighter Way, Black Creek, Georgia 31308.

16.  **Oasis Outback, LLC ("Oasis")** is a Texas limited liability company with its principal office in Uvalde, Texas.  Oasis Outback is a firearms dealer in the business of selling guns, including AR-15 style semi-automatic rifles, to untrained civilians and young adults in Uvalde, Texas.  Oasis Outback served as the local gun dealer for Daniel Defense to complete the sale of guns and ammunition to the Uvalde school shooter. Oasis Outback may be served with process by serving its registered agent and chief executive officer, William R. Klein, at 236 East Nopal Street, Uvalde, Texas 78801.

17.     **Firequest International, Inc. ("Firequest")** is an Arkansas corporation with its principal place of business in El Dorado, Arkansas. Firequest is an online retailer and supplier of shooting equipment, firearm parts, and firearm accessories. Firequest designed, manufactured, marketed, and sold an accessory trigger system, HellFire Gen 2, that is used to convert a semiautomatic rifle into the equivalent of a machine gun. Firequest is in the business of seeling accessory trigger systems like the Hell-Fire Gen 2 trigger system, to untrained civilians, young adults, and minors in Uvalde, Texas. The Hell-Fire Gen 2 trigger system is nearly identical to illegal bump stocks and allows a rifle to fire at a rate like a fully automatic weapon. Firequest designed, manufactured, marketed, and sold the Hell-Fire Gen 2 trigger system to the Uvalde school shooter. Daniel Defense, Oasis Outback, and Firequest, are collectively referred to in this Complaint as the "Gun Defendants." Firequest may be served with process by serving its registered agent, Lisa McCuistion, at 505 East 5th Street, El Dorado, Arkansas, 71730.

18.     **Motorola Solutions, Inc. ("Motorola")** is a Delaware corporation with its principal office in Chicago, Illinois. Motorola is a communications technology company that develops and implements mobile, radio, and wireless communication systems, command center software, and security systems for government and commercial customers worldwide. Based on information and belief, Motorola designed and/or sold the radio communication devices used by some of the first responders during the Uvalde school shooting. Motorola may be served with process by serving its registered agent, CT Corporation System, at 208 SO Lasalle Street, Suite 814, Chicago, Illinois 60604.

19.     **Schneider Electric USA, Inc. ("Schneider")** is a Delaware corporation with its principal office in Andover, Massachusetts.  Schneider is a manufacturer of electrical distribution and control products used in commercial, industrial, and residential markets. Based on

information and belief, Schneider manufactured and/or installed the security door locking

mechanisms for the doors at Robb Elementary School, Uvalde, Texas that were breached by the

Uvalde school shooter.  Schneider may be served with process by serving its registered agent,

CSC-Lawyers Inc. Service Company, at 211 E. 7th Street, Ste. 620, Austin, Texas 78701-3218

or its Vice-President, Robert Murray, at 70 Mechanic Street, Foxboro, Massachusetts 02053.

20.     **John Doe Company I** is a company doing business in Texas whose true identify

is presently unknown to Plaintiffs. Plaintiffs reasonably believe the School District had a contract

and/or a memorandum of understanding with a third-party vendor to assure security measures

were functioning, including but not limited to exterior and interior doors, security and

surveillance systems, and radio communications and this third party did not do so and was

negligent.  For purposes of service of process, such address is presently unknown to Plaintiffs.

## I. GENERAL ALLEGATIONS

### A.   GUN VIOLENCE IN AMERICA

21.     The United States leads the world in the number of children injured and killed

every year by guns.  Tragically, as the number of American gun sales rise, so do deaths.

According to the Centers for Disease Control and Prevention, the rate of gun deaths of children

14 and younger rose by roughly 50 percent from the end of 2019 to the end of 2020.  In 2021,

over 1,500 children and teenagers younger than 18 were killed in homicides and accidental

shootings, compared with about 1,380 in 2020.

22.     Mass shootings are also on the rise almost doubling in the past four years. [1] In 2018 there were 336 mass shootings, 417 in 2019, 610 in 2020, and 691 in 2021. [2] After the Uvalde school shooting, the FBI released a report "Active Shooter Incidents in the United States, 2021," showing a rapid increase in public shootings in the U.S.:



There were 61 "active shooter" attacks in 2021 that killed 103 people. The 2021 total is a 52 percent increase from 2017.  Texas, Georgia, and California had the most active shooter events. [3] All except three occurred in a public setting.

23.     Of the ten most destructive mass shootings committed in the U.S. between January 2012 and the present, 70% were by male shooters between the ages of 18 and 26.[4] People of all genders aged 18 to 26 comprise only 12 percent of the U.S. population but are responsible for committing 70 percent of the mass shootings.[5] Mass shootings are mostly

---

[1] "Mass shooting" is defined as 4 or more victims shot, either injured or killed, not including the shooter. *See* Gun Violence Achieve, https://www.gunviolencearchive.org/methodology.
[2] *See* Gun Violence Archive, https://www.gunviolencearchive.org/past-tolls.
[3] Federal Bureau of Investigation, Active Shooter Incidents in the United States in 2021.
[4] Everytown for Gun Safety, July 15, 2022, *Complaint and Request for Investigation of Daniel Defense, LLC*, Federal Trade Commission, Samuel Levine, Director, Bureau of Consumer Protection.
[5] *Id.* Everytown calculated the relevant population percentage based on the 2019 data in the data set titled Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010, to July 1, 2019, and provided by the U.S. Census Bureau. https://www.census.gov/data/tables/time-series/demo/popest/2010s-national- detail.html

committed by young males. 60 of the 61 active shooters were male who acted alone.[6]



24.     AR-15 style, semi-automatic rifles, are the weapons of choice for mass shooters because these high-powered devices result in more deaths in less time.  They are an *automatic* loading weapon that fires one shot at each trigger pull.  Without modifications, an AR-15 style rifle can fire about 60 rounds a minute, which is up to *three times* faster than regular weapons. Because of the speed, rapid fire, and velocity of this weapon, ammunition can hit the victim, quickly tear through limbs and organs, and explode leaving the victim little chance of survival. What makes these weapons even more deadly is the high-capacity ammunition magazine capability.  30-round magazines are standard, but ammunition magazines or drums holding up to 100 rounds can be added in seconds. If that is still not enough power, a trigger system can be added for under $50.00 to convert the weapon into a machine gun.

25.     The Uvalde school shooter used 30-round magazines and had 60 more on him. He also used a Hell-Fire trigger system to add more speed and power without the hassle of manual trigger pulls. Texas does not restrict high-capacity magazines, nor does it limit the

---

[6]  Federal Bureau of Investigation, Active Shooter Incidents in the United States in 2021, at 17.

number of rounds or size of magazines a gun owner can carry and use in public.  The trigger system the shooter bought was also legal.

26.     Between 2009 and 2022, the six deadliest mass shootings in the U.S. all involved the use of assault weapons and/or high-capacity magazines: Las Vegas (58), Orlando (49), Newtown (27), Sutherland Springs (26), El Paso (23), and Uvalde (21). Assault weapons with high-capacity magazines are disproportionately used in public mass shootings. Of the shootings with known weapon type, 76 percent of those that involved an assault weapon and/or high-capacity magazine occurred in public compared to 44 percent of those that involved a handgun.[7]

27.     AR-15 style, semi-automatic rifles, were banned in the U.S. from 1994-2004. The Public Safety and Recreational Firearms Use Protection Act or Federal Assault Weapons Ban ("AWB"), a subsection of the Violent Crime Control and Law Enforcement Act of 1994, was a U.S. federal law that prohibited the manufacture of certain semi-automatic weapons, defined as "assault weapons," and certain large capacity ammunition magazines for civilian use. The 10-year ban was passed by Congress on August 25, 1994, and signed into law by President Bill Clinton on September 13, 1994.[8] The AWB ban applied only to weapons manufactured after the ban's enactment. It expired on September 13, 2004, under its sunset provision. Constitutional challenges were filed against provisions of the ban, but all were rejected by the courts.

28.     The AWB prohibited the manufacture of 19 specific assault weapons and any semi-automatic rifle, pistol, or shotgun capable of accepting a detachable magazine with two or more features considered characteristic of such weapons, such as telescoping or folding stocks, pistol grips, flash suppressors, grenade launchers, and bayonet lugs. The AWB also prohibited

---

[7] Everytown Research & Policy, Mass Shooting in America (as of August 15, 2022), https://everytownresearch.org/maps/mass-shootings-in-america/
[8] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (codified as amended in scattered sections of 18 U.S.C. and 42 U.S.C.).

possession of newly manufactured magazines holding over ten rounds of ammunition.  On the day of the Uvalde school shooting, there was no federal ban on semi-automatic weapons or high-capacity magazines.

29.     The AWB ban has been criticized as ineffective and rife with exceptions and loopholes.  But studies show mass shootings went down during the ban, then rose after the ban expired in 2004.  In a study led by Charles DiMaggio, Ph.D., an injury epidemiologist at New York University, assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8-88.9) in 44 mass-shooting incidents.[9]  Mass-shooting fatalities were 70 percent less likely to occur during the federal ban period.[10]

30.     The State of Texas has some of the most lenient gun laws. Young adults, 18 years and older, can purchase AR-style, semi-automatic rifles, with ease in Texas and can freely carry them unconcealed in public.  No license, training, waiting period, or safety course is required.  Governor Greg Abbott described Texas as having "the strongest Second Amendment legislation in Texas history."

**B.   MOST SCHOOL SHOOTERS ARE YOUNG ADULT MALES**

31.     The studies confirm school mass shooters are commonly young adult males, age 18-21.[11] Not surprisingly, this aligns with the biological development process of the young adult brain.  The brain of a young adult, age 18 to mid-twenties, is not yet matured and has less capacity for rational, reasoned, and thoughtful judgment than a mature brain. Young adults with a still developing brain lack impulse, emotional, and self-control and are more likely to engage in

---

[9] Charles Dimaggio, et al., *Changes in US mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data*, 86 J. of Trauma and Acute Care Surg. 11-19 (2019).
[10] *Id.*
[11] Joshua Brown, et al., *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States*, 1982-2018, 108 Am. J. of Public Health 1385-1387 (2018).

risky behaviors, random violence, and hasty, mindless decision-making. Due to the ongoing changes in the brain, along with physical, emotional, and social changes of adolescence, young adults are more vulnerable to stress, emotional outbursts, emotional instability, and mental health problems. The brain does not reach full development until a person is in their mid to late 20s.[12] It is reckless to expect that the still developing brain of a young adult civilian has the capacity and maturity to responsibly handle lethal weapons, high-capacity magazines and systems to convert a rifle to a machine gun outside the confines of a military or other structured setting where the person is educated, trained and supervised.

32.     Nevertheless, and despite these biological and developmental medical facts, gun makers and sellers aggressively market directly to young adults and do everything they can to attract their attention through advertising, even going so far as using youth culture icons such as Star Wars, Fortnite, and Call of Duty in their marketing.  Gun makers and sellers deliberately push their lethal weapons into the hands of unpredictable, emotional, and volatile young adult civilians knowing that it is needlessly reckless, absurd, and dangerous to the public. Gun makers and sellers understand their market audience, research their targets' preferences, activities, and characteristics, and are keenly aware of the vulnerabilities and emotional variability of the young adult minds they target.

## C.   ONSET OF MENTAL ILLNESS IN YOUNG ADULTS

33.     Adolescence and young adulthood are also when symptoms of psychiatric illness first appear and begin to manifest. It may take years before a diagnosis is confirmed as symptoms may be dismissed as part of adolescence and teen mood instability.  Symptoms of isolation, anger, agitation, sadness, volatility, paranoia, and changes in appearance and dress may

---

[12] *The Teen Brain, 7 Things to Know*. The National Institute of Health, www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know.

be brushed off as "finding one's way" rather than considered the onset of mental illness requiring treatment.  A serious mental pathology can be missed right when the young person is of age to buy a semi-automatic deadly weapon.  A background check does not solve this problem.

34.     In many instances, mental illness is not known before age 25, while the average age of school shooters is 18-21.[13]  In the first large scale study on the onset of psychiatric illness, researchers found that the global onset of the first mental disorder occurs before age 14 (in one-third of individuals), age 18 in almost half (48.4%), and before age 25 in half (62.5%).[14]  The 18-year old Uvalde school shooter displayed symptoms of mental disturbance, violence, and had a history of domestic issues, but had no barriers to buy a lethal assault weapon from the Gun Defendants. The Gun Defendants are aware of the characteristics of its young consumers, yet they consciously choose to market directly to this population at this critical time of developmental and maturation.  There is no utility other than profit to do so.

35.     Gun makers have made more than $1 billion from the sale of AR-15 style, semi-automatic weapons in the last decade.  Daniel Defense's revenue from AR-15 style rifles tripled from $40 million in 2019 to over $120 million in 2021.[15]  Its CEO publicly acknowledged the huge profit increases flowing from mass shooting events. As mass shootings double, so do the gun industry's profits.  None of the profits are allocated to the victims of their reckless business and marketing practices.

---

[13] *Id.*
[14] Solmi M, Radua J, Olivola M, Croce E, Soardo L, Salazar de Pablo G, Il Shin J, Kirkbride JB, Jones P, Kim JH, Kim JY, Carvalho AF, Seeman MV, Correll CU, Fusar-Poli P. Age at onset of mental disorders worldwide: large-scale meta-analysis of 192 epidemiological studies. Mol Psychiatry. 2022 Jan;27(1):281-295. doi: 10.1038/s41380-021-01161-7. Epub 2021 Jun 2. PMID: 34079068; PMCID: PMC8960395.
[15] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 2 (July 27, 2022).

### D.   TEXAS SCHOOL AND FIREARMS SAFETY ACTION PLAN

36.     On May 30, 2018, in response to the Santa Fe High School shooting by a 17-year old in Texas, Governor Abbott issued a *School And Firearm Safety Action Plan* addressing the need for a multitude of seemingly preventative measures that included:  increased law enforcement presence at schools, increased funding for active shooter response training, and "school hardening" including security systems, controlled access to campus buildings, and active shooter alarms.[16]  More than $110 million dollars was given to school districts to help schools implement the identified solutions.[17]

37.     The Uvalde School District benefited from these measures and received funding to update their policies, police training, and equipment.  As discussed, *infra*, however, the Uvalde School District took the money but did little to prophylactically protect the students and teachers.  The Uvalde school shooter entered Robb Elementary through unlocked campus doors. The School District was aware of the shooter's presence on campus before he entered but failed to activate a campus-wide alert leaving news of the shooter and "lock down" order to travel inconsistently by word of mouth.  The School District's intercom system was available but not used Principal Mandy Gutierrez. The shooter was free to shoot children and teachers for more than an hour and with school and local police just feet away.

### II. STATEMENT OF FACTS

### A.   UVALDE, TEXAS

38.     Uvalde, Texas is a small rural community located 80 miles from the Mexican border. Uvalde has approximately 25,000 residents, a majority of whom are Latino.[18]  It is a tight

---

[16] *School and Firearm Safety Action Plan* (May 18, 2018)
[17] https://www.bizjournals.com/houston/news/2018/05/30/texas-governor-unveils-plan-to-prevent-school.html
[18]  United States Census Bureau, https://www.census.gov/quickfacts/uvaldecountytexas.

knit, friendly community where everyone knows everyone. Uvalde is a young community with an average resident age of 31.9.[19]  The Uvalde residents are hard-working people that still believe in a sense of community and helping others.

39.     The Uvalde School District covers nine campuses, including Robb Elementary, which educates students grades second through fourth. Mandy Gutierrez was appointed the principal of Robb beginning with the 2021-2022 school year.  She has since been re-assigned. In 2018, the School District established its own police department, the UCISD PD, headquartered at Uvalde High School. With nine schools and a budget for only six police officers, the School District oversees more schools than it has officers.  No officer was specifically assigned to Robb Elementary.[20] Instead, officers would regularly visit the Robb campus for a walk-through several times per week, usually lasting from 15–45 minutes.[21]  There were no School District law enforcement officers at Robb the morning of May 24, 2022.

## B.    THE PLAINTIFFS, CHILDREN SURVIVORS

40.     The day of the massacre, G.M. was nine years old and in the fourth grade at Robb Elementary.  He was in Eva Mireles' and Irma Garcia's class in Room 112.  That morning, G.M. attended the end of year awards ceremony with his class.  When the awards ceremony was over, G.M. and his classmates went back to their classroom for free time.  Children were reading,

---

[19]  https://www.texas-demographics.com/uvalde-demographics

[20]  H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 13 (Tex. 2022).

[21]  Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022) (couple times per week, approximately 15 minutes per visit); *see also* Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022) (usually took 30-45 minutes to walk Robb Elementary); Committee testimony of Jaime Perez, Robb

Elementary head custodian (June 16, 2022) (about once per day, usually for less than an hour unless dealing with a problem); Committee testimony of Kenneth Mueller (June 16, 2022) (officers would float, visiting all elementary-school campuses). Uvalde CISD police officer Ruby Gonzalez described how she and her colleagues would rotate shifts based at the high school. The 7:00 a.m.–4:00 p.m. shift would begin with traffic control and watching the courtyard at the high school, followed by rounds to check in at other campuses, walk halls, and check doors. Similarly, the officer working the 9:00 a.m.–6:00 p.m. shift would visit various campuses in the afternoon. Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

playing, and drawing on the chalkboard when the shooter entered the school, walked down the hallway, and fired hundreds of rounds into the classroom.  Both of his teachers were killed.  His best friend was killed.  G.M. was shot in his right leg.

41.     After receiving a call from her mother about the shooter, G.M.'s. mother, Corina Camacho, returned to the school with her partner, Michael Martinez, to get G.M.  It was chaos, parents were panicked, restrained, and told by police they could not go into the school to save their children. Parents were told the shooter was detained but later learned he was not and was in G.M.'s classroom. No police had entered or taken the shooter down, and children were not allowed to leave their classrooms.

42.     Close to 1:00 p.m. as they waited terrified outside, Corina and Michael saw G.M. come out, bloodied, and being taken to a school bus.  They rushed to the bus and yelled to G.M. to go to the back of the bus, roll down the window, and climb out.  Michael Martinez grabbed G.M. and they rushed him to the hospital to treat his gunshot wound.

43.     G.M. told his parents the name of every classmate killed, including his best friend. He visited the memorials of his friends at the Uvalde town square and at Robb Elementary. Prior to the shooting, G.M. told his best friend's mother he would always protect his best friend.  Tearfully, he told her after, he was sorry he couldn't.

44.     G.R. was nine years old and in the fourth grade.  She was playing on the playground at the back of the school when the gunman fired shots towards the school. Frightened, she ran into Ms. Davis' classroom and hid with other children while the shooting continued all around her. Eventually, the U.S. Border Patrol officers came to the classroom and escorted the class to a nearby carwash where the students were checked for injuries and then escorted to the civic center.

45.     D.J. was eight years old and in the second grade.  D.J. was walking from the school gym to the nurse.  While in the breezeway, he saw the gunman shooting towards the classrooms.  Terrified, he ran to the nurse's station next to the principal's office, then ran to Ms. Robin's classroom. The students hid while the shooting continued all around them.  Eventually, the class was rescued by law enforcement and taken to school buses outside the school.

C.   **THE GUN MAKER – DANIEL DEFENSE**

46.     Daniel Defense is a Georgia-based gun manufacturer who proudly markets itself as a military weapons dealer located at 101 Warfighter Way, Black Creek, Georgia.  Daniel Defense researches, develops, designs, manufactures, markets, and sells semi-automatic weapons, including AR-15 style rifles, for use and possession by civilians and young adults.

47.     Daniel Defense makes millions off the sale of assault weapons but does not track death, dangers, or crimes resulting from use of their guns and does not educate consumers of the dangers of use by young adults.  Daniel Defense made $528 million from AR-15 style rifle sales from 2012 to 2021.[22]

1.   **DANIEL DEFENSE AGRESSIVELY MARKETS TO UNTRAINED CIVILLIANS AND YOUNG ADULTS**

48.     Although 90 percent of its sales are to civilians, Daniel Defense aggressively markets itself as a military weapons dealer misleading consumers into believing they are buying military sponsored weapons.  Daniel Defense promotes its AR-15 style rifles as the same used by the U.S. military leading potential buyers, including young adults and untrained civilians, to believe they will be standing in the shoes of a powerful, fierce, and dangerous U.S. military soldier when using their products. Daniel Defense's advertising imagery depicts combat scenes

---

[22] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 6 (July 27, 2022).

with soldiers carrying its guns.

 

49.     But Daniel Defense's marketing is built on deception, bait, and hook. Its guns share similar characteristics to the military assault rifle, M-16, and both designs feature exceptional muzzle velocity, the ability to accommodate large-capacity magazines, and effective rapid fire.  The significant difference is the M-16 design was not developed for civilian mass shootings and certainly not intended to be used freely by untrained and unstable young adult civilians.  Daniel Defense's guns are accessible to civilian consumers unlicensed, untrained, and as young as 18 years old, and Daniel Defense targets this consumer directly.

50.     Daniel Defense's marketing images are a rouse.  They depict men in combat gear on active battlefields telling the purchaser that is what buying this weapon will bring.  The purchaser's fantasy, which may be only in online games, can come to life with Daniel Defense's guns, which Daniel Defense promises have been "tested, proven, and chosen" by the U.S. military.  Daniel Defense intentionally misleads consumers in a fantasy scheme engineered for maximum profit at the expense of American lives.

51.     Daniel Defense is known in the industry for its brazen and provocative marketing.



It uses fast-moving, high-quality videos drowning in electronic music, featuring gun-toting young adults and allusions to popular video games and movies such as Star Wars. Daily social media posts are littered with emojis promoting "Sunday Gunday," normalizing "kitchen Daniels," and promoting "not your grandpa's bolt gun."  Daniel Defense promises young adults' power and glamour when using its guns couple with the force and prestige of military grade lethality.

52.     Daniel Defense specifically targets young children not of age to purchase its guns. Much of its heavy social media marketing is on Instagram and Twitter, which are popular with youth.  Daniel Defense does not limit or age-restrict access to any of its marketing and freely allows all ages to take in its violence-based content.

53.     Daniel Defense even offers financing deals to purchasers, like young adults, who cannot afford to wait.  A purchaser can buy an assault weapon from Daniel Defense through a "buy now, pay later" program allowing the purchaser to have the gun right away.   Daniel Defense will finance murder, which is especially convenient for young adults who cannot afford

the weapons or cannot afford to wait to save up the money.

54.     Daniel Defense promotes its weapons with images of children.  Days before the

Uvalde school massacre, Daniel Defense tweeted a picture of a toddler holding a rifle captioned

with a biblical quote from the Book of Proverbs: "Train up a child in the way he should go, and

when he is old, he will not depart from it."



55.     Daniel Defense admits 90 percent of its purchasers are consumers that are not

military trained.  In other words, Daniel Defense knows the consumers buying its military style

lethal weapons are not competent to responsibly use their guns.

56.     Daniel Defense admits children should not handle or use their guns:

Store your firearm and ammunition securely locked in separate locations out of the reach and sight of children. (Children are naturally curious and do not always believe or understand the real danger and responsibilities of firearms.)

Daniel Defense admits untrained consumers they market and sell to should not use their guns:

⚠ **CLEANING AND STORAGE CAUTIONS**
1. **ALWAYS** make sure your firearm is completely UNLOADED before you attempt to clean or store your firearm.
2. **ALWAYS** store your firearm and ammunition SEPARATELY and SECURELY out of reach of anyone who should not have access to them.
   a. Keep it out of reach of children and others who are not trained in the safe handling of firearms.
   b. Keep firearms and ammunition locked securely when not in use to prevent them entering the wrong hands.

## 2.  DANIEL DEFENSE KNOW THEIR WEAPONS ARE USED BY CIVILIANS IN MASS SHOOTINGS.

57.     AR-15 style, assault weapons with their rapid-fire large ammunition capacity, are the weapon of choice for mass shootings. Four of Daniel Defense's semi-automatic rifles were part of the arsenal of firearms used by the shooter that killed 60 people in Las Vegas in 2017. Smith & Wesson's assault weapons also purchased by the Uvalde school shooter have been used in some of the worst mass shootings in U.S. history including:

a.   2022 Fourth of July shooting in Highland Park, Illinois where Robert E. Crimo III, age 21, murdered 7 people using a Smith & Wesson M&P15 he purchased online.[23]

b.   2018 Stoneman Douglas High School shooting in Parkland, Florida where Nikolas Cruz, age 19, murdered 17 people.  All victims were shot in under four minutes.

c.   2015 San Bernardino, California shooting where terrorists murdered 14 people using AR-15 style rifles, including a Smith & Wesson M&P15. [24]

d.   2012 Aurora, Colorado theater shooting where James Holmes, age 25, murdered 12

---

[23] *Highland Park Suspect Robert Crimo Bought Rifle Used in Attack Online*, New York Post (July 6, 2022); *Illinois State Police Director Defends Decision to Give Suspected Highland Park Killer a Gun Permit in 2020*, Chicago Sun Times (July 6, 2022);
[24] *Guns Used in San Bernardino Shooting Were Purchased Legally from Dealers*, Washington Post (Dec. 3, 2015); *Florida Gunman Had Extra Ammo at School, Fired for 3 Minutes*, Associated Press (Feb. 15, 2018).

people using several guns including a Smith & Wesson M&P15, with a 100-round drum.[25]

### 3. DANIEL DEFENSE DELIBERATELY STAYS IGNORANT OF THE HUMAN HARMS AND LOSSES RESULTING FROM ITS RECKLESS MARKETING PRACTICES.

58.     Daniel Defense knows their assault weapons land in the hands of mass shooters but deliberately stay ignorant to the number of killings and crimes caused by their weapons and direct marketing to vulnerable and/or young adult consumers. Daniel Defense chooses not to do any studies evaluating the effects of their marketing strategies on the health and well-being of Americans and chose not to look at the cost to families and communities like Uvalde, Texas. Gun makers mistakenly believe they have blanket immunity against civil lawsuits under PLCAA,[26] discussed *infra*, and have no incentive to promote or implement reasonable gun marketing.

59.     Daniel Defense's CEO and founder, Marty Daniel makes no apologies for his company's place in the marketplace and the benefits he gains off tragedy and mass shootings. Mr. Daniel proudly told Forbes Magazine in 2017 that its sales went up after the mass shooting at Sandy Hook Elementary in 2012. Like the Uvalde school shooter, the Sandy Hook shooter was a young adult, 20 years old.  Marty Daniel contributes substantiality to the campaigns of politicians who will ensure its assault weapons remain accessible to young adults like the Uvalde school shooter.  Unlike other product manufacturers, the Gun Defendants are consciously indifferent to the human harms and losses caused by their intentional sales and marketing practices.

---

[25] *Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol,* The New York Times (July 23, 2012).
[26] Protection of Lawful Commerce in Arms Act, 15 U.S.C. 7902 *et seq.*

60.     Daniel Defense could try to reduce the number of semi-automatic weapons and AR-15 style rifles sold to civilians and young adults but chooses not to.  Daniel Defense could stop marketing to and glamorizing guns to children and young adults and enact more prudent merchandising and marketing policies but chooses not to.  Daniel Defense could provide educational marketing to the public on why young adults should not buy its weapons but chooses not to.  It could analyze the crime and death caused by its weapons and their role in mass shootings but chooses not to.

61.     Daniel Defense knows marketing to children and young adults is not in the public interest and increases the risk of death to Americans and children.  Daniel Defense knows that doing so leads to mass shootings using their weapons.  Daniel Defense makes millions off the sale of assault weapons especially after a mass shooting. Daniel Defense consciously chooses profits over the safety and lives of Americans. In the years before the Uvalde school massacre, the Daniel Defense did nothing to curtail the marketing and sale of guns to American youth.  Its business practices are reckless, deliberate, intentional, and needlessly endanger American children.



PLAINTIFFS' ORIGINAL COMPLAINT

62.     Daniel Defense knows AR-15 style, semi-automatic rifles are unsuited for home defense, recreation, or casual use and possession. The origin of the AR-15 is the military M-16, specifically designed to kill multiple people fast.  Daniel Defense knows its strategy of marketing directly to youth enables untrained civilians as young as 18 years old the power and ability to inflict unparalleled human carnage on unarmed and unprotected civilians and children. The Uvalde school shooter seamlessly bought the AR-15 style rifle directly from Daniel Defense via its eCommerce website and had it shipped directly to Uvalde, Texas. Daniel Defense has done nothing to protect Americans against their reckless marketing and business practices.

D.   **THE YOUNG UVALDE SCHOOL SHOOTER**

63.     The Uvalde school shooter was 18 years old on the day of the massacre. Days after his 18th birthday, he bought 2 AR-15 style, semiautomatic rifles, 60 30-round magazines, and over 2,000 rounds of ammunition. He collected tactical gear and ammunition well before his birthday but could not purchase the firearms legally. According to friends and family, he had no firearm experience and had never shot a gun until the massacre.

64.     On May 17, 2022, the day after his birthday, the gunman purchased a Smith & Wesson M&P15, AR-15 style, semi-automatic rifle, from Oasis Outback in Uvalde, Texas. Oasis Outback is a local sporting goods store that also serves as a local firearms dealer to complete online purchases made directly from gun manufacturers.

65.     On May 17, 2022, the gunman bought 1,740 rounds of 5.56mm 75 grain boat tail hollow points for $1,761.50 shipped directly to his house.

66.     On May 18, 2022, the gunman returned to Oasis Outback to buy 375 rounds of 5.56 caliber ammunition.

67.     On May 20, 2022, the gunman returned to Oasis Outback to pick up another

weapon, an AR-15 style semi-automatic rifle, DDM4 V7, which he bought directly online from Daniel Defense for $2,054.28. The gun had a 16-inch barrel and total gun length of 32 ¼" – 35 7/8".



68.      Oasis Outback knew, or should have known, the gunman was suspicious and dangerous. Oasis Outback's owner talked to the gunman and asked him how he could afford $3,000 of guns and ammunition. The owner noticed the gunman was always alone and quiet, all warning signs of a mass shooter. Conveniently, after the shooting, the store owner now claims the gunman did not seem suspicious or raise any "red flags." However, store witnesses who saw the gunman at Oasis Outback buying expensive AR-15 style weapons and large amounts of hollow point ammunition told the FBI the gunman was "very nervous looking" and "appeared odd and looked like one of those school shooters." Another witness described the gunman's all black clothing as simply giving off "bad vibes." [27]

69.      The Uvalde school shooters background check was clean, and Oasis Outback sold him the guns and ammunition knowing he was suspicious and likely dangerous. The store owner and his staff did not act on their suspicions and block the purchases or notify law enforcement. The shooter was able to assemble a lethal military-grade assault weapon with a 30-round

---

[27] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 36 (Tex. 2022).

capacity magazine capable of pulverizing many people within minutes with no oversight, licensure, experience, or training.

70.     The shooter had a history of mental and behavioral problems and would cut up his face with knives for fun.[28]  Uvalde PD was called multiple times due to conflicts between the gunman and his mother.[29]  He would drive around with another friend at night to shoot at random people with a BB gun or egg their cars.[30]  He wore all black, had long black hair and wore large military boots.[31]  The shooter once commented to a friend he wanted to join the Marines to kill people.[32]

71.     The shooter used Yubo and Instagram to send sexually aggressive comments, and threats of kidnap, rape, and death.[33]  Multiple teens reported the violent threats made by the account alleged to be the shooter, but nothing ever came of it.[34]  In one chatroom, the shooter bragged about buying his guns and then said that "girls deserved to get raped."  In late 2021, the shooter ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn on the day of the Robb massacre.[35]  He asked friends and family members to buy guns for him since he was underage.[36]

72.     Beginning in February 2022 while still underage, the shooter bought firearms

---

[28] Robert Klemko et al., *Gunman bought two rifles, hundreds of rounds in days before massacre*, The Washington Post (May 25, 2022), https://www.washingtonpost.com/nation/2022/025/uvalde-texas-school-shooting-gunman/.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] Alyson Klein, *The Uvalde Shooter Posted Threats on Yubo. What to Know About the App and Others Like It*, Education Week, (June 2, 2022), https://www.edweek.org/leadership/the-uvalde-shooter-posted-threats-on-yubo-what-to-know-about-the-app-and-others-like-it/2022/06

[34] Silvia Foster Frau, Cat Zakrzewski, Drew Harwell, & Naomi Nix, *Before Massacre, Uvalde Gunman Frequently Threatened Teen Girls Online*, The Washington Post, (May 28, 2022).

[35] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 33 (Tex. 2022).

[36] *Id.* at 34.

PLAINTIFFS' ORIGINAL COMPLAINT

accessories including 60 30-round magazines, a holographic weapon sight, and a Hell-fire Gen 2 snap on trigger system.[37]  A Hellfire trigger system, nearly identical to a bump stock, allows a rifle to fire at a rate like a fully automatic weapon.  The bump stock device was banned after the 2017 Las Vegas mass shooting, but the Hellfire trigger systems is still legal.  The Hell-fire trigger system clamps to the trigger guard behind the trigger and presses a "finger" against the back of the trigger to increase the force that returns the trigger to its forward position, effectively decreasing the time required for the trigger to reset, allowing for a faster follow up shot. The Hell-Fire converts an otherwise semiautomatic firearm into a machine so the shooter can continue firing (even with one hand) without additional physical manipulation of the trigger by the shooter.  In other words, the Hell-Fire gives machine gun power to a civilian *legally.*

73.     Firequest, the manufacturer of the Hellfire Gen 2 Trigger System, states, "All you have to do is squeeze the trigger to shoot at rates up to 900 rpm," which is comparable to AR-15s with bump stocks that can fire between 450 and 900 rounds per minute.  Firequest also claims the Hellfire Gen 2 is "ATF legal and compliant" and is sold with a "certificate of legality."  In fact, Firequest knew, or should have known, that the Hellfire Gen 2 trigger system was classified as a "machine gun" under Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") regulations, and is therefore illegal.  Youtube videos linked to Firequest's website and product page for the Hellfire Gen 2 depict an AR-15 rifle with the Hellfire Gen 2 trigger system firing as a fully automatic rifle.

74.     According to Department of Public Safety Director Col. Steven C. McCraw, there was a discussion on Instagram on February 28, 2022, about Salvador Ramos being a "school

---

[37] *Id.* at 35.

PLAINTIFFS' ORIGINAL COMPLAINT

shooter."[38] Ten days before the shooting, he messaged an individual, "10 more days," to which the person responded, "are you going to shoot up a school or something?" Ramos responded, "No, stop asking dumb questions. You'll see."

75.     The shooter networked with local peers in ongoing group chats on Snapchat, and played a range of videogames, including the Call of Duty and Grand Theft Auto series, which glamorize guns and murder.  Most of his usernames and even his email address reflected themes of confrontation and revenge.  The shooter demonstrated interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online.[39]

**E.     THE UVALDE SCHOOL MASSACRE ON MAY 24, 2022**

76.     The Uvalde school shooting was one of the worst shootings in American history. Regrettably, the School District, its leaders, policymakers, and law enforcement did not prepare its schools, staff, and police for an active school shooting.  The facts below expose a culture of noncompliance with safety protocols, state-mandated school shooter training, disregard for school alerts, and deliberate indifference to the threat of criminal trespassers and school shooters leaving the children and teachers vulnerable to attack.  It should surprise no one the school doors were unlocked leaving the gunman free to enter at his leisure.  Likewise, Uvalde PD and UCISD PD displayed indifference to the requirements of their position as peace officers, safety guardians, and protectors of students and residents of Uvalde.  Like UCISD PD, the Uvalde PD was required by state law to be competent in active shooter protocol and able to execute the

---

[38] Julie Moreno, *There Were Warnings, Clues About Uvalde School Shooting from Social Media Posts, Investigators Say*, KSAT News, (May 27, 2022). https://www.ksat.com/news/local/2022/05/27/there-were-warnings-clues-about-uvalde-school-shooting-from-social-media-posts-investigators-say/

[39] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 32 (Tex. 2022)

PLAINTIFFS' ORIGINAL COMPLAINT

required kill tactics to protect innocent civilians.  Neither law enforcement agency complied with basic principles of active shooter training on May 24, 2022.

77.    The morning of May 24, 2022, the gunman sent a Facebook private message to a girl in Germany telling her he shot his grandmother in the head and would shoot up the elementary school.



78.    He shot his grandmother in the face, stole her vehicle, and drove to nearby Robb Elementary.  The gunman's grandmother called the Uvalde PD.

79.    At 11:27 a.m., Robb teacher, Emilia "Amy" Marin exited the school building via an exterior door in the west hall to retrieve food for a school party leaving the door propped open with a rock. The School District and its leaders allowed staff to prop open doors for their convenience, in violation of its own safety protocols.

80.    At 11:28 a.m., the gunman crashed his grandmother's truck into a dry ditch near

the school. Two people from nearby Hillcrest Memorial Funeral Home approached the crash

scene at 11:29:02 a.m. and ran when the gunman shot at them with a rifle.  The witnesses called

911.



81.     At 11:29:40 a.m., teacher Emilia Marin returned through the school's west entry

exterior door kicking the rock from the door she propped open, then pulled it shut while she

continued to look out of the exterior door as she frantically spoke on her cell phone.[40]  Ms. Marin

attempted to enter a door on the south side of the west hallway only to find it locked.[41] She

knocked on the door, and it was eventually answered by another female, whom she advised of

the emergency.[42]  They moved into classrooms to secure their students.[43]  The door is a security

door supposed to lock automatically when closed.  According to School District Board of

Trustees meeting minutes, the doors were made and/or installed by Schneider Electric USA,

---

[40] Robb Elementary School Attack Response Assessment and Recommendations, June 30, 2022 ("ALERRT Report"); *see also* H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 2022) ("The surveillance camera inside the west building recorded that someone had propped open the west door with a rock earlier on May 24. *See* Robb Elementary surveillance video. Apparently in response to the lockdown alert, a teacher came into the hallway and removed the rock. *Id.* When the gunman arrived, the door was not propped open by a rock—but because the door was unlocked, he was still able to open the door and enter the building.")
[41] *Id.*
[42] *Id.*
[43] *Id.*

Inc.[44]

82.     At 11:30:14 a.m., the gunman, wearing dark clothing and carrying a bag, left the crash scene and climbed a five-foot chain-link fence onto the school property and walked across the open grounds between the fence and the teachers' parking lot towards the school buildings on the west side of the school campus.



83.     Robb Elementary Coach Yvette Silva was outdoors with a group of third graders, and she spotted the gunman's backpack being tossed over the school fence followed by a person dressed in black climbing over it. She then saw the person raise a gun and shoot. Coach Silva thought the gunman was shooting at her, and she ran from the field toward her classroom. She used her school radio to report: "Coach Silva to office, somebody jumped over the fence and he's shooting." She ran toward a group of third graders on the school playground, including Plaintiff G.R., to tell them to lock down. She expected to hear an announcement of a lockdown, but she did not hear one right away.[45] Meanwhile, the gunman proceeded to the fourth-grade

---

[44] Plaintiffs tried on several occasions to obtain copies of the contract, invoices and repair documents from Schneider Electric USA, but Schneider refused to cooperate or respond.  The Court should not entertain motions to dismiss unless and until Plaintiffs can obtain discovery on an expedited basis from Schneider. Plaintiffs are entitled to plead their best case, and the court should not consider foreclosing any claims, if Schneider attempts to seek such foreclosure, without allowing Plaintiffs basic discovery and the ability to replead, if necessary.

[45]  Committee testimony of Coach Yvette Silva, Robb Elementary (June 16, 2022).

teachers' parking lot, continuing to fire his gun.

84.     Robb Elementary Principal, Mandy Gutierrez, was in her office when she heard Coach Silva's report over the radio. Principal Gutierrez attempted to initiate a lockdown on the Raptor application but had difficulty making the alert because of a bad wi-fi signal.[46] She did not communicate the lockdown alert over the school's intercom. Instead, she called and spoke with Chief Arredondo, who told her, "shut it down Mandy, shut it down."[47]  She told head custodian Jaime Perez to ensure that all the doors were locked. She initially locked down in her own office, but she later moved to the cafeteria.[48]

85.     At 11:31:36 a.m., the gunman is seen on video walking between cars shooting, and a Uvalde PD unit is captured arriving at the crash site.[49]  At 11:31:43, a.m. a UCISD PD officer drove through the west gate near the crash site and across the field to the south side of the building at a high rate of speed.[50] The gunman was in the parking lot, but the UCISD PD officer did not see him due to his haste. [51]

86.     At 11:31 a.m. a teacher frantically called 911 telling dispatch, "He's shooting!" Gun shots are heard in the background while the teacher, terrified, yelled repeatedly for the kids get to their classrooms.

87.     At 11:32:08 a.m. the gunman reached the west teachers' parking lot adjacent to the building and fired shots through windows into the westmost classrooms before entering the building.

---

[46] DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).
[47] *Id.*
[48] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Chief Arredondo told the Committee he had no recollection of talking to Principal Gutierrez. Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 161 (June 21, 2022).
[49] *Id.*
[50] *Id.*
[51] *Id.* at 15.

88.     At 11:33 a.m., the gunman entered the school through the back westside door that was unlocked.  The teacher who kicked the rock and shut the propped door did not check to see that it was locked allowing the gunman easy access inside the school.[52]  Video showed the gunman open and enter the school building unabated.  The exterior doors on the east and south sides of the building were also unlocked so the gunman had several options for entry.[53]

89.     Twenty-four seconds after the gunman entered the school and walked down the hallway, he shot into the classrooms spraying over 100 bullets in 2 ½ minutes killing and injuring many innocent victims.  There were no School District police inside the school.  At 11:33:24 a.m., the gunman fired rounds from the hallway toward classrooms 111 and 112.[54]  At 11:33:32 a.m., he entered classroom 111, which was unlocked.[55]  The rate of fire was initially very rapid then slowed, lasting only a few seconds.[56] The sound of children screaming was removed from video recordings released to the public.

90.     At 11:33:37 a.m., the gunman backed out of classroom 111 into the south hallway and fired shots from the hallway into classroom 112. The gunman then re-entered classroom 111 and continued the shooting spree.  The gunman fired over 100 rounds by 11:36:04 a.m., according to audio analysis.[57]

91.     Two minutes, 57 seconds after the shooting began, the first wave of law enforcement officers entered the school taking positions in the hallway north and south of classrooms 112 and 111. At 11:35:55 a.m. three Uvalde PD officers entered the school through

---

[52] ALERRT Report, at 15.
[53] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 2022).
[54] Id.
[55] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 20 22).
[56] Id.
[57] Id.

PLAINTIFFS' ORIGINAL COMPLAINT

the west exterior door into the west hallway.[58] The officers had external armor, two with concealable body armor, two rifles, and three pistols.

92.     At 11:36:00 a.m., four additional law enforcement officers arrived, including two Uvalde PD officers, a Uvalde PD SWATT team commander, and UCISD PD Chief Arredondo. Chief Arredondo was at his office at the Uvalde High School when he heard "shots fired" on the radio. He rushed to Robb Elementary at 11:36 a.m., unprepared, carrying only a Glock 22 handgun.  He had no classroom keys, radio, or protective gear.  When he got to the school, he dropped his radios near the school fence because they bothered him.[59]  He arrived with another UCISD PD officer and two Uvalde PD officers.  They had three external body armor carriers, concealable body armor, and pistols.[60]

93.     Chief Arredondo was required by the School District's active shooter plan to set up an outside command post as the on-scene commander, but he did not. He told the House Committee:

> [W]hile you're in there, you don't title yourself … .I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as … I'm talking about the command part … the people that went in, there was a big group of them outside that door. I have no idea who they were and how they walked in or anything. I kind of – I wasn't given that direction.
> ***
> you can always hope and pray that there's an incident command post outside. I just didn't have access to that. I didn't know anything about that.[61]

94.     No officer from Uvalde PD assumed the role of incident commander either, even in the face of Chief Arredondo's failure to do so.  A central command away from the immediate

---

[58] ALERRT Report, at 9.
[59] Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).
[60] *Id*.
[61] Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

PLAINTIFFS' ORIGINAL COMPLAINT

action helps coordinate the law enforcement response and centralize and evaluate information and events as they come in to ensure it gets out to key responders on the front lines, and to make decisions and course changes as things develop.  Establishing an incident commander is essential for maintaining effective command and control.

95.     Lt. Pargas, the acting Chief of Uvalde PD, told the House Committee that, it was his understanding that officers on the north side of the building understood there were victims trapped inside the classroom with the gunman.  And although nobody said it, he and the officers on the north side of the building were waiting for other personnel from Department of Public Safety or BORTAC to arrive with better equipment like rifle-rated shields.

96.     The portable radios used by UCISD PD and other law enforcement officers did not work inside the school building, and officers had to step 10 feet away from the school to receive signals. Radios used by Border Patrol agents did work but poorly.[62]

97.     Audio recordings confirm the gunman was actively firing his weapon until 11:36:04 a.m.  G.M.'s teacher, Ava Mireles, was killed in front of him. Ms. Mireles called her husband, Ruben Ruiz, a UCISD PD police officer, to tell him she was shot and dying.  At 11:36 a.m. Officer Ruiz was seen checking his phone, then a few minutes later, heard telling the other officers his wife was shot. After Ms. Mireles was shot and called her husband, her phone slipped, and a female student grabbed it and called 911.  She called several times asking them to send the police.

98.     At 11:37:00 a.m. Uvalde PD officers converged on rooms 111 and 112 led by Lt. Martinez and Sgt. Eduardo Canales but retreated when the gunman fired.[63]  UCISD PD and

---

[62] Texas House Committee testimony of Texas Department of Public Safety Director Steve McCraw (June 21, 2022).
[63] ALERRT Report, at 15.

PLAINTIFFS' ORIGINAL COMPLAINT

Uvalde PD police did not make another attempt at the gunman for more than an hour, until U.S. Border Patrol officers arrived.[64]

99.     At 11:43 a.m., Chief Arredondo called for more firepower because he had only a pistol compared to the gunman's AR-15, 30-round magazines, and bags of ammunition.  He gave orders to officers to stand down while the shooter was actively shooting teachers and students trapped in classrooms 111 and 112.  Chief Arredondo later told the public he thought the gunman was barricaded and no more children were at risk. But audio recordings confirm shooting was ongoing: 11:40:58 a.m., the gunman fired a shot, at 11:44:00 a.m., the gunman fired another shot, and at 12:21:08 p.m., the gunman fired 4 more shots.[65] During each instance, the event was active requiring an immediate action plan. Video footage show hundreds of officers standing with firearms and tactical gear, body armor, and ballistics shields, but no one acted.



100.    By 11:51:20 a.m., law enforcement from various agencies (including Uvalde PD, UCISD PD, Uvalde County Sheriff's Department, Fire Marshals, Constable Deputies, Southwest Texas Junior College Police Department, and the U.S. Border Patrol) arrived.[66]  There were

---

[64] *Id.* at 17.
[65] ALERRT Report, at 17.
[66] ALERRT Report, at 8.

approximately 376 law enforcement officers at the school.[67]  Meanwhile, terrified students and teachers trapped inside classrooms with the gunman dialed 911.

101.    At 12:03 p.m., the first 911 call came from a female child. She called back several times over the next 13 minutes, telling officials there were multiple people dead at 12:16 p.m., she called back and said there was eight to nine students alive.

102.    At 12:19 p.m., a 911 call was placed by a student in an adjoining classroom. The child hung up when another student told her to hang up. Another Robb call came in three minutes later. On this one, the sound of three gunshots can be heard. Due to lack of communication among law enforcement and Chief Arredondo's and Lt. Pargas' failure to set up a command post, Chief Arredondo, and others inside were unaware of the 911 calls.

103.    At 12:36 p.m., the initial female student caller dialed 911 again. The student was told to "stay on the line and to be quiet."  The student told the dispatcher "He shot the door," and hung up after 21 seconds.  Minutes later, the child called to plead: "Please send the police now."

104.    The next 911 calls coincide with when U.S. Border Patrol officers entered the classroom — more than an hour after the gunman's arrival on campus — and shot him.  "At 12:51 p.m., it's very loud and it sounds like officers are moving children out of the room," according to DPS Director McGraw.  "By that time, the first child was out before the call cuts off."

105.    The ALERRT June 30, 2022, report contains a timeline of events:



**Figure 8. Exigency vs Capability Timeline**

106.    From 12:21:16 p.m. until 12:34:38 p.m., Chief Arredondo discussed tactical options and considerations including snipers, windows, a master key, and how to get into the classroom with a Uvalde PD officer. They also discussed who had the keys, testing keys, the probability of the door being locked, and if kids and teachers are dying or dead.[68] When the keys arrived, Chief Arredondo tried them, on a different door, but none worked.  He never asked the school principal, just feet away, or the head custodian for the master key. He was inside

---

[68]ALERRT Report, at 9.

fumbling with keys when he should have been outside at a command post.  The House Committee investigation revealed that the door to classroom 111 was probably not locked.[69]

107.    At 12:50:03 p.m., 77 minutes after the massacre began, U.S. Border Patrol officers breached the door of Room 111 and fatally shot the gunman.[70]  The Border Patrol officers, using a ballistic shield, entered the classroom and shot and killed the gunman after local law enforcement officers, including UCISD PD and Uvalde PD officers waited outside doing nothing for nearly 50 minutes while children repeatedly called 911 pleading for help.  The gunman was standing in front of a closet in the corner of Room 111, and he fired his rifle at the stack of officers coming through the classroom door. The officers fired on the gunman killing him.

### F.    THE SCHOOL DISTRICT'S AND LAW ENFORCEMENT'S FAILURE TO FOLLOW STATE ACTIVE SHOOTER MANDATES AND THEIR OWN WRITTEN POLICIES

108.    Active shooter protocols for school shootings, developed after the 1999 Columbine massacre, require law enforcement officials responding to a school shooter to immediately target the subject, even if it means putting themselves in harm's way.  In 2019, the Texas Legislature passed House Bill 2195, effective June 14, 2019, requiring all school district police officers to complete an active shooter response training program approved by Texas Commission on Law Enforcement ("TCOLE") and for all districts to develop an active shooter plan.[71] Jon Rosenthal, Texas House of Representatives, District 135, told National Public Radio, the Uvalde School District received money from the Texas Legislature specifically for training,

---

[69] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 71 (Tex. 2022).
[70] ALERRT Report, at 11.
[71] Tex. H.B. 2195, § 1, 86th Leg., R.S. (2019) ("A school district shall include in its multihazard emergency operations plan a policy for responding to an active shooter emergency. The school district may use any available community resources in developing the policy described by this subsection."), codified as Tex. Educ. Code § 37.108.

for equipment and for updating the school's security.[72]  Rep. Rosenthal was one lawmaker who

wrote HB 2195 advocating that school police take standardized active shooter training

emphasizing confronting the shooter quickly. The UCISD PD took the course in March 2022.[73]

109.    The active shooter protocols direct officers to "isolate, distract, and neutralize:"

> Officers have three primary goals in responding to an active attack on their school. These goals are:
>
> **ISOLATE** – Drive or segregate the attacker in an area where their capacity to harm students, staff or visitors is minimized until more first responders arrive.
>
> **DISTRACT** – Engage the attacker so that they have a diminished capacity to hurt students, staff or visitors. If they are engaged with the officer(s) they will be less capable of hurting innocents. It also buys time for students, staff and visitors to implement their Avoid-Deny-Defend (ADD) strategies.
>
> **NEUTRALIZE** – Take away the attacker's capacity to harm other people. This may include the use of deadly force, disabling an attacker, or disarming an attacker and taking them into custody.

110.    Under HB 2195, Chief Arredondo was required to develop and implement an

active shooter plan.  On April 15, 2020, he and Director of Student Services, Kenneth Mueller,

prepared and adopted, "Annex 1 Active Shooter."[74] The plan recognized that "[t]he district has

primary responsibility for the health and safety of students, staff, substitute teachers, and visitors

while on district property and shall ***coordinate the law enforcement***, health, and medical

services with other first responders.[75]

111.    The School District never assumed a leadership role to establish a centralized

---

[72] Id.
[73] *Id.*
[74] *See* Uvalde Consolidated ISD, Annex 1: Active Shooter ¶ I ("The Uvalde CISD police department along with the Director of Student Services makes recommendations and creates plans to develop a safe environment and to lead the District to Mitigate, Prevent, Prepare, Respond, and Recover from potential active shooter situations.").
[75] *Id.* ¶ IV.B.4.f.

PLAINTIFFS' ORIGINAL COMPLAINT

command to coordinate the law enforcement response and active shooter tactics and protocols to stop the killing and render medical aid – protocols clearly known to them. Chief Arredondo knew, by his own written policy, excerpted above, it was his responsibility as Police Chief of the UCISD PD to take command. DPS Director, Col. Steve McGraw, told the Texas Senate on June 21, 2022: "The School District police's response was an "abject failure."[76] He confirmed: "there were enough armed officers wearing body armor to isolate, neutralize and distract the gunman. It doesn't matter what you are wearing, you go in, windows are also an option."[77] McGraw was referring to the directives of the active shooter training tactics all school and local police are required to know.

112.    Recognizing Chief Arredondo's obvious incompetence and failure to take command, the Uvalde PD was under an obligation to assume command. The active shooter protocols instruct all officers that, any law enforcement officer can assume command, somebody must assume command, and an incident commander can transfer responsibility as an incident develops. Lt. Mariano Pargas, the acting chief of Uvalde PD on the day of the massacre in Chief Daniel Rodriguez's absence, never assumed command. Uvalde PD were the first responders to arrive. The lack of effective command by all on scene law enforcement contributed to loss of life and injuries and was a moving force in causing the constitutional violations of Plaintiffs and their damages.

113.    The School District and UCISD PD's active shooter policy specifically addressed campus security and mandated that all outside and inside doors locked. Regarding securing doors, the plan required:

> Staff will conduct inspections of classrooms to make sure doors and windows can be secured …. Doors to all classrooms will remain locked during instruction and the

---

[76] Id.
[77] Id.

campuses will have one main entry point to the school. Each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.[78]

114.    The plan further required:

> Teachers are instructed to keep their classroom doors closed and locked at all times.  Barriers are not to be used.  Substitutes shall follow the same policy, with campuses ensuring they have access to the classrooms they need throughout the day.  The Standard Response Protocol are on the back of all our badges issues to substitute teachers.[79]

115.    Despite these policies written and adopted by the School District and UCISD PD, it was common for the School District to intentionally leave doors unlocked or propped opened. Teachers and others would use door stops, wedges, rocks, and magnets to prevent interior doors from latching.  Substitute teachers were told by School District officials to use the "magnet system" to circumvent the locks in violation of school security policy.[80]  It was not uncommon for regular staff not to have keys because they were lost, forgotten, or not given to them due to lack of supply.  It was customary for staff to leave doors unlocked for their convenience. The School District administrators and police tacitly condoned the staff's conduct and were aware of these unsafe practices but did not treat them as serious infractions requiring immediate correction.[81] On the morning of the massacre, *after* the School District was aware of the gunman and went on "lock down," the doors still were not checked or locked.  In fact, no one had locked any of the three exterior doors of the west building that day.[82]  This was not unusual.

---

[78] *Id*. ¶ IV.B.1.b.

[79] *Id.* ¶ IV.B.2.r.

[80] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 25-26 (Tex. 2022). Harrison, Uvalde CISD Maintenance and Operations Director (June 16, 2022). Assistant principal Shawna Wolbert, who was not present on campus during the incident, told the Department Fof Public Safety that there was a "magnet system" with magnets provided to substitutes to keep doors from locking. DPS interview of Robb Elementary Assistant Principal Shawna Wolbert (May 28, 2022). Principal Gutierrez said the same thing in her statement to DPS. DPS interview of Robb Elementary Principal Mandy Gutierrez (May 28, 2022).

[81] *Id.*

[82] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 6 (Tex. 2022).

116.    The House of Representatives, Investigative Committee's July 16, 2022, Interim Report found the door to classroom 111 was usually unlocked, and despite many knowing it was broken, was never repaired.

117.    "Room *111 could be locked, but an extra effort was required to make sure the latch engaged. Many knew Room 111's door had a faulty lock, and school district police had specifically warned the teacher about it. The problem with locking the door had been reported to school administration, yet no one placed a written work order for a repair.*"[83]

118.    Robb Principal Gutierrez confirmed during her committee testimony that school administration **knew** about the issues with classroom door 111, stating it was reported around spring break of 2022.[84]  It was known to her and among teachers and students throughout the fourth grade that Room 111's door was always unlocked.  Staff regularly entered the unlocked door to access the printer in that room.[85]  **No one** placed a work order for the door to be repaired.[86]

119.    The School District had a history of failing to protect students against trespassers. In the last year, there were incidents where the school had to shut down that school because trespassers were on school property. The school never addressed or fixed its security issues.[87]

120.    School alerts and school trespassers were not treated with urgency by the School District and its staff. Moreover, the regularity of school alerts from area "bailouts" created

---

[83] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 4 (Tex. 20 ALERRT Report, at 16.
[84] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).
[85] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022); see also interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).
[86] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).
[87] *See* Michael Martinez CNN interview. June, 2022.

lessened security vigilance.[88] Too many "cry wolves" left the leadership and staff feeling too comfortable and not ready to act in the event of a school shooter. School District administrators and the Uvalde PD initially thought the shooting was likely a "bailout" situation.[89] While "bailouts" are particular to border cities; the incidence of school shootings was common knowledge and occurring in schools across the United States. Compliance with security protocols was urgent, demanding the School District and local police to be hyper vigilant.

121.    Uvalde PD officers were also required to complete the state mandated active shooter training as part of basic training. Since the 1999 Columbine tragedy, law enforcement departments around the country recognized the urgent need that all officers be trained on school shooter protocols. All Texas Peace Officers certified since 2005 should have received basic active shooter response as part of their basic academy training.

122.    The active shooter training commands all police and first responders to put innocent lives above their own and move in and stop the killing. This is regardless of the officers' specialty or usual role. The training refers to the "Priority of Life Scale" where innocent civilians come before all others.

123.    All UCISD PD and Uvalde PD officers knew and understood that time was critical during a mass shooting, and any delay meant loss of life due to blood loss. Every second someone is bleeding, decreases their chance of survival. Medical aid must be started immediately to prevent loss of life. The average human body contains 5-6 liters of blood. Children have proportionately smaller amounts. When the body loses approximately half of its normal volume,

---

[88] "Bailouts" is a term used in border communities for the increasingly frequent occurrence of human traffickers trying to outrun the police, usually ending with the smuggler crashing the vehicle and the passengers fleeing in all directions. The frequency of these "bailout"-related alarms—around 50 of them between February and May of 2022—contributed to a diminished sense of vigilance about responding to security alerts. *See* H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 6 (Tex. 2022).

[89] The possibility of a bailout "came over my mind at some point … because they happen so often, and there's been a few that were armed." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

irreversible shock sets in and the body cannot survive regardless of the medical care it eventually receives. Time is crucial.  One teacher died on the way to the hospital, suggesting that taking down the gunman faster might have made a difference. Teacher Elisa Avila in Classroom 109 was shot by a bullet that went through the wall.[90] A pediatrician who treated the victims described small bodies "pulverized" and "decapitated." The bodies of several victims, disfigured beyond recognition, were identified by their DNA; one 10-year-old victim's body was identified based on her green Converse sneakers.[91] Chief Arredondo, his team, Lt. Pargas and Uvalde PD, knew that time is critical during a mass shooting, because of their active shooter training and written policies. Yet, law enforcement officers chose to place the lives of themselves and other officers before the lives of children.

### G.   THE GUN DEFENDANTS ARE NOT SHIELDED FROM LIABILITY BY THE PROTECTION OF LAWFUL COMMERCE IN ARMS ACT ("PLCAA").

124.    The Gun Defendants cannot abate any responsibility for this massacre and attempt to hide behind the federal law, The Protection of Lawful Commerce in Arms Act, 15 U.S.C. Sec. 7901, *et. seq.* ("PLCAA").  PLCAA is a federal law that prohibits injured parties from suing gun manufacturers or dealers for personal injuries solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.  PLCAA, however, is unconstitutional, in violation of the Tenth Amendment.

125.    Even assuming PLCAA is constitutional and applies, PLCAA is not an absolute

---

[90] *See* Texas House Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[91] Nicholas Bogel-Burroughs, An Uvalde pediatrician says he will 'never forget what I saw' after the shooting, N.Y. Times (June 8, 2022), www.nytimes.com/2022/06/08/us/uvalde-pediatrician-shooting.html;Jaclyn Diaz, The story of a Uvalde victim's green shoes captures the White House's attention, NPR (June 7, 2022), https://www.npr.org/2022/06/07/1103577387/matthew-mcconaughey-green-converse-shoes-sneakers-uvalde-maite-rodriguez.

PLAINTIFFS' ORIGINAL COMPLAINT

bar, but is an affirmative defense.   Plaintiffs' claims against the Gun Defendants are not

prohibited by PLCCA, but expressly allowed.  PLCAA allows narrow protection from some

claims, while expressly permitting other claims based upon the unlawful or negligent actions of

the gun dealer or manufacturer, or violation of a state or federal statute applicable to firearms.

126.    The Gun Defendants violated federal law by negligently entrusting their deadly

weapons to the Uvalde school shooter in violation of 15 U.S.C. § 7903(5)(B).  The Gun

Defendants supplied their lethal products to the Uvalde school shooter when they knew or should

have known the shooter was likely to, and did, use the products in a manner involving

unreasonable risk of physical injury to others.  *See.* 15 U.S.C. § 7903(5)(B).  Because the Gun

Defendants are liable under federal law (assuming PLCAA is found constitutional), they are not

entitled to dismissal.

**III. FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 VIOLATION OF FOURTEENTH AMENDMENT**
**RIGHT TO DUE PROCESS OF LAW**

***(Against the Uvalde Consolidated School District, The City of Uvalde,***
***Chief Pedro Arredondo, Lt. Mariono Pargas, and Principal Mandy Gutiérrez)***

127.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all

subsequent paragraphs.

128.    The School District, Uvalde, Chief Arredondo, Lt. Mariano Pargas, and Principal

Gutierrez are liable to Plaintiffs under the Fourteenth Amendment of the United States

Constitution for using their authority under state law to create a dangerous environment for

Plaintiffs.  The School District, Uvalde, Chief Arredondo, Lt. Mariano Pargas, and Principal

Gutierrez had policies, practices, and customs of conscious indifference to federal law, federal

and state legal mandates, and their own policies and procedures regarding school safety and

preparing their schools, staff, and police for a school shooter. Such acts and omissions rise to the

level of deliberate indifference and conscious indifference to a state-created danger, in violation of the Plaintiffs' Fourteenth Amendment rights under the United States Constitution, and for which Plaintiffs seeks recovery under 42 U.S.C. §1983.

129.    The School District, Uvalde, Chief Arredondo, Lt. Mariano Pargas, and Principal Gutierrez are liable to Plaintiffs under the Fourteenth Amendment of the United States Constitution for using their authority under state law to interfere with and prevent other law enforcement officers from intervening and responding to the active shooter at Robb Elementary. By interfering with and preventing other law enforcement officers and first responders from intervening and responding to the active shooter, School District, Uvalde, Chief Arredondo, Lt. Mariano Pargas, and Principal Gutierrez assumed a duty of care over Plaintiffs.  But in doing so, the government and individual Defendants failed to protect Plaintiffs, who were in their care and to whom they owed a duty of care.

## A.    THE SCHOOL DISTRICT'S LIABILITY UNDER 42 U.S.C. § 1983

130.    The School District is liable to Plaintiffs for constitutional violations of the Fourteenth Amendment for failing to protect Plaintiffs, whom it was under a duty to keep safe and protect.  The Fourteenth Amendment's Due Process Clause provides that no state shall deprive any person of life, liberty, or property without due process of law. U.S. Const amend., XIV, § 1.  This imposed upon the School District a duty of care to protect Plaintiffs from immediate harm, *especially* harm it created as it did on May 24, 2022.  Plaintiffs were locked down in the School District's custody and, because of the School District's affirmative acts and omissions, the Plaintiffs were imprisoned, terrorized, and shot at by the school shooter.  Plaintiffs were not free to leave, and in fact their parents were restrained outside and not allowed to get them from the School District's custody.

1.   <u>The School District Created a Danger to Plaintiffs Whom They Had in Their Custody on May 24, 2022.</u>

131.    On May 24, 2022, the School District placed the Plaintiffs in immediate danger by their own affirmative acts and omissions.  Because the School District assumed a duty of care to protect Plaintiffs by locking them in, the School District is responsible for their harm.

132.    A Robb Elementary schoolteacher exited the school through an exterior door in the west building leaving it propped open. Minutes later and only after becoming aware of the gunman, the schoolteacher kicked the rock to close the door but did not check to make sure the door was secured and locked.  No School District employee locked any of the three exterior doors of the west building that day.[92] By design, the exterior building doors manufactured and/or installed by Schneider Electric could only be locked from the outside.

133.    During this same time, Coach Silva saw the gunman outside approaching the school and alerted Principal Gutierrez.  Principal Gutierrez did not alert the teachers using the available intercom system resulting in the failure to initiate a school-wide lockdown.  Instead, she locked down in her office. Many teachers were not aware of the shooter because the shooter alert and lockdown order traveled only by word of mouth.  Video footage showed the gunman enter Robb Elementary's west building door previously propped open and head down the hallway to start the massacre at Classrooms 111 and 112.  The gunman entered Classroom 111, that was supposed to be repaired by the School District but was not.  The door was unlocked, and the teacher never received notice of the lockdown during to the failure of the alerts to travel to the teacher. Eleven children died in Classroom 111 and others were injured.

134.    The School District's affirmative acts and omissions created an immediate danger

---

[92] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 6 (Tex. 2022).

to Plaintiffs.  The School District was aware of the gunman on campus before he entered the school but failed to secure the school and its doors and protect Plaintiffs in their custody.  The School District ordered Plaintiffs, the staff and students, age 8-10, to be "locked down" in the classrooms and in doing so, assumed responsibility for their care and safety.  Plaintiffs were not free to leave. In fact, Plaintiffs' parents rushed to the school to save their children but were restrained outside by UCISD PD and Uvalde PD officers.  Some parents were handcuffed for trying to rescue their children.

135.    The School District affirmatively and knowingly created an immediate danger to Plaintiffs in their custody and control.  The School District assumed a duty of care for the Plaintiffs' safety during the shooting and failed to keep them safe.  The School District's conscious choices on May 24, 2022, were deliberately indifferent to the rights of Plaintiffs and were moving forces in causing the constitutional violations of Plaintiffs and their damages.

## 2.   <u>The School District Had a Policy, Practice, and Custom of Not Complying with its Own Security Procedures.</u>

136.    The School District had a security policy requiring that all exterior and interior classroom doors be always locked.[93]  No outside doors were to be unlocked, propped, or left open.  However, the School District, its staff, and police had an unfortunate policy, practice, and custom of noncompliance with its own school security policies.  For some teachers, the inconveniences of keeping up with a key outweighed their perception of the risk of leaving doors unlocked.[94]  For others, the regularity of school alerts from area "bailouts" created a culture of lax and lessened security vigilance. The School District, its leaders, and staff were not attentive

---

[93] Uvalde Consolidated ISD, Annex 1: Active Shooter ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times.").

[94] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 26 (Tex. 2022).

to the real possibility of a school shooter and did not enforce security policies and outright dismissed school alerts as "bailouts."

137.    The School District and its staff had a pattern and practice of circumventing security access procedures by propping opening exterior school doors as evident by the rocks and wedges on the ground outside most exterior doors after the massacre.[95]  The staff routinely propped open doors for easy access to and from the parking lot to carry things in and out of school for their convenience.  The School District even suggested circumventing the door locks as a solution for substitute teachers and others who lacked their own keys.[96]

138.    The School District knew not enforcing its school security procedures and allowing staff to circumvent security protocols would give criminals access to school buildings leaving children at risk of death.  The School District was well informed about school shootings and its obligation to comply with security and training mandates set by its regulating agencies, including the Texas Education Agency. Yet, the School District allowed its staff to leave doors unlocked, propped, and locking mechanisms disabled knowing the full consequences.

### 3.   <u>The School District Had a Policy, Practice, and Custom of Not Repairing Broken Security Doors.</u>

139.    The School District had a policy, practice, and custom of not maintaining Robb Elementary's exterior and interior security doors and ensuring they were repaired and locked correctly.  The House of Representatives, Investigative Committee's July 16, 2022, Interim Report found the door to classroom 111 was usually unlocked, and despite many knowing it was broken was never repaired.[97] After the gunman entered the exterior westside door, he walked

---

[95] ALTERRT Report, 15.
[96] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session (Tex. 2022).
[97]  H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 4 (Tex. 20  ALERRT Report, 16.

PLAINTIFFS' ORIGINAL COMPLAINT

down the hallway towards classrooms 111 and 112.  At 11:33:24 a.m., the gunman fired rounds from the hallway toward classrooms 111 and 112.[98]  At 11:33:32 a.m., he entered classroom 111 unabated where eleven children died.

140.    Robb Elementary Principal Gutierrez testified school administration **_knew_** about the issues with classroom door 111, but it was never fixed.[99]  The school's custodian never received a work order from the principal or anyone else.  If he had, he told the House Committee, he would have fixed it.[100]

141.    The School District's failure to maintain and repair its security doors was deliberately indifferent to the rights of Plaintiffs and were moving forces in causing the constitutional violations of Plaintiffs and their damages.

### 4.   The School District and Principal Gutierrez Failed to Utilize Alert Systems.

142.    The School District's failure to have a working alert system left many teachers without warning of the gunman, including the teacher of classroom 111 who did not receive notice of the lock down.[101]  After Principal Gutierrez received notice of the gunman, she tried to order a lockdown on the Raptor application, but the alert did not go through due to a bad wi-fi signal.[102]  She could have used the school's intercom system but did not. Many teachers and staff only learned of the gunman by word of mouth, and many got no warning at all.

143.    Due to the School District's equipment inadequacies and Principal Gutierrez's intentional choice to not use the available intercom system, many teachers did not receive news of the school shooter and were unable to take protective measures like securing doors.  The

---

[98]  ALERRT Report, 16.
[99]  Texas House Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).
[100]  Texas House Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).
[101]  DPS (Elizondo) interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).
[102]  DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).

School District's and Principal Gutierrez's policy, practice and custom of not implementing and using adequate alert systems that would work in the event of a campus wide emergency was deliberately indifferent to the rights of Plaintiffs and were moving forces in causing the constitutional violations of Plaintiffs and their damages.

### 5. The School District Had a Policy, Practice and Custom of Not Complying with State-Mandated Active Shooter Protocol Training.

144.    Active shooter training protocols were required by law for all local and school law enforcement.  In 2019, the Texas Legislature passed House Bill 2195, mandating active shooter training for all school district law enforcement personnel. All UCISD PD officers had to complete an active shooter response training program approved by Texas Commission on Law Enforcement ("TCOLE").[103] The mandate was urgent, and not discretionary. The School District was responsible for making certain the law enforcement officers had the resources and training required to meet its constitutional obligations to provide a safe and secure learning environment for the children and teachers of Uvalde.   The School District received funding from the State of Texas for the training, and was under an affirmative obligation to follow, implement, oversee, and enforce the state-mandated training.

145.    The School District made decisions about law enforcement resources and training policies, practices, and customs and implemented and executed them through their chief policymakers including Chief Arredondo, the Chief of the UCISD PD.  The School District was aware of the incidence of school shootings across the U.S. for the past decades through news reports, media, police training, and mandates from the Texas Education Agency educating school

---

[103] Tex. H.B. 2195, § 2, 86th Leg., R.S. (2019) ("A school district peace officer or school resource officer shall complete an active shooter response training program approved by the Texas Commission on Law Enforcement."), codified as Tex. Educ. Code § 37.0812.

districts on the urgency of school security and law enforcement training to protect students from school shooters. But due to the School District's culture of noncompliance and lackadaisical attitude, it did not enforce the training or take it seriously as shown by the police response during the shooting.

146.    The decisions and failures by the School District, Principal Gutierrez, Chief Arredondo, and his officers, expose the School District's deliberate disregard of the state-mandated active shooter training protocols.  No one from the School District police team took steps to "isolate, distract, and neutralize" the gunman or stop the killing evidencing the School District's *de facto* policy of failing to comply with the state school shooter mandates.  In an active shooter situation, there is no time for delay.  The lives of the children must be preserved first before the officers.  The School District's failure to comply with the training requirements were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

### 6.  <u>The School District's Law Enforcement Hiring and Supervision Policies and Procedures Were Constitutionally Inadequate.</u>

147.    The School District and its policy makers, including the Board of Trustees and Superintendent, were responsible for selecting, hiring, and overseeing the School District's police department and its Chief of Police.  The School District and its Board of Trustees appointed Chief Arredondo to run its police force for all the School District's schools in 2020 and put him in command of a team of six officers.  After the shooting, Chief Arredondo resigned from his city council position and was fired by the School District.

148.    As evidenced by the lack of action by Chief Arredondo and his officers, the UCISD PD was neither prepared nor competent to protect the students and staff to defend the attack of a single inexperienced 18-year-old gunman.  The lack of command and response by UCISD PD showcased their incompetence and ignorance of what their positions required, and

the courage needed to stop a gunman.  It was clear they did not understand or learn the active

shooter training protocols.  Chief Arredondo and each of the officers selected by the School

District to protect the students stood by cowardly taking no affirmative steps to stop the gunman.

The police actions evidence the School District's inadequate hiring policies and lack of

oversight. If the officer selection and oversight policies and practices had been adequate, the

School District chief and officers would not have stood by, with protective equipment and

firearms, while students and teachers were shot and terrorized.

149.    The School District's failure to hire competent law enforcement coupled with

their policies, practices, and customs of not supervising, training, and preparing them for school

shooters, amounted to deliberate indifference to the constitutional rights of Plaintiffs and were

moving forces behind and caused the constitutional violations and damages of Plaintiffs.

### 7.  The Individual Liability of Chief Arredondo's for Failure to Take Command and Execute Active Shooter Training Protocols.

150.    Chief Arredondo is individually liable in his official and individual capacities

under 42 U.S.C. § 1983 for his decisions and failures on May 24, 2022.  The Chief is not entitled

to immunity due to his deliberate indifference to the rights of Plaintiffs.

151.    As the chief of the six-person UCISD PD, Chief Arredondo oversaw safety and

security for the School District, including Robb Elementary.  He was responsible for establishing

the UCISD PD's active shooter emergency plan, coordinating the first responders' response to an

active school shooter, and making certain UCISD PD officers understood the state-mandated

active shooter training protocols and stood ready to deploy them. As chief of the UCISD PD,

Chief Arredondo was the official policymaker for the UCISD PD, who was delegated

responsibility for establishing USISD's active shooter emergency plan.

152.    Chief Arredondo was one of the first responders at Robb Elementary. His active

shooter plan appointed him the incident commander in any active shooter response. Rather than take command, he stayed inside the school hallway, failing to set up an outside command post where he could effectively provide direction and information to the first responders. He was without radios (because he dumped them outside) and was unaware of the children's 911 calls from inside the classrooms providing important information on the shooter's whereabouts and actions. He wasted precious time fumbling around for keys. He never asked the principal or head custodian on site for the master key. He never needed the keys because the doors were left unlocked.

153.    Local and School District law enforcement officers were seen standing around with firearms, body armor, and ballistic shields doing nothing while unprotected teachers and students were shot and killed for over an hour. There were at least 376 officers at the scene versus one inexperienced gunman. If Chief Arredondo had implemented the active shooter protocols and had taken command as he was required to do, as required by his own written policy, officers would not have stood down as they did. Instead, Chief Arredondo established an on-the-scene official policy of disregarding all state-mandated active shooter policies and adopted flawed policies of: (1) treating the active shooter as a "barricaded suspect"; (2) not establishing a command post; and (3) waiting for other law enforcement agencies to breach the door and gain control of the gunman. Bizarrely, Chief Arredondo told the House Committee he never thought he was the on-scene commander despite the clear written policy, *he implemented,* directing that he was.

154.    The facts and his own admission show Chief Arredondo made a deliberate choice not to execute his emergency plan ("Annex 1: Active Shooter" plan) take command or mobilize his team – the very life-saving duties he was appointed to fulfill. Chief Arredondo's decisions

contributed to the lack of a swift and effective law enforcement response that could have saved innocent lives and prevented further injuries. Chief Arredondo's decisions amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

### 8.   The Individual Liability of Principal Gutierrez for Failure to Comply with School Security Procedures.

155.    Principal Gutierrez is individually liable in her official and individual capacities under 42 U.S.C. § 1983.  Principal Gutierrez is not entitled to immunity due to her deliberate indifference to the rights of Plaintiffs.

156.    Principal Gutierrez was the Principal for Robb Elementary charged with the duty to enforce school security and active shooter protocols, and to discipline staff for any misconduct and non-compliance. Ms. Gutierrez allowed staff to leave classroom doors unlocked, propped open, and/or without the latching mechanisms engaged for the convenience of teachers and staff who did not have keys. Principal Gutierrez, as an official policymaker for the School District, was aware of the security non-compliance at Robb Elementary, ratified it, and encouraged it.

157.    Principal Gutierrez was also aware of broken security doors. She told the House Committee she was aware of Room 111's broken lock and that she never made certain it was reported to the custodian or repaired.  Because of Principal Gutierrez' deliberate indifference to school safety, the gunman entered Robb Elementary and the unlocked classroom 111.  Principal Gutierrez' failure to enforce school security procedures amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

### B.   UVALDE'S LIABILITY UNDER 42 U.S.C. § 1983

158.    Uvalde is liable to Plaintiffs for constitutional violations of the Fourteenth

Amendment for failing to protect Plaintiffs, whom it was under a duty to keep safe and protect. Uvalde is charged by law with the administration and operation of the Uvalde PD, including the employment, control, supervision, discipline, training, and practices of Uvalde PD's personnel and employees, and with the formulation of its policies, practices, and customs. Uvalde is legally responsible for the acts and omissions of the Uvalde PD. Uvalde PD is also responsible the dangers it creates due to its indifference.

159.    On May 24, 2022, due to its inadequate selection, hiring, supervision, training, and enforcement policies, practices, and/or customs, a gunman shot and killed victims at Robb Elementary without any threat from the Uvalde PD.   Uvalde PD's policies, practices, and customs were executed with deliberate indifferent to the rights of Plaintiffs and were moving forces in causing the constitutional violations of Plaintiffs and their damages.

### 1.  Uvalde PD Did Not Follow State-Mandated Active Shooter Training Protocols.

160.    Uvalde had 25 officers at Robb Elementary on May 24, 2022.  Uvalde PD were the first responders.  As they arrived at the west building, the initial responders knew there had been gunfire inside the building. They heard it as they were approaching.[104]  As the initial responders, Uvalde PD was charged with employing active shooter training protocols, including assuming the role of incident commander until command was assumed by UCISD PD. ALERRT training teaches that any law enforcement officer can assume command, that somebody must assume command, and that an incident commander can transfer responsibility as an incident develops.  Uvalde PD never assumed a command initially, or any time after it was obvious that Chief Arredondo did not.  No law enforcement assumed command until more than an hour into the shooting, when U.S. Border Patrol officers arrived.

---

[104] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 57 (Tex. 2022).

161.    Like UCISD PD, the Uvalde PD made deliberate decisions not to use active shooter training protocols. Every law enforcement officer in Texas must be trained on active shooter scenarios.[105]  The training commands that every peace officer must be willing to risk his or her life without hesitation.[106]  The Uvalde PD was expected to distract, isolate, and neutralize the shooter threat, even in tactically complex situations and when they lacked special training.[107] The Uvalde PD did not need to wait on an order.  In fact, the Uvalde PD was under an obligation to take over command due to the School District Chief's failure to lead.  While Uvalde PD did make an early attempt to breach the classroom, they retreated and never tried again. The scene remained "active" and active shooter protocol required Uvalde PD to pursue the primary goal of stopping the killing and gunman no matter how many times it takes.

## 2.    The Individual Liability of Lt. Pargas for Failure to Take Command and Execute Active Shooter Training Protocols.

162.    Lt. Mariano Pargas is individually liable under 42 U.S.C. § 1983 for his decisions and failures on May 24, 2022, and is not entitled to immunity due to his deliberate indifference to the rights of Plaintiffs.

163.    Lt. Pargas, the acting chief of Uvalde PD on the day of the massacre, never assumed command despite clear directives from active shooter training protocols to do so.  As discussed throughout this Complaint, Uvalde PD were the first responders and Lt. Pargas was required to assume initial command.  Lt. Pargas was further required to assume command after it was evident the School District did not.  Lt. Pargas assumed Chief Arredondo was in command,

---

[105] Tex. H.B. 2195, § 2, 86th Leg., R.S. (2019) ("A school district peace officer or school resource officer shall complete an active shooter response training program approved by the Texas Commission on Law Enforcement."), codified as Tex. Educ. Code § 37.0812.
[106] Federal Bureau of Investigation & ALERRT, Active Shooter Response – Level 1, at STU 1-9 (version 7.2, 2020).
[107] Id.

although he never confirmed. [108]  Uvalde PD Chief Rodriquez told Lt. Pargas by phone to establish a command post, which he attempted to do at the funeral home across the street.[109] But, because he did not stay at the command post to lead, his command post was woefully inadequate and not in accord with active shooter protocols.

164.    Lt. Pargas' failure to follow his Chief's orders and deliberate decision not to implement active shooter training protocols amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

### IV. SECOND CAUSE OF ACTION: NEGLIGENCE
### *(Against all Defendants and John Doe Company I)*

165.    Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

166.    This cause of action arises under the general laws and Constitution of the State of Texas.

167.    The School District and Uvalde is charged with executing their duties without the threat of unreasonable risk to Plaintiffs—and each, had to act reasonably to avoid, or foresee, the risk that defendants themselves, or their colleagues or subordinates, would commit the acts complained of throughout this Complaint including but not limited to: (a) failing to enforce state-mandated active shooter protocols; (b) failing to enforce security policies and procedures; (c) failing to maintain the security equipment, doors, and alert systems and (d) failing to select, hire and train competent leaders and law enforcement officers.

---

[108] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 59 (Tex. 2022).
[109] *Id.*

168.    The School District and Uvalde had a duty to act reasonably to foresee and avoid the risk that itself, its staff, or its sworn law enforcement personnel, would commit the acts complained of throughout this Complaint.

169.    The School District and Uvalde, and each of them, breached their duty of care by not acting reasonably under the circumstances of such risk, as described throughout this Complaint, and/or by impeding or otherwise curtailing the civil rights of, or endangering, without lawful basis, the Plaintiffs.

170.    The School District and Uvalde, and each of them, breached their duty of care and failed to act toward Plaintiffs as a reasonable educator, and/or law enforcement officer would in similar circumstances by failing to enforce security procedures and failing to execute lifesaving state mandated active shooter protocols.

171.    Defendant Chief Arredondo breached his duty of care and failed to act as a reasonable Chief of Police and official policymaker for the School District would in similar circumstances by failing to execute his own active shooter plan, execute active shooter protocols, and failing to take command and coordinate the first responders' response, as required for any school shooting.

172.    Defendant Lt. Pargas breached his duty of care and failed to act as a reasonable Chief of Police and official policymaker for Uvalde would in similar circumstances by failing to mobilize his officers and execute active shooter protocols, and failing to take command and coordinate the first responders' response in three instances: (1) initially as the first responders to arrive at the scene; (2) as directed by Uvalde Chief of Police, Daniel Rodríguez, who was off scene; and (3) when it was clear neither Chief Arredondo, nor any other law enforcement officer, had not taken command.

173.     Principal Gutierrez breached her duty of care and failed to act as a reasonable educator, school principal, and policymaker for Robb Elementary would in similar circumstances by failing to follow and enforce established school security procedures, maintenance protocols, state mandated active shooter protocols and failure to discipline staff for non-compliance.

174.     At all times herein relevant, defendants, and each of them, failed to follow established guidelines, rules and procedures—including their own—for the use is school shootings.

175.     At all times herein relevant, the School District and Uvalde and individual Defendants, Chief Arredondo, Lt. Pargas, and Principal Gutierrez breached their duty of care by not acting reasonably under the circumstances of such risk, as described above and throughout this Complaint, and/or by failing to discharge their respective duties to enforce state mandates; appropriately select, hire, and train their staff and law enforcement officers; investigate and discipline their staff and officers for misconduct and non-compliance with security procedures; and acting negligently by authorizing and ratifying security non-compliance, and providing improper training that failed in still the urgency of stopping the killing during an active school shooter event, which resulted in harm to Plaintiffs.

176.     The Gun Defendants had a duty to market their products in a truthful manner and not mislead consumers about the characteristics of their products.  The Gun Defendants had a duty to market their products, which they know are dangerous in the hands of young untrained adults, in a reasonable and prudent manner.  The Gun Defendants, and each of them, breached their duty of care and failed to act as a reasonable weapons manufacturer and seller would in similar circumstances by failing to be truthful in their marketing and directly targeting classes of consumers known to misuse their products to harm others.

177.    In addition, Oasis Outback had a duty to not to sell weapons to the 18-year-old

Uvalde shooter it knew, based on actual and constructive knowledge, had the characteristics of a

school shooter, and who appeared suspicious.   Oasis Outback, its owner, and staff, knew, or

should have known, due to the gunman's age, inexperience, appearance, demeanor, and display

of young school shooter characteristics, the gunman intended to use the guns and ammunition to

injure and kill people.  Oasis Outback breached its duty of care and failed to act as a reasonable

weapons manufacturer and seller would in similar circumstances.

178.    Moreover, Firequest had a duty to market its products in a truthful manner and not

mislead customers into believing the Hellfire Gen 2 trigger system was legal, when in fact,

Firequest knew, or should have known, that the Hellfire Gen 2 trigger system was classified as a

"machine gun" under ATF regulations, and was therefore unreasonably dangerous and illegal.

179.    As a Proximate cause of Defendants' negligence, Plaintiffs suffered, and continue

to suffer, physical and emotional damages, increased medical and mental health care visits, and

loss of enjoyment of childhood.

180.    As a proximate cause of Defendants' negligence, Plaintiffs have suffered and

continues to suffer economic losses, including considerable financial expenses for medical and

mental healthcare and treatment, and diminished income capacity, and will continue to incur

these losses and expenses in the future.

### V. THIRD CAUSE OF ACTION: NEGLIGENT ENTRUSTMENT
#### (*Against the Gun Defendants and John Doe Defendant I*)

181.    Plaintiffs realleges and incorporates each of the preceding paragraphs, and all

subsequent paragraphs.

182.    The Gun Defendants had, at all relevant times, actual or constructive knowledge

the AR-15 style rifles sold to the 18-year-old Uvalde school shooter had no reasonable

application to lawful uses of firearm (such as military or self-defense) but instead were well-suited and/or intended for misuse.

183.    The Gun Defendants had, at all relevant times, actual or constructive knowledge that young adult males are most commonly the perpetrators of mass shootings, including school shootings, and had actual knowledge at all times of the Uvalde school shooter's date of birth and gender.

184.    Oasis Outback, the owner, and its staff, had actual knowledge of the Uvalde school shooter's characteristics and dangerous propensities.  Oasis Outback sold two AR-15 style rifles and 375 rounds of ammunition to the gunman on May 17, May 18, and May 20, 2022, and installed a holographic sight on the Daniel Defense AR-15 rifle the gunman used in the shooting.  Oasis Outback's owner talked to the gunman and asked him how he was able to afford $3,000 of guns and ammunition. The owner noticed the gunman was always alone and quiet. Store witnesses told the FBI the shooter was "very nervous looking" and "appeared odd and looked like one of those school shooters."  Another witness described the gunman's all black clothing as simply giving off "bad vibes."  Despite the shooter's young age, inexperience, appearance, display of dangerous characteristics, and profile of a young adult school shooter, Oasis Outback entrusted and sold the AR-15 rifles and ammunition to him just days after his 18th birthday.  Oasis Outback, its owner, and staff, knew, or should have known, due to the gunman's age, inexperience, appearance, demeanor, and display of young school shooter characteristics, the gunman intended to use the guns and ammunition to injure and kill people.

185.    All Defendants had a duty not to entrust a lethal weapon to a person having and/or displaying dangerous propensities or indicating a propensity to harm and kill others.

186.    As a proximate cause of the Gun Defendants' negligent entrustment of guns,

ammunition, and accessories to the shooter, the shooter was able to acquire and misuse the weapons causing the school massacre on May 24, 2022. The Uvalde school shooting was a foreseeable consequence of the Gun Defendants' negligent entrustment of the weapons to the shooter.

187. The Gun Defendants' negligent entrustment of the weapons to the shooter caused the Plaintiffs to suffer, and continue to suffer, physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of life.

188. As a proximate cause of the Gun Defendants' negligent entrustment, Plaintiffs have suffered and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## VI. FOURTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

189. Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

190. This cause of action arises under the laws of the State of Texas.

191. The Defendants' conduct acts and omissions, conscious choices, and deliberate indifference to Plaintiffs as alleged throughout this Complaint was intentional and done with reckless disregard for Plaintiffs' health, well-being, safety, and lives.

192. Defendants' conduct was extreme, outrageous, atrocious, and intolerable in a civilized community. Defendants knew or should have known that their conduct, acts and omissions, and choices would create a high degree of risk of harm to Plaintiffs. Defendants knew the Plaintiffs' vulnerabilities and susceptibility to harm given their age. Despite this knowledge, Defendants deliberately proceeded to act, and failed to act, in conscious disregard of

68
PLAINTIFFS' ORIGINAL COMPLAINT

and with indifference to that risk.

193.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer severe emotional distress including fear, apprehension, terror, anxiety, panic, worry, stress, night terrors, insomnia, stress induced health effects, post-traumatic stress syndrome, mood disorders, behavioral changes, and loss of security and peace.  The depth, intensity, and duration of the mental distress and emotional pain suffered by Plaintiffs is not ordinary, and not what children should have to endure due to the intentional and reckless conduct of the Defendants.

194.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood.

195.    As a proximate cause of Defendants' negligent entrustment, Plaintiffs have suffered and continues to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## VII. FIFTH CAUSE OF ACTION: PRODUCTS LIABILITY – FAILURE TO WARN

### (*Against Motorola and Schneider Electric*)

196.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

197.    Plaintiff brings this strict liability claim against Motorola and Schneider Electric for failure to warn of the dangers and risks associated with use of their products.

198.    Defendants' products were defective and unreasonably dangerous because they did not contain adequate warnings or instructions concerning failure during normal use.  These actions were under the ultimate control and supervision of Defendants.

199.    Defendants' products are used for public safety and in public settings and Defendants had a duty to warn of the risks of failure associated with the reasonably foreseeable use of the products and a duty to instruct on the proper and safe use of these products.

200.    At all relevant times, Defendants had a duty to properly research, test, develop, manufacture, inspect, label, market, promote, provide proper warnings, and take such steps as necessary to ensure that its products did not fail during an emergency causing others to suffer unreasonable and dangerous risks and harm. Defendants had a continuing duty to instruct on the proper, safe use of these products especially given that the products were used by schools and first responders.  Defendants as the designers, manufacturers, sellers, or distributors is held to the knowledge of an expert in the field.

201.    Defendants could have provided warnings or instructions regarding the full and complete risks of their products because they knew or should have known of the unreasonable risks of harm associated with the use of products and/or failure during use.

202.    Defendants failed to properly investigate, study, research, test, manufacture, and label their products and failed to minimize the dangers to others due to product failures. Defendants knew failing to do so would be catastrophic and prevent schools and first responders from protecting victims such as Plaintiffs during an attack.

203.    Defendants' products reached the intended users without substantial change in their condition as designed, manufactured, sold, distributed, labeled, implemented, and sold by Defendants.

204.    As a result of Defendants' failures to warn, Defendants products were defective and unreasonably dangerous when they left the possession and/or control of Defendants and used by its consumers on the day of the school shooting.

205.     As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

### VIII. SIXTH CAUSE OF ACTION: PRODUCTS LIABILITY – MANUFACTURING DEFECT
### (*Against Motorola and Schneider Electric*)

206.     Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

207.     Plaintiffs brings this strict liability claim against Motorola and Schneider Electric for manufacturing defect.

208.     At all relevant times, Motorola researched, tested, developed, manufactured, marketed, sold and/or installed communications, radio, and security systems used for safety.  At all relevant times, Schneider Electric manufactured, designed, marketed, sold, and/or installed security doors used for safety.

209.     Based on information and belief, Defendants' products were defective and unreasonably dangerous because they failed during normal use and when used as intended. Motorola's systems and devices failed inside the school building leaving first responders without information communicated from dispatch and/or other first responders.  Schneider Electric's doors failed to lock as designed after being shut.

210.     Defendants are liable to Plaintiffs for injuries caused as a result of their products' manufacturing defects.

211.     The products' defects were substantial and a proximate cause of Plaintiffs'

injuries.

212.     As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## IX. SEVENTH CAUSE OF ACTION: PRODUCTS LIABILITY – MARKETING DEFECT

### (*Against the Gun Defendants and John Doe Defendant I*)

213.     Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

214.     Plaintiff brings this strict liability claim against the Gun Defendants for marketing defect and its intentional marketing to untrained civilians and young adults without adequate warnings.

215.     The Gun Defendants aggressively market lethal weapons to youth, civilians, and young adults they know are not competent by maturity, skill, training, or experience to responsibly use an assault weapon such as an AR-15 style rifle, with high-capacity magazines and trigger systems and appreciate the risk of harm to others.  The Gun Defendants have actual or constructive knowledge that AR-15 style rifles, rapid-fire trigger systems, and high-capacity magazines are used by most often by young adults in mass shootings.  The Gun Defendants have actual or constructive knowledge that young adults, due to the process of brain development and biological maturation are not competent emotionally to safely use their products without adequate training, guidance, and/or supervision and/or within the setting of a safe and supervised environment.  The Gun Defendants further have actual or constructive knowledge that the young

adult civilian consumers its sells to and/or targets do not have the experience or expertise to appreciate the risk of harm to others if proper warnings, training, guidance, and instruction is not provided.

216.    The Gun Defendants' products fail to warn civilian and young adult consumers that adequate training, guidance, and/or supervision is necessary to ensure the safe use of their products.  Because of the age, inexperience, and vulnerability of the young adult civilian consumers adequate training, guidance, instruction, precaution, and supervision is necessary for safe use of the products.

217.    The Gun Defendants' products fail to warn young adult consumers that use of their products by young adult consumers carries a high risk of harm to self and others given the emotional, physical, and psychological development changes of young adults resulting in mood and behavior instability and volatility.

218.    The Gun Defendants could provide warnings or instructions regarding the full and complete risks and dangers of use by young adult civilians but chose not to.  The Gun Defendants could market its products with adequate warnings but chose not to.  The products without these warnings are unreasonably dangerous.

219.    The Gun Defendants' products reached the Uvalde school shooter, a young adult civilian, without adequate warnings and were thus unreasonably dangerous.

220.    As a result of Defendants' marketing defects, Defendants products were defective and unreasonably dangerous when they left the possession and/or control of Defendants and used by the Uvalde school shooter on the day of the school shooting.

221.    As a proximate cause of Defendants' marketing defects, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care

visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## X. EIGHT CAUSE OF ACTION: NUISSANCE
### (*Against the Gun Defendants and John Doe Defendant I*)

222.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

223.    This cause of action arises under the laws of the State of Texas.  The Gun Defendants and John Doe Company I are liable to Plaintiffs for creating a nuisance.

224.    A private nuisance exists in Plaintiffs' community due to the Gun Defendants' negligent, intentional, and reckless marketing and sale of AR-15 style rifles to young adults and civilians in Uvalde, Texas for the purpose of causing terror, harm, and death in Plaintiffs' community.  The Gun Defendants' conduct caused and continues to cause emotional and physical harm to Plaintiffs in innumerable ways by creating fear, apprehension and diminishing Plaintiffs' sense of security, peace, and enjoyment of life in their own homes and property in addition to the needless loss of life.

225.    Plaintiffs have an interest in the safe, secure, and peaceful use and enjoyment of their homes and property in Uvalde, Texas.  The Gun Defendants took these rights by marketing and selling AR-15 style rifles in Plaintiffs' community, knowing the consequences of their conduct, and foreseeable loss of life and enjoyment of peace, safety, serenity, and security to Plaintiffs.

226.    Daniel Defense is in the business of researching, testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting AR-15 style rifles, including those used by the Uvalde school shooter.

227.    Oasis Outback is a Uvalde, Texas sporting goods store that markets and sells AR-15 style rifles, accessories, and ammunition to young adults and civilians in Plaintiffs' community.  On May 17, 2022, the Uvalde school shooter purchased a Smith & Wesson M&P15 AR-15 style rifle from Oasis Outback.  On May 18, 2022, he returned to Oasis Outback to buy 375 rounds of M193, 5.56 55-grain round with full metal jacket ammunition.  On May 20, 2022, the shooter returned to Oasis Outback to pick up the DDM4 V7 rifle he purchased online from Daniel Defense and used in the Uvalde school shooting.

228.    AR-15 style rifles can carry drums or magazines containing up to 100 rounds of ammunition.  These rifles can be modified legally to increase the firing rate to the speed of a fully automatic machine gun that is illegal for civilians. The shooter carried 60 30-round magazines and had a Hellfire Gen 2 snap-on trigger system so his rifle could fire as fast as a fully automatic machine gun. [110] The shooter was able to put together a military grade assault weapon at age 18 and use it to terrorize and harm Plaintiffs and others in Plaintiffs' school and community.

229.    The AR-15 style rifles are dangerous to humans and persons living in a community.  AR-15 style rifles destroy human bodies, limbs, organs, and tissue, pulverize the human body, explode, and cause immediate death.  The only purpose of the rifles is to kill as many as possible in little time.

230.    The AR-15 style rifles are not suitable for civilian use and have no utility in the hands of a young untrained adult civilian living in a community such as Plaintiffs.

231.    The Gun Defendants' marketing and sale of AR-15 style rifles in Plaintiffs' community created and continues to create fear, apprehension, terror, injury, loss of life, peace,

---

[110] *Id.* at 35. The Hellfire trigger system was found on the floor of the classroom.

security, enjoyment, and peace in Plaintiffs' homes and community.

232.    The Gun Defendants only interest in Plaintiffs' community is profit. With the exception of the gun store, the Gun Defendants have no relationship to Uvalde other than profiting off firearm sales to civilians.  In furtherance of the Gun Defendants' financial interest in Uvalde, the Gun Defendants directly markets to young adult and civilian consumers in Plaintiffs' community with the intent to make money off the community and distribute their weapons for use in the community.

233.    The Gun Defendants know that selling AR-15 style rifles, accessories, and ammunition to young adults and civilian in Plaintiffs' community will cause fear, apprehension, terror, injury, loss of life, peace, security, enjoyment, and peace to Plaintiffs.  The Gun Defendants market and sell AR-15 style rifles, accessories, and ammunition to young adults and civilians in Plaintiffs' community they know are not competent or capable of using the firearms safely. For example, Daniel Defense admits its firearms should not be handled and used by children or untrained civilians. The Gun Defendants know their AR-15 style rifles' only purpose is to kill yet they market and sell them to young adults and civilians anyway.

234.    The Gun Defendants have no processes in place to stop the marketing or sale of AR-15 style rifles to young adults and civilians in Plaintiffs' community.  Defendants could educate the community and potential consumers of the dangers of use by young adult civilians but choose not to.  Defendants could set age restrictions, or training requirements for its firearms, but choose not to.  Defendants could stop the sale of AR-15 style rifles to untrained civilians but choose not to.  The Gun Defendants have no processes, guidelines, or procedures in place to reduce or eliminate the physical and emotional harm to the Plaintiffs caused by the Gun Defendants' marketing and sales practices.

235.    The Gun Defendants' marketing and sales strategies are the result of intentional decisions to directly market to young adults and civilians in Plaintiffs' community, including the Uvalde school shooter, without regard for the interests of Plaintiffs in the peaceful use and enjoyment of their homes and property.  Defendants' interests are purely for profit, above the safety, wellbeing, interests, and lives of Plaintiffs.

236.    As a result of the Gun Defendants' marketing and selling practices, the Uvalde school shooter bought AR-15 style rifles, accessories, and ammunition directly from Defendants and used the weapons to terrorize, injure, traumatize, and kill Plaintiffs and persons in Plaintiffs' community.

237.    The Gun Defendants knew or should have known that directly marketing and selling distributing AR-15 style rifles to young adults and civilians in Plaintiffs' community involved an extreme degree of risk of interfering with or causing an invasion of Plaintiffs' interest in the safe, secure, and peaceful use and enjoyment of their homes and property.

238.    The Gun Defendants are aware that AR-15 style rifles are used by young adults and civilians in mass shootings.  It was foreseeable to Gun Defendants the AR-15 style rifles purchased by the 18-year-old shooter would be used to terrorize, injure, traumatize, and kill Plaintiffs and persons in Plaintiffs' schools and community.  Despite this knowledge, the Gun Defendants sold the rifles to the gunman and others in Plaintiffs' community and continue to do so without regard for the rights of Plaintiffs.

239.    The Gun Defendants' marketing and sale of AR-15 style rifles to young adults and civilians in Plaintiffs' community interfered with and invaded the Plaintiffs' interest in the peaceful use and enjoyment of their homes and property and creates a nuisance causing Plaintiffs' reasonable fear, apprehension, trauma, injury, and terror in the peaceful use and

enjoyment of their homes and property. The Gun Defendants' conduct in creating the nuisance and invading Plaintiffs' interests was negligent, reckless, and intentional.

240.    As a proximate cause of the Gun Defendants' conduct, Plaintiffs suffered, and continue to suffer, physical and emotional damages including discomfort, annoyance, fear, anxiety, terror, stress, insomnia, increased medical and mental health care visits, loss of enjoyment of childhood, cognitive affects, loss of peace of mind, post-traumatic stress disorder and related stress induced physical effects, and physical injuries.

241.    As a proximate cause of Defendants' conduct, Plaintiffs have suffered and continues to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

242.    The Gun Defendants' conduct, as described above, was aggravated, outrageous, unreasonable, evil, and beyond all sensibilities. The Gun Defendants market and sell, and continue to market and sell, AR-15 style rifles for use in Plaintiffs' community knowing the dangerous propensities, kill purpose, and history of killings in Plaintiffs' and others' schools and communities.  The Gun Defendants, by their reckless and outrageous practices regularly puts Plaintiffs at risk of terror, fear, apprehension, injury, loss of life, peace, security, enjoyment, and peace with full knowledge that their practices put their profits over the safety and interests of Plaintiffs.

## XI. PUNITIVE/EXEMPLARY DAMAGES
### (Against the Gun Defendants and John Doe Defendant I)

243.    Each Defendant's conduct was done with reckless disregard for human life, oppression, and malice. Defendants, and each of them, were aware of the serious and demonstrable risk of serious bodily injury and death associated with their conduct and that such

risks are compounded and worsened by their intentional inaction.  With full knowledge of such risks, Defendants proceeded causing Plaintiffs to suffer and sustaining severe physical, mental, and emotional harm.

## XII. RELIEF SOUGHT

244.    Wherefore, Plaintiffs respectfully request that the Court enter a judgment as follows:

a.  A declaratory judgment that defendants' conduct detailed herein was a violation of plaintiff's rights under the Constitutions and laws of the United States and Texas;

b.  To the extent that the Court finds that Defendants' conduct was authorized by custom, policy, or practice, and/or the inadequate training, supervision, instruction and discipline, a declaratory judgment that those customs, policies, or practices, and/or the inadequate trainings, supervisions, instructions and disciplines are unconstitutional under the Fourteenth Amendments to the United States Constitution, and the analogous provisions of the Texas Constitution.

c.  Permanent injunctive relief to preclude similar acts by defendants at future gatherings.

d.  An award of past and future economic damages against all Defendants for the harms sustained by Plaintiffs in an amount to be determined according to proof at the time of trial;

e.  An award of general damages against Defendants, and each of them, for the physical, mental and emotional damages, past and future, according to proof at the time of trial;

f.  An award of punitive and exemplary damages against the Defendants in an amount

to be determined according to proof at the time of trial

g.  An award of attorneys' fees pursuant to 42 U.S.C. § 1983 and any other applicable provisions, and

h.  Costs of suit and pre- and post-judgment interest as permitted by law

## XIII. DEMAND FOR JURY TRIAL

245.  Plaintiffs respectfully demand a trial by jury.

## XIV. SPOLIATION

246.  Plaintiffs require and demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Uvalde school shooting or other violations made the basis of the Complaint and the alleged damages, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

Dated:  September 28, 2022

**BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.**

/s/ *Stephanie Sherman*
Stephanie Sherman
Texas State Bar No. 24006906
ssherman@baumhedlundlaw.com
Monique Alarcon (*Pro Hac Vice* to be filed)
California State Bar No. 311650
malarcon@baumhedlundlaw.com
10940 Wilshire Blvd., Suite 1600
Los Angeles, CA 90024
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

**LAW OFICE OF SHAWN C. BROWN**

Shawn C. Brown
Texas State Bar No. 24003613
shawn@shawnbrownlaw.com
540 S. St. Mary's Street
San Antonio, TX 78205
Telephone: (210) 224-8200
Facsimile: (210) 224-8214

***Attorneys for Plaintiffs***