**FILED**

December 29, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ **LS**

DEPUTY

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION**

| | |
|---|---|
| **CORINA CAMACHO, Individually and on behalf of G.M., a Minor; TANISHA RODRIGUEZ, Individually and on behalf of G.R., a Minor; and SELENA SANCHEZ, Individually and on behalf of D.J., a Minor.; AMANDA ESCOBEDO, Individually and on behalf of A.T., a Minor and on behalf of A.E., a Minor; and ANGELICA TALLEY, Individually and on behalf of M.T., a Minor.** | Case No. 2:22-cv-00048-AM-CW |

**Plaintiffs,**

v.

**THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT; PEDRO "PETE" ARREDONDO, an Individual; THE CITY OF UVALDE; MARIANO PARGAS, an Individual; MANDY GUTIERREZ, an Individual; UVALDE COUNTY; SHERIFF RUBEN NOLASCO, an Individual; TEXAS DEPARTMENT OF PUBLIC SAFETY; DANIEL DEFENSE, LLC, a Limited Liability Company; OASIS OUTBACK, LLC, a Texas Limited Liability Company; FIREQUEST INTERNATIONAL, INC., an Arkansas Corporation; MOTOROLA SOLUTIONS, INC., a Delaware Corporation; JOHN DOE COMPANY 1, and JOHN DOES 1-100**

**Defendants.**

**FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

(1) 42 U.S.C. § 1983 – 14th Amendment

(2) 42 U.S.C. § 1983 – 4th Amendment

(3) Negligence

(4) Negligent Transfer

(5) 15 U.S.C. §§ 41-58 – False, Deceptive, and Misleading Advertising

(6) Intentional Infliction of Emotional Distress

(7) Products Liability – Failure to Warn

(8) Products Liability – Manufacturing Defect

(9) Products Liability – Marketing Defect

(10) Nuisance

(11) Punitive / Exemplary Damages

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................... 5

JURISDICTION AND VENUE ......................................................................... 6

THE PARTIES ................................................................................................... 6

I.      GENERAL ALLEGATIONS ................................................................. 13

      A.      GUN VIOLENCE IN AMERICA ............................................. 13

      B.      MOST SCHOOL SHOOTERS ARE YOUNG ADULT MALES .................. 18

      C.      ONSET OF MENTAL ILLNESS IN YOUNG ADULTS ................ 20

      D.      ACTIVE SHOOTER TRAINING IS REQUIRED FOR ALL LAW ENFORCEMENT .................................................................... 21

      E.      THE SCHOOL DISTRICT WAS REQUIRED TO IMPLEMENT SCHOOL SAFETY, SECURITY AND EMERGENCY PLANS. .................................... 22

II.     STATEMENT OF FACTS ..................................................................... 24

      A.      UVALDE, TEXAS ................................................................... 24

      B.      THE PLAINTIFFS, CHILDREN SURVIVORS ....................... 25

      C.      THE GUN MAKER – DANIEL DEFENSE .............................. 27

      D.      THE UVALDE SCHOOL SHOOTER ...................................... 38

      E.      THE UVALDE SCHOOL SHOOTING ON MAY 24, 2022 ........... 43

      F.      THE SCHOOL DISTRICT AND LAW ENFORCEMENT DID NOT FOLLOW ACTIVE SHOOTER MANDATES AND THEIR OWN POLICIES .............................................................................. 55

      G.      THE GUN DEFENDANTS ARE NOT SHIELDED BY THE PROTECTION OF LAWFUL COMMERCE IN ARMS ACT ("PLCAA") BECAUSE THEY VIOLATED FEDERAL LAWS. ............................................. 62

III.    FIRST CAUSE OF ACTION: 42 U.S.C. § 1983 FIFTH AND FOURTEENTH AMENDMENTS; STATE CREATED DANGER AND SPECIAL RELATIONSHIP
      63

A.     THE SCHOOL DISTRICT CREATED A DANGER TO PLAINTIFFS IN THEIR CUSTODY. ........................................................................................ 64

B.     THE SCHOOL DISTRICT DID NOT COMPLY WITH SECURITY PROCEDURES. ...................................................................................................... 66

C.     THE SCHOOL DISTRICT DID NOT REPAIR BROKEN SECURITY DOORS .......................................................................................................... 67

D.     THE SCHOOL DISTRICT AND PRINCIPAL GUTIERREZ DID NOT USE ALERT SYSTEMS. ................................................................................ 67

E.     THE SCHOOL DISTRICT DID NOT COMPLY WITH ACTIVE SHOOTER PROTOCOLS ................................................................................ 68

F.     THE SCHOOL DISTRICT'S HIRING AND SUPERVISION POLICIES AND PROCEDURES WERE CONSTITUTIONALLY INADEQUATE..... 70

G.     INDIVIDUAL LIABILITY OF CHIEF ARREDONDO FOR FAILURE TO TAKE COMMAND AND FOLLOW ACTIVE SHOOTER PROTOCOLS.71

H.     INDIVIDUAL LIABILITY OF PRINCIPAL GUTIERREZ FOR FAILURE TO COMPLY WITH SCHOOL SECURITY PROCEDURES. .................... 72

I.     UVALDE, UVALDE COUNTY, AND TDPS'S DID NOT TAKE COMMAND OR FOLLOW ACTIVE SHOOTER PROTOCOLS. .............. 73

J.     UVALDE PD DID NOT RESPOND TO 911 CALLS FROM THE SHOOTER'S NEIGHBOR. .................................................................................. 74

K.     INDIVIDUAL LIABILITY OF LT. PARGAS FOR FAILURE TO TAKE COMMAND AND EXECUTE ACTIVE SHOOTER PROTOCOLS. .......... 75

L.     INDIVIDUAL LIABILITY OF SHERIFF NOLASCO FOR FAILURE TO TAKE COMMAND AND EXECUTE ACTIVE SHOOTER PROTOCOLS. ...................................................................................................... 76

IV.     SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 FOURTH AND FOURTEENTH AMENDMENTS;  UNLAWFUL SEIZURE ................................................................ 77

V.     THIRD CAUSE OF ACTION:  NEGLIGENCE ........................................................ 78

VI.     FOURTH CAUSE OF ACTION: NEGLIGENT TRANSFER .................................. 85

VII.     FIFTH CAUSE OF ACTION: FALSE, DECEPTIVE AND MISLEADING ADVERTISING IN VIOLATION OF THE FEDERAL TRADE COMMISSION ACT, 15 U.S.C. §§ 41-58 ............................................................................................ 86

VIII.   **SIXTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** ....................................................................................................... 90

IX.   **SEVENTH CAUSE OF ACTION: PRODUCTS LIABILITY FAILURE TO WARN** 91

X.   **EIGHTH CAUSE OF ACTION: PRODUCTS LIABILITY - MARKETING DEFECT** ................................................................................................................. 92

XI.   **NINTH CAUSE OF ACTION: NUISSANCE** .............................................................. 94

XII.   **PUNITIVE/EXEMPLARY DAMAGES** ...................................................................... 99

XIII.   **RELIEF SOUGHT** ..................................................................................................... 99

XIV.   **DEMAND FOR JURY TRIAL** ................................................................................ 100

XV.   **SPOLIATION** ......................................................................................................... 100

PLAINTIFFS' FIRST AMENDED COMPLAINT

COMES NOW Plaintiffs, CORINA CAMACHO, Individually and on behalf of G.M., a Minor; TANISHA RODRIGUEZ, Individually and on behalf of G.R., a Minor; SELENA SANCHEZ, Individually and on behalf of D.J., a Minor; AMANDA ESCOBEDO, Individually and on behalf of A.T., a Minor and on behalf of A.E., a Minor; and ANGELICA TALLEY, Individually and on behalf of M.T., a Minor complaining of Defendants, THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, PEDRO "PETE" ARREDONDO, an Individual, THE CITY OF UVALDE, UVALDE COUNTY; MARIANO PARGAS, an Individual, TEXAS DEPARTMENT OF PUBLIC SAFETY (TDPS); MANDY GUTIERREZ, an Individual, DANIEL DEFENSE, LLC, a Limited Liability Company, OASIS OUTBACK, LLC, a Texas Limited Liability Company, FIREQUEST INTERNATIONAL, INC. an Arkansas Corporation, MOTOROLA SOLUTIONS, INC., a Delaware Corporation; JOHN DOE COMPANY 1 and JOHN DOES 1-100 and each of them, and allege as follows:

## INTRODUCTION

1.      On May 24, 2022, Uvalde, Texas had one of the worst school massacres in U.S. history. 19 children and two teachers were killed, and countless others injured and traumatized while school officials and hundreds of law enforcement personnel stood by failing to act. An 18-year-old Uvalde man with a history of mental disturbance, instability, and domestic issues legally purchased AR-15 semi-automatic rifles, ammunition, high-capacity magazines, and a Hellfire trigger system to use in the massacre.  Due to the conduct of the school and police, and the deliberate choices of the gun makers and sellers to directly market their lethal weapons to young untrained civilians, the shooter bought and assembled a military grade assault weapon with 30-round magazines days after his 18th birthday and entered the Uvalde elementary school unabated, wearing tactical gear. The shooter was left with free range to shoot, terrorize, and kill

children and teachers for over an hour.

## JURISDICTION AND VENUE

2.        This case is brought under 42 U.S.C. § 1983 and under state law. Jurisdiction is

conferred on this Court based upon 28 U.S.C. §§ 1331 and 1343. This Court also has

supplemental jurisdiction over Plaintiffs' state law claims and over Defendants under 42 U.S.C.

§ 1367 because the state law claims are interrelated to the federal claims.

3.        Venue is proper within the Western District of Texas, Del Rio Division, under 28

U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district,

Defendants regularly conduct business in this district, and the events and omissions giving rise to

Plaintiffs' claims occurred within this district.

## THE PARTIES

4.        **G.M.** is a resident of the State of Texas, and during the time of the events giving

rise to the lawsuit, resided with his legal and biological mother, Corina M. Camacho, in Uvalde,

Texas.  G.M., a male, age 10 on the day of the massacre, was in Classroom 112 where he and

other students were shot.  G.M. was shot in his right leg.

5.        **Corina Camacho** is a resident of the State of Texas, and during the time of the

events giving rise to the lawsuit, resided in Uvalde, Texas. Ms. Camacho is the legal and

biological mother of G.M. and sues individually and on behalf of her son, G.M.

6.        **G.R.** is a resident of the State of Texas, and during the time of the events giving

rise to the lawsuit, resided with her legal and biological mother, Tanisha Rodriquez in Uvalde,

Texas.  G.M., a female, was age 9 on the day of massacre when the shooter entered the school

campus, shooting near her where she was playing on the playground before G.R. was rushed

inside.  The shooter entered the school, killing her friends and teachers.

7.        **Tanisha Rodriguez** is a resident of the State of Texas, and during the time of the

events giving rise to the lawsuit, resided in Uvalde, Texas. Ms. Rodriquez is the legal and biological mother of G.R. and sues individually and on behalf of her daughter, G.R.

8.     **D.J.** is a resident of the state of Texas and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother Selena Sanchez. D.J., a male, was age 8 on the day of massacre, when he saw the shooter shooting towards the school as he passed between buildings running for cover.  The shooter entered the school killing his friends and teachers.

9.     **Selena Sanchez** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Sanchez is the legal and biological mother of D.J. and sues individually and on behalf of her son, D.J.

10.     **A.T.** is a resident of the state of Texas and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother Amanda Escobedo.  A.T., a male, was age 10 on the day of massacre, when he hid for cover behind some backpacks in room #109 and saw the shooter. The shooter entered the school killing his friends and teachers.

11.     **A.E.** is a resident of the state of Texas and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother Amanda Escobedo.  A.E., a male, was age 8 on the day of massacre, when he hid under his desk in room #19 and could hear the bullets firing in the building next over. The shooter entered the school killing his friends and teachers.

12.     **Amanda Escobedo** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Escobedo is the legal and biological mother of A.T. and A.E. and sues individually and on behalf of her two sons, A.T. and A.E.

13.     **M.T.** is a resident of the state of Texas and during the time of the events giving

rise to the lawsuit, resided with his legal and biological mother Angelica Talley. M.T., a male, was age 9 on the day of massacre, when he was outside in P.E class when the shooter jumped the fence and started shooting at his teachers. M.T. ran for cover inside a fourth-grade building near the library. The shooter entered the school killing his friends and teachers.

14.     **Angelica Talley** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Talley is the legal and biological mother of M.T. and sues individually and on behalf of her son, M.T.

15.     **The Uvalde Consolidated Independent School District (the "School District")** is a public school district in Uvalde, Texas. Robb Elementary is within the School District. The School District was, at all relevant times, responsible for the care, safety, management, and security of all students, teachers, staff, campuses, and public-school business within its jurisdiction, including Robb Elementary. The School District acted or failed to act, at all relevant times, through its employees, agents, and/or chief policymakers, and is liable for such actions and/or failure to act. The Uvalde Consolidated Independent School District Police Department ("UCISD PD") is an agency of the School District. The School District is charged by law with the administration and operation of UCISD PD, including the employment, control, supervision, discipline, training, and practices of UCISD PD's personnel and employees, and with the formulation of its policies, practices, and customs. The School District is legally responsible for the acts and omissions of UCISD PD. The School District and UCISD PD's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages. The School District may be served with process through its Superintendent, Dr. Hal Harrell, at 1000 N. Getty Street, Uvalde, Texas 78801.

16.     **Pedro "Pete" Arredondo ("Chief Arredondo")** is an individual residing in

Uvalde, Texas. At all relevant times, Chief Arredondo was a council member of the City of

Uvalde and the Chief of Police for the UCISD PD. Chief Arredondo as the chief policymaker for

the School District and UCISD PD acted, or failed to act, with deliberate indifference to the

constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to

Plaintiffs. Chief Arredondo is sued in both his individual and official capacities and may be

served with process at 101 Larkspur Drive, Uvalde, Texas 78801.

      17.    **The City of Uvalde ("Uvalde")** is a municipality organized under the laws of the

state of Texas. The Uvalde Police Department ("Uvalde PD") is an agency of Uvalde. Uvalde is

charged by law with the administration and operation of the Uvalde PD, including the

employment, control, supervision, discipline, training, and practices of Uvalde PD's personnel

and employees, and with the formulation of its policies, practices, and customs. Uvalde is legally

responsible for the acts and omissions of the Uvalde PD. Uvalde and Uvalde PD's policies,

practices, and/or customs were moving forces in causing the constitutional violations of

Plaintiffs and Plaintiffs' resulting damages. Uvalde may be served with process through Mayor

Don McLaughlin, at 101 E. Main Street, Uvalde, Texas 78801.

      18.    **Mariano Pargas** is an individual residing in Uvalde, Texas. At all relevant times,

Mariano Pargas (or "Lt. Pargas") was a lieutenant with the Uvalde PD. Lt. Pargas was the acting

Chief of Uvalde PD during the massacre, in Uvalde PD Chief Daniel Rodriquez's absence. Lt.

Pargas, as the chief policymaker for Uvalde PD acted, or failed to act, with deliberate

indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law,

and is liable to Plaintiffs. Lt. Pargas is sued in both his individual and official capacities and can

be served with process at 964 W. Main Street, Uvalde, Texas 78801.

      19.    **Uvalde County** is a county organized under the laws of the State of Texas. The

Uvalde County Sheriff's Office ("UCSO") is an agency of Uvalde County. The Uvalde County Sheriff's Office is an agency of Uvalde County. At all relevant times, Uvalde County was charged by law with the administration and operation of the UCSO and its deputies, including employment, control, supervision, discipline, training, and practices of the UCSO's personnel and employees, and deputies, and with the formulation of its policies, practices, and customs. Uvalde County is legally responsible for the acts and omissions of the UCSO, its Sheriff, and its deputies. In addition, Uvalde County is responsible for ensuring that the personnel of UCSO and deputies obeyed the laws of the United States and of the State of Texas. Uvalde County may be served with process through the County Judge, The Honorable William R. Mitchell, at 100 N. Getty Street, Uvalde, Texas 7880.

20.     **Ruben Nolasco ("Sheriff Nolasco")** is an individual residing in Uvalde, Texas. At all relevant times, Sheriff Nolasco was the Sheriff of UCSO and its chief policymaker who acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and is liable to Plaintiffs. Sheriff Nolasco is sued in both his individual and official capacities and may be served with process at 101 Larkspur Drive, Uvalde, Texas 78801.

21.     The **Texas Department of Public Safety ("TDPS")** a law enforcement agency organized and run by the State of Texas. Texas is charged by law with the administration and operation of TDPS, including the employment, control, supervision, discipline, training, and practices of TDPS's personnel and employees, and with the formulation of its policies, practices, and customs and is legally responsible for the acts and omissions of TDPS. TDPS may be served with process at 5805 North Lamar Boulevard, Austin, Texas 78752.

22.     **Mandy Gutierrez** is an individual residing in Uvalde, Texas. At all relevant times, Mandy Gutierrez (or "Principal Gutierrez") was the Principal at Robb Elementary School.

Principal Gutierrez was an official policymaker for the School District and the official policymaker for Robb Elementary School. Principal Gutierrez acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. Principal Gutierrez is sued in both her individual and official capacities and can be served with process at 1000 N. Getty Street, Uvalde, Texas 78801.

23.     **Daniel Defense, LLC a/ka Daniel Defense, Inc. ("Daniel Defense")** is a limited liability company with its principal office in Black Creek, Georgia. At all relevant times, Daniel Defense was engaged in the business of researching, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising guns, including AR-15 style semi-automatic rifles, for use by untrained civilians and young adults. Daniel Defense may be served with process by serving its registered agent, Marvin C. Daniel, at 101 Warfighter Way, Black Creek, Georgia 31308.

24.     **Oasis Outback, LLC ("Oasis")** is a Texas limited liability company with its principal office in Uvalde, Texas. Oasis Outback is a firearms dealer in the business of selling guns, including AR-15 style semi-automatic rifles, to untrained civilians and young adults in Uvalde, Texas. Oasis Outback served as the local gun dealer for Daniel Defense to complete the sale of guns and ammunition to the Uvalde school shooter. Oasis Outback may be served with process by serving its registered agent and chief executive officer, William R. Klein, at 236 East Nopal Street, Uvalde, Texas 78801.

25.     **Firequest International, Inc. ("Firequest")** is an Arkansas corporation with its principal place of business in El Dorado, Arkansas. Firequest is an online retailer and supplier of shooting equipment, firearm parts, and firearm accessories. Firequest designed, manufactured, marketed, and sold an accessory trigger system, HellFire Gen 2, that is used to convert a

semiautomatic rifle into the equivalent of a machine gun. Firequest is in the business of seeling accessory trigger systems like the Hell-Fire Gen 2 trigger system, to untrained civilians, young adults, and minors in Uvalde, Texas. The Hell-Fire Gen 2 trigger system is nearly identical to illegal bump stocks and allows a rifle to fire at a rate like a fully automatic weapon. Firequest designed, manufactured, marketed, and sold the Hell-Fire Gen 2 trigger system to the Uvalde school shooter. Daniel Defense, Oasis Outback, and Firequest, are collectively referred to in this Complaint as the "Gun Defendants." Firequest may be served with process by serving its registered agent, Lisa McCuistion, at 505 East 5th Street, El Dorado, Arkansas, 71730.

26.     **Motorola Solutions, Inc. ("Motorola")** is a Delaware corporation with its principal office in Chicago, Illinois. Motorola is a communications technology company that develops and implements mobile, radio, and wireless communication systems, command center software, and security systems for government and commercial customers worldwide. Based on information and belief, Motorola designed and/or sold the radio communication devices used by some of the first responders during the Uvalde school shooting. Motorola may be served with process by serving its registered agent, CT Corporation System, at 208 SO Lasalle Street, Suite 814, Chicago, Illinois 60604.

27.     **John Doe Company 1** is a company doing business in Texas whose true identify is presently unknown to Plaintiffs. Plaintiffs reasonably believe the School District had a contract and/or a memorandum of understanding with a third-party vendor to assure security measures were functioning, including but not limited to exterior and interior doors, security and surveillance systems, and radio communications and this third party did not do so and was negligent.  For purposes of service of process, such address is presently unknown to Plaintiffs.

28.     **John Does 1-100** are law enforcement officers who were present at Robb

Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to Plaintiffs. At all relevant times, Does 1-100 were acting in the scope of their employment, under color of state law, and in their individual and official capacities. Does 3-20 are sued in their official and individual capacities.

## I.     GENERAL ALLEGATIONS

### A.     GUN VIOLENCE IN AMERICA

29.     The United States leads the world in the number of children injured and killed every year by guns.  Tragically, as the number of American gun sales rise, so do deaths. According to the Centers for Disease Control and Prevention, the rate of gun deaths of children 14 and younger rose by roughly 50 percent from the end of 2019 to the end of 2020.  In 2021, over 1,500 children and teenagers younger than 18 were killed in homicides and accidental shootings, compared with about 1,380 in 2020.

30.     Mass shootings are also on the rise in the U.S. almost doubling in the past four years. [1] In 2018, there were 336 mass shootings, 417 in 2019, 610 in 2020, and 691 in 2021.[2] After the Uvalde school shooting, the FBI released a report "Active Shooter Incidents in the United States, 2021," showing a rapid increase in public shootings in the U.S.:

\\

\\

\\

\\

---

[1] "Mass shooting" is defined as 4 or more victims shot, either injured or killed, not including the shooter. *See* Gun Violence Achieve, https://www.gunviolencearchive.org/methodology.
[2] *See* Gun Violence Archive, https://www.gunviolencearchive.org/past-tolls.



There were 61 "active shooter" attacks in 2021 that killed 103 people. The 2021 total is a 52

percent increase from 2017.  Texas, Georgia, and California had the most active shooter events.[3]

31.     Of the ten most destructive mass shootings in the U.S. between January 2012 and

the present, 70% were committed by male shooters between the ages of 18 and 26.[4]  People of all

genders aged 18 to 26 comprise only 12 percent of the U.S. population but are responsible for

committing *70 percent of the mass shootings*.[5] (emphasis added).  Mass shootings are most often

committed by young males. 60 of the 61 active shooters in 2021 were, like the Uvalde school

shooter, males who acted alone.[6]



_____

[3]  Federal Bureau of Investigation, Active Shooter Incidents in the United States in 2021.
[4]  Everytown for Gun Safety, July 15, 2022, *Complaint and Request for Investigation of Daniel Defense, LLC*, Federal Trade Commission, Samuel Levine, Director, Bureau of Consumer Protection.
[5]  *Id.* Everytown calculated the relevant population percentage based on the 2019 data in the data set titled Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States: April 1, 2010, to July 1, 2019, and provided by the U.S. Census Bureau. https://www.census.gov/data/tables/time-series/demo/popest/2010s-national- detail.html
[6]  Federal Bureau of Investigation, Active Shooter Incidents in the United States in 2021, at 17.

32.     Mass shooters prefer to use "AR-15 style" assault rifles in their massacres because they accomplish the most kills in the least amount of time. AR-15 rifles are user friendly, precise, and accurate every time.  The mass shooter does not need any previous weapons training or experience at all to use the rifle and make the kills.

33.     AR-15 style rifles were designed for the U.S. military, not for civilians.  "AR" refers to ArmaLite, Inc., a small American gun manufacturer that designed and made the AR style rifle for the military between 1957-1959.  Gun manufacturer, Colt, bought the AR design from ArmaLite in the 1960s and started manufacturing a version known as the M-16 for the U.S. troops in the Vietnam War. When Colt's patents for the AR-15 expired in the 1970s, other manufacturers began making similar models.  AR-15 is the generic term for the design created by ArmaLite.

34.     The AR-15 was specifically designed with the combat soldier in mind and not designed for civilian use.  The AR-15 is lightweight, has a higher velocity than preceding military rifles, and can hold more ammunition at one time.  AR-15s are *automatic* loading weapons that fire one shot per each trigger pull then automatically reload the chamber with the next round.  Without modifications, an AR-15 style rifle can fire about 60 rounds a minute, which is up to *three times* faster than regular weapons. Because of the speed, rapid fire, and velocity of this weapon, ammunition can hit the victim, quickly tear through limbs and organs, and explode leaving the victim little chance of survival. What makes these weapons even more deadly is the high-capacity ammunition magazine capability.  30-round magazines are standard, but ammunition magazines or drums holding up to 100 rounds can be added in seconds.

35.     The AR-15 design also allows a shooter to spray lots of bullets over a large area in little time.  The shooter does not need to waste time targeting subjects nor does the shooter

need to be an expert marksman to get the kills. The AR-15 is so light it can be used with one hand. For even more speed, a trigger system can be added for under $50.00 to convert the AR-15 inro a fully automatic machine gun.

36.     Because of these features, AR-15s are the weapons of choice for civilian mass shooter like the Uvalde school shooter. AR-15s are user friendly, light, precise, and most likely to kill regardless of the shooter's steadiness or weapons' experience. An untrained civilian like the Uvalde school shooter can "hose down" many targets in little time and with little error. The AR-15 is so effective that someone like the Uvalde school shooter, *who had never shot a gun before the massacre,* can murder 19 people, and injure countless others within feet of law enforcement trained in active shooter techniques and protocols.

37.     In 1968, Congress amended the National Firearms Act of 1934 ("NFA") and expanded the definition of machine gun to include "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts.

38.     Interpreting this language, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") clarified in 1982 that semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with "simple modification or elimination of existing component parts" were "machineguns" under the NFA.[7] That is, even if a gun was not originally a machinegun, it qualifies as one under the NFA if it can be simply modified into one.

39.     The Uvalde school shooter carried 60 30-round magazines and legally bought a

---

[7] ATF Ruling 82-2; ATF Ruling 82-8.

Hell-Fire Gen 2 snap-on trigger system allowing his Daniel Defense AR-15 style rifle to fire like a fully automatic machine gun without manual reloading.[8] There were no barriers to him putting together this machine gun and neither the gun maker, Daniel Defense, nor gun seller, Oasis Outback, reported the gun to the ATF as meeting the definition of a machine gun.

40.     Between 2009 and 2022, the six deadliest mass shootings in the U.S. all involved the use of assault weapons and/or high-capacity magazines: Las Vegas (58), Orlando (49), Newtown (27), Sutherland Springs (26), El Paso (23), and Uvalde (21). Assault weapons with high-capacity magazines are disproportionately used in public mass shootings. Of the shootings with known weapon type, 76 percent of those that involved an assault weapon and/or high-capacity magazine occurred in public compared to 44 percent of those that involved a handgun.[9]

41.     AR-15 style rifles were banned in the U.S. from 1994-2004. The Public Safety and Recreational Firearms Use Protection Act or Federal Assault Weapons Ban ("AWB"), a subsection of the Violent Crime Control and Law Enforcement Act of 1994, was a U.S. federal law that prohibited the manufacture of certain semi-automatic weapons, defined as "assault weapons," and certain large capacity ammunition magazines for civilian use. The 10-year ban was passed by Congress on August 25, 1994, and signed into law by President Bill Clinton on September 13, 1994.[10] The AWB ban applied only to weapons manufactured after the ban's enactment. It expired on September 13, 2004, under its sunset provision. Constitutional challenges were filed against provisions of the ban, but all were rejected by the courts.

42.     The AWB prohibited the manufacture of 19 specific assault weapons and any

---

[8] *Id.* at 35. The Hellfire trigger system was found on the floor of the classroom.
[9] Everytown Research & Policy, Mass Shooting in America (as of August 15, 2022), https://everytownresearch.org/maps/mass-shootings-in-america/
[10] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (codified as amended in scattered sections of 18 U.S.C. and 42 U.S.C.).

semi-automatic rifle, pistol, or shotgun capable of accepting a detachable magazine with two or more features considered characteristic of such weapons, such as telescoping or folding stocks, pistol grips, flash suppressors, grenade launchers, and bayonet lugs. The AWB also prohibited possession of newly manufactured magazines holding over ten rounds of ammunition. On the day of the Uvalde school shooting, there was no federal ban on semi-automatic weapons or high-capacity magazines.

43.    The AWB ban has been criticized as ineffective and rife with exceptions and loopholes. But studies show mass shootings went down during the ban, then rose after the ban expired in 2004. In a study led by Charles DiMaggio, Ph.D., an injury epidemiologist at New York University, assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8-88.9) in 44 mass-shooting incidents.[11] Mass-shooting fatalities were 70 percent less likely to occur during the federal ban period.[12]

**B.    MOST SCHOOL SHOOTERS ARE YOUNG ADULT MALES**

44.    A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, with 18 to 20-year-olds being nearly four times more likely to perpetrate a gun homicide than those 21-years-old or older.[48] School shooters are commonly young adult males, age 18-21.[13] This is because the area of a young adult brain known as the "frontal lobe," which is responsible for higher level executive functioning including decision making and emotional regulation, is not yet mature. The brain of a young adult, age 18 to mid-twenties, has less capacity for rational, reasoned, and thoughtful judgment

---

[11]  Charles Dimaggio, et al., *Changes in US mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data*, 86 J. of Trauma and Acute Care Surg. 11-19 (2019).
[12] *Id.*
[13] Joshua Brown, et al., *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States*, 1982-2018, 108 Am. J. of Public Health 1385-1387 (2018).

than a mature brain. Young adults lack impulse, emotional, and self-control and are more likely to engage in risky behaviors, random violence, and hasty, mindless decision-making. Due to the ongoing changes in the brain along with the physical, emotional, and social changes of adolescence, young adults are more vulnerable to stress, emotional outbursts, emotional instability, and mental health problems.  The brain does not reach full development until a person is in their mid to late 20s.[14]  It is reckless to expect that the still developing brain of a young adult has the capacity and maturity to responsibly handle lethal weapons, AR-15s, high-capacity magazines, and systems readily available to convert a rifle to a machine gun outside the confines of a military or other structured setting where the person is educated, trained, and supervised. Insurance companies know this and generally don't reduce their rates for young drivers until they reach age 25.[15]

45.      Despite the biological and developmental characteristics of the brain which are widely known, gun makers and sellers aggressively market deadly weapons directly to adolescents and young adults using deception and even going as far as using youth culture icons such as Star Wars, Fortnite, and Call of Duty in their advertising.  Gun makers and sellers deliberately glamorize and push their lethal weapons into the hands of unpredictable, emotional, and volatile young adult civilians knowing that doing so is a grave public safety concern.  The gun makers and sellers marketing and selling practices are needlessly reckless, absurd, and dangerous to the public including American children. Gun makers and sellers understand their consumer audience, research their targets' preferences, activities, and characteristics, and are keenly aware of the vulnerabilities and emotional variability of the young adult minds they

---

[14] The Teen Brain, 7 Things to Know, The National Institute of Health, NIH Publication No. 20-MH-8078 (Revised 2020), https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know.
[15] Jason Metz, How Age and Gender Affect Car Insurance Rates (Nov. 7, 2021), https://www.forbes.com/advisor/car-insurance/rates-age-and-gender (last accessed November 10, 2022).

target.

### C.    ONSET OF MENTAL ILLNESS IN YOUNG ADULTS

46.    Adolescence and young adulthood are also when symptoms of psychiatric illness first appear and begin to manifest. It may take years before a diagnosis is confirmed as symptoms may be dismissed as part of adolescence and teen mood instability.  Symptoms of isolation, anger, agitation, sadness, volatility, paranoia, and changes in appearance and dress may be brushed off as "finding one's way" rather than considered the onset of mental illness requiring treatment.  A serious mental pathology can be missed right when the young person is of age to buy a semi-automatic deadly weapon.  A background check does will not work if there is no history to report.

47.    In many instances, mental illness is not known before age 25, while the average age of school shooters is 18-21.[16]  In the first large scale study on the onset of psychiatric illness, researchers found the global onset of the first mental disorder occurs before age 14 (in one-third of individuals), age 18 in almost half (48.4%), and before age 25 over half (62.5%).[17]  In other words, the onset of mental illness coincides with the data pointing to the average age of mass shooters.  The 18-year-old Uvalde school shooter displayed symptoms of mental disturbance, violence, and had a history of domestic issues, but had no barriers to buy a lethal assault weapon from the Gun Defendants. The Gun Defendants are aware of the characteristics and vulnerabilities of their young consumers, yet they consciously choose to market directly to this population at this critical time of developmental and maturation.  There is no utility other than

---

[16] *Id.*

[17] Solmi M, Radua J, Olivola M, Croce E, Soardo L, Salazar de Pablo G, Il Shin J, Kirkbride JB, Jones P, Kim JH, Kim JY, Carvalho AF, Seeman MV, Correll CU, Fusar-Poli P. Age at Onset of Mental Disorders Worldwide: Large-Scale Meta-Analysis of 192 Epidemiological Studies, Mol Psychiatry. 2022 Jan;27(1):281-295. doi: 10.1038/s41380-021-01161-7. Epub 2021 Jun 2. PMID: 34079068; PMCID: PMC8960395.

profit to do so.  A background check at age 18 will likely not capture a gun purchaser's any

mental health that would prohibit the sale.

48.     Gun makers have made more than $1 billion from the sale of AR-15 style rifles in

the last decade.  Daniel Defense's revenue from AR-15 style rifles tripled from $40 million in

2019 to over $120 million in 2021.[18]  Its CEO publicly acknowledged the huge profits flowing

from mass shooting events. As mass shootings double, so do the gun industry's profits and

demand for AR-15 rifles.  None of the gun makers' profits are allocated to any of the victims or

to any efforts to stop the marketing or sale to adolescents and young adult civilians.

### D.   ACTIVE SHOOTER TRAINING IS REQUIRED FOR ALL LAW ENFORCEMENT

49.     The 1999 Columbine High School massacre in Colorado led to a large-scale and

nationwide revision of police response training and protocols to stop an active shooter.  The

tactics changed from a containment response where police formed a perimeter around the shooter

and waited for SWAT, to a **direct attack** on the shooter to immediately stop the killing. Law

enforcement officers, including school-based police, and required to adopt the active shooter

training protocols and priority of life scale putting law enforcement first in harm's way and save

innocent lives above their own.[19]  The first and central priority is to "stop the killing," which

means moving in quickly to aggressively confront the shooter even bypassing cries for help from

victims.  The protocol demands urgency without hesitation   Nothing else should be done until

the shooter is isolated, distracted, or neutralized.  All law enforcement officers are required to

learn, understand, and implement these tactics.

50.     TDPS Director Steven McCraw confirmed this was the standard all the responding

---

[18] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 2 (July 27, 2022).
[19] Active Shooter Response for School Based Law Enforcement, January 2020, Course 2195 at 8.

officers at Robb Elementary. McCraw said every officer was trained to immediately neutralize active shooters. "When there is an active shooter, the rules change, McCraw told the media after the shooting. "Texas embraces active shooter training, active shooter certification, and that doctrine requires officers—we don't care what agency you're from. You don't have to have a leader on the scene. Every officer lines up, stacks up, goes, and finds where those rounds are being fired at and keeps shooting until the subject is dead, period.""

51.     Reports have indicated that only half of the responding Uvalde PD officers, received active shooter training, including Lt. Pargas then acting chief at the scene, and only 20% of UCSO officers.  More than 375 law enforcement were at the Robb massacre, and none used active shooter training tactics until U.S. Border Patrol arrived more than an hour after the shooter entered the school.

**E.      THE SCHOOL DISTRICT WAS REQUIRED TO IMPLEMENT SCHOOL SAFETY, SECURITY AND EMERGENCY PLANS.**

52.     On May 30, 2018, in response to the Santa Fe High School shooting by a 17-year old in Texas, Governor Abbott issued a *School And Firearm Safety Action Plan* addressing the need for a multitude of seemingly preventative measures that included:  increased law enforcement presence at schools, increased funding for active shooter response training, and "school hardening" including security systems, controlled access to campus buildings, and active shooter alarms.[20]  In 2019, the Texas legislature enacted SB11, amending the Texas Education Code to require every Texas school district to adopt and implement a multi-hazard emergency operations plan to mitigate and prepare schools for emergencies such as active shooters.[21]  SB11 required active shooter training for teachers and staff, mandatory school exercises and drills,

---

[20]  *School and Firearm Safety Action Plan* (May 18, 2018)
[21]  Texas Education Code § 37.108, Multihazard Emergency Operations Plan; Safety and Security Audit (2005); see also S.B. 11, 2019 Leg., 86th Sess. (Tex. 2019).

communication technology and infrastructure necessary to allow staff to communicate during emergencies, and an active shooter response plan of action be prepared and submitted to the Texas School Safety Center for review, and an audit of the plan every three years.[22] To assist with compliance, the Texas Education Agency (TEA) provides monthly school safety guidance, updates, and an online learning portal to schools to inform and reinforce the districts obligations and to assist with program implementation.[23] As part of TEA's effort to provide timely and in-depth information to support implementation of SB11, the TEA created a website, tea.texas.gov/schoolsafety for schools to access.  As part of the school safety legislation, the Texas legislature appropriated over $100,000,000 to the TEA to provide funding to schools for additional safety and security equipment.

53.     The Uvalde School District benefited from these measures and received the funding to update the security policies, school-based law enforcement training, infrastructure, technology, and equipment.  The Uvalde School District, its school-based law enforcement, principal, and staff were aware of the TEA and Texas School Safety Center training requirements, resources, events, and received TEA's monthly school safety updates and guidelines.  The School District was further aware of its obligations to routinely audit its security measures and active shooter response protocols, conduct drills, test technology, and continually train staff and law enforcement.   Rather than comply with its obligations aimed to protect students and teachers, the Uvalde School District and its policymakers took the money

---

[22] The Texas School Safety Center is a university-level research center at Texas State University tasked in Chapter 37 of the Texas Education Code and the Governor's Homeland Security Strategic Plan with key school safety initiatives and mandates including serving as a clearinghouse for the dissemination of safety and security information through research, training, and technical assistance for K-12 schools and junior colleges throughout the state of Texas and active shooter training for school staff and school based law enforcement. *See* https://txssc.txstate.edu/about/

[23] *See i.e.,* https://tea.texas.gov/about-tea/news-and-multimedia/correspondence/taa-letters/senate-bill-11-sb-11-and-other-school-safety-related-legislation (last accessed November 10, 2022).

earmarked for school safety and did little to prophylactically prepare for a school shooter. The School District did not address the school's infrastructure, and staff's communication technologies to make sure the systems were updated, working, and ready for an emergency such as a school shooting. The School District recently adopted a Raptor system, software used for mobile alerts sent to staff phones, but did not use it during the shooting. Based on information and belief, the School District was aware of wi-fi issues within the buildings and the foreseeability that communication devices and alert systems would not work during an emergency. The School District did not address these infrastructure and communication issues, which was a cause of lack of communication and information coming from students' 911 calls during the shooting.

54.     The Uvalde school shooter entered Robb Elementary through unlocked exterior campus doors. The School District was aware of the shooter's presence on campus before he entered but failed to activate a campus-wide "Secure, Lock Out" or "Lock Down" order required by their training and the SRP leaving news of the shooter to travel inconsistently by word of mouth. The School District's intercom system was available but not used Principal Mandy Gutierrez. The wi-fi signals were unstable preventing communications via the Raptor system within the building.

55.     Uvalde PD and UCSO's 911 call center received calls right after the shooter shot his grandmother. However, the initial calls from the grandmother's neighbor were not answered giving the shooter time to get to the school without being stopped by law enforcement.

## II.    STATEMENT OF FACTS

### A.    UVALDE, TEXAS

56.     Uvalde, Texas is a small rural community located 80 miles from the Mexican

border. Uvalde has approximately 25,000 residents, a majority of whom are Latino.[24]  It is a tight

knit, friendly community with an average resident age of 31.9.[25]  The Uvalde residents are hard-

working people that still believe in a sense of community and helping others.

57.      The Uvalde School District covers nine campuses, including Robb Elementary,

which educates students grades second through fourth. Mandy Gutierrez was appointed the

principal of Robb beginning with the 2021-2022 school year.  She has since been re-assigned. In

2018, the School District established its own police department, the UCISD PD, headquartered at

Uvalde High School. With nine schools and a budget for only six police officers, the School

District oversees more schools than it has officers.  No officer was specifically assigned to Robb

Elementary.[26] Instead, officers would regularly visit the Robb campus for a walk-through several

times per week, usually lasting from 15–45 minutes.[27]  There were no School District law

enforcement officers at Robb the morning of May 24, 2022.

   **B.      THE PLAINTIFFS, CHILDREN SURVIVORS**

58.      The day of the massacre, G.M. was nine years old and in the fourth grade at Robb

Elementary.  He was in Eva Mireles' and Irma Garcia's class in room 112.  That morning, G.M.

attended the end of year awards ceremony with his class.  When the awards ceremony was over,

---

[24]  United States Census Bureau, https://www.census.gov/quickfacts/uvaldecountytexas.

[25]  https://www.texas-demographics.com/uvalde-demographics

[26]  H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 13 (Tex. 2022).

[27]  Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022) (couple times per week, approximately 15 minutes per visit); *see also* Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022) (usually took 30-45 minutes to walk Robb Elementary); Committee testimony of Jaime Perez, Robb

Elementary head custodian (June 16, 2022) (about once per day, usually for less than an hour unless dealing with a problem); Committee testimony of Kenneth Mueller (June 16, 2022) (officers would float, visiting all elementary-school campuses). Uvalde CISD police officer Ruby Gonzalez described how she and her colleagues would rotate shifts based at the high school. The 7:00 a.m.–4:00 p.m. shift would begin with traffic control and watching the courtyard at the high school, followed by rounds to check in at other campuses, walk halls, and check doors. Similarly, the officer working the 9:00 a.m.–6:00 p.m. shift would visit various campuses in the afternoon. Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

PLAINTIFFS' FIRST AMENDED COMPLAINT

G.M. and his classmates went back to their classroom for free time. Children were reading, playing, and drawing on the chalkboard when the shooter entered the school, walked down the hallway, and fired hundreds of rounds into the classroom. Both of his teachers were killed. His best friend was killed. G.M. was shot in his right leg.

59.     After receiving a call from her mother about the shooter, G.M.'s. mother, Corina Camacho, returned to the school with her partner, Michael Martinez, to get G.M. It was chaos, parents were panicked, restrained, handcuffed, and pepper-sprayed, tased, and told by police they could not go into the school to save their children. Parents were told the shooter was detained but later learned he was not and was in G.M.'s classroom. No police had entered or taken the shooter down, and children were not allowed to leave their classrooms.

60.     Close to 1:00 p.m. as they waited terrified outside, Corina and Michael saw G.M. come out, bloodied, and being taken to a school bus. They rushed to the bus and yelled to G.M. to go to the back of the bus, roll down the window, and climb out. Michael Martinez grabbed G.M. and they rushed him to the hospital to treat his gunshot wound.

61.     G.M. told his parents the name of every classmate killed, including his best friend. He visited the memorials of his friends at the Uvalde town square and at Robb Elementary. Prior to the shooting, G.M. told his best friend's mother he would always protect his best friend. Tearfully, he told her after, he was sorry he couldn't.

62.     G.R. was nine years old and in the fourth grade. She was playing on the playground at the back of the school when the shooter fired shots towards the school. Frightened, she ran into Ms. Davis' classroom and hid with other children while the shooting continued all around her. Eventually, the U.S. Border Patrol officers came to the classroom and escorted the class to a nearby carwash where the students were checked for injuries and then

escorted to the civic center.

63.     D.J. was eight years old and in the second grade.  D.J. was walking from the school gym to the nurse.  While in the breezeway, he saw the shooter shooting towards the classrooms.  Terrified, he ran to the nurse's station next to the principal's office, then ran to Ms. Robin's classroom. The students hid while the shooting continued all around them.  Eventually, the class was rescued by law enforcement and taken to school buses outside the school.

64.     A.T. was 10 years old and in the fourth grade. A.T. was in classroom 109 when the shooter was actively shooting in the school. Terrified, he hid next to some backpacks for cover while the shooting continued around him. Eventually, the classroom was evacuated and A.T. and other children were taken across the street to the funeral home to be picked up by a school bus and taken to the civic center.

65.     A.E. was 8 years old and in the second grade. A.E. was in classroom #19 when the shooter was actively shooting in the school. Terrified, he hid under his desk where gunshots were heard from a distance. Eventually, the classroom was evacuated and A.E. and other children were taken across the street to the funeral home to be picked up by a school bus and taken to the civic center.

66.     M.T. was 9 years old and in the third grade. M.T. was outside in his P.E. class when the shooter was actively shooting in the school. He ran away from the gunshots and ran inside the nearest classroom that was unlocked. He pounded on the doors screaming "help me" until a teacher opened her classroom door and hid into a bathroom. Eventually, the classroom was evacuated across the street to the funeral home to be picked up by a school bus and taken to the civic center.

## C.     THE GUN MAKER – DANIEL DEFENSE

67.     Daniel Defense is a Georgia-based gun maker who proudly markets itself as a

military weapons dealer located at 101 Warfighter Way, Black Creek, Georgia. Daniel Defense researches, develops, designs, manufactures, markets, and sells semi-automatic weapons, including AR-15 style rifles, for use and possession by civilians and young adults.

68.     Daniel Defense makes millions off the sale of assault weapons but does not track death, dangers, or crimes resulting from use of their guns, does nothing to curtail marketing and sales of its guns to vulnerable young consumers, and does nothing to inform and educate consumers and the public of the dangers associated with purchase and use by young adult civilians. Daniel Defense's advertising is built on deception misleading consumers to believe Daniel Defense is a military weapons supplier to gain market share and increase sales. Daniel Defense made $528 million from AR-15 style rifle sales from 2012 to 2021.[28]

1. **<u>Daniel Defense Aggressively Markets to Untrained Civilians and Young Adults Using Deceptive and Unfair Advertising.</u>**

69.     Although 90 percent of its sales are to civilians, Daniel Defense aggressively markets itself as a military weapons dealer leading consumers to believe they are buying military sponsored weapons. Daniel Defense promotes its AR-15 style rifles as the same used by the U.S. military deceiving consumers, including young adults and untrained civilians. Daniel

---

[28] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 6 (July 27, 2022).

Defense's advertising blasted over the internet and on social media sites contains images of combat scenes and soldiers carrying its guns into battle.



70.     Daniel Defense's marketing tells consumers to "Use What They Use" yet Daniel Defense has **no weapons' contracts** with the U.S. military.

71.     Daniel Defense's marketing is deceptive, unscrupulous, and deliberately plays on the vulnerabilities of its audience making it unlawful and unfair. Daniel Defense's AR-15 rifles share similar characteristics to the military assault rifle, M-16, and both designs feature exceptional muzzle velocity, the ability to accommodate large-capacity magazines, and effective rapid fire.  The significant difference is the M-16 was not developed for civilian mass shootings and certainly not intended to be used by untrained young adult civilians.  Daniel Defense's guns

are accessible to civilian consumers unlicensed, untrained, and as young as 18 years old, and Daniel Defense targets this consumer directly.



72.     Daniel Defense's advertising statements and images are blatantly false, misleading, and unfair.  Daniel Defense's advertising depicts military men in combat gear on active battlefields telling the purchaser that is the power, force, and prestige buying the weapons will bestow.  The purchaser's fantasy, which may be only in online games, can come to life with Daniel Defense's guns, which Daniel Defense promises have been "tested, proven, and chosen" by the U.S. military.  This is false.  Daniel Defense intentionally misleads consumers in a fantasy scheme engineered for maximum profit at the expense of public safety and American lives using the military, among other imagery, as its bait.  Daniel Defense has no weapons contracts with the

U.S. government contrary to what it deliberately depicts. [29]



73.      Daniel Defense intentionally uses the military images and vernacular in its advertising to create a "halo effect" to increase sales. The "halo effect" is a well-studied psychological phenomenon that causes a person to make choices in favor of something the person associates with positive experiences, bias, or prejudices, regardless of accuracy. The "halo effect" of Daniel Defense's military advertising causes suspectable consumers to purchase their weapons believing that if the weapons are good enough for the military, they must be the best.

74.      Daniel Defense is known in the industry for its brazen and provocative marketing. Daniel Defense specifically targets young children not of age to purchase guns. Much of its heavy social media marketing is on Instagram and Twitter, which are popular with youth. Daniel Defense does not limit or age-restrict access to any of its marketing and freely allows all ages to

---

[29] https://danieldefense.com/faq

take in its violence-based content. It uses fast-moving, high-quality videos drowning in electronic music, featuring gun-toting young adults and allusions to popular video games like *Call of Duty* and movies such as *Star Wars*.



75.     Daniel Defense's use of youth popular culture themes and icons is intended to attract and unfairly exploit the vulnerabilities of children and young adults. Daniel Defense specifically targets adolescents and young adults knowing this consumer group is unqualified by age or experience to anticipate or appreciate the possibility the representations may be exaggerated or untrue. Moreover, there is no caution or disclaimers to the young audience warning them the weapons are not intended for them, as physiologically immature consumers.

76.     Daniel Defense promises young adults' power and glamour when using its guns couple with the force and prestige of military grade lethality. Daniel Defense even offers financing deals to purchasers, like young adults, who cannot afford to wait. A purchaser can buy an assault weapon from Daniel Defense through a "buy now, pay later" program allowing the purchaser to have the gun right away. Daniel Defense will finance murder, which is especially convenient for young adults who cannot afford the weapons or cannot afford to wait to save up the money.

77.    Daniel Defense promotes its weapons with images of children.  Days before the
Uvalde school massacre, Daniel Defense tweeted a picture of a toddler holding an AR-15 style
rifle captioned with a biblical quote from the Book of Proverbs: "Train up a child in the way he
should go, and when he is old, he will not depart from it.



78.    Daniel Defense admits 90 percent of its purchasers are consumers that are not
military trained and not competent to responsibly use the guns.

79.    Daniel Defense admits children should not handle or use their guns:

> Store your firearm and ammunition securely locked in separate locations out of the reach
> and sight of children. (Children are naturally curious and do not always believe
> or understand the real danger and responsibilities of firearms.)

Daniel Defense admits the consumers they target should not use their guns:

> ⚠ **CLEANING AND STORAGE CAUTIONS**
>   1. **ALWAYS** make sure your firearm is completely UNLOADED before you attempt to clean or store your firearm.
>   2. **ALWAYS** store your firearm and ammunition SEPARATELY and SECURELY out of reach of anyone who should not have access to them.
>       a. Keep it out of reach of children and others who are not trained in the safe handling of firearms.
>       b. Keep firearms and ammunition locked securely when not in use to prevent them entering the wrong hands.

None of these disclaimers are in their marketing materials and in fact their marketing promotes the opposite.

 80. Daniel Defense Knows Their Weapons Are Used in Mass Shootings.

 81. Daniel Defense knows their AR-15 style assault weapons with their rapid-fire large ammunition capacity are the weapons of choice for mass shootings. Four of Daniel Defense's semi-automatic rifles were part of the arsenal of firearms used by in the Las Vegas shooting that killed 60 people in 2017. Smith & Wesson's assault weapons also purchased by the Uvalde school shooter have been used in some of the worst mass shootings in U.S. history including:

  a. 2022 Fourth of July shooting in Highland Park, Illinois where Robert E. Crimo III, age 21, murdered 7 people using a Smith & Wesson M&P15 he purchased online.[30]

  b. 2018 Stoneman Douglas High School shooting in Parkland, Florida where

---

[30] *Highland Park Suspect Robert Crimo Bought Rifle Used in Attack Online*, New York Post (July 6, 2022); *Illinois State Police Director Defends Decision to Give Suspected Highland Park Killer a Gun Permit in 2020*, Chicago Sun Times (July 6, 2022).

Nikolas Cruz, age 19, murdered 17 people. All victims were shot in under four minutes.

   c. 2015 San Bernardino, California shooting where terrorists murdered 14 people using AR-15 style rifles, including a Smith & Wesson M&P15. [31]

   d. 2012 Aurora, Colorado theater shooting where James Holmes, age 25, murdered 12 people using several guns including a Smith & Wesson M&P15, with a 100-round drum. [32]

82.    Daniel Defense Deliberately Ignores the Human Harms and Losses Resulting from Its Deceptive and Unfair Marketing Practices.

83.    Daniel Defense knows their assault weapons land in the hands of mass shooters but deliberately stays ignorant to the number of killings and crimes caused by their weapons and their direct marketing to vulnerable and/or young adults. On the day of the Uvalde school shooting, Daniel Defense posted a photo of the gun used by the Uvalde school shooter with

---

[31] *Guns Used in San Bernardino Shooting Were Purchased Legally from Dealers*, Washington Post (Dec. 3, 2015); *Florida Shooter Had Extra Ammo at School, Fired for 3 Minutes*, Associated Press (Feb. 15, 2018).
[32] *Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol*, The New York Times (July 23, 2012).

bullet proof body armor with the hashtags "gunsofinstagram" and "loadout."



84.     Daniel Defense does not do any studies evaluating the effects of their marketing on the health and well-being of Americans and chooses not to look at the cost to families and communities like Uvalde, Texas.  Daniel Defense believes they have blanket immunity against civil lawsuits under PLCAA,[33] discussed *infra*, and have no incentive to promote or implement reasonable and truthful marketing practices or to stop sales to young adult civilians.

85.     Daniel Defense's CEO and founder, Marty Daniel makes no apologies for his company's place in the marketplace and the benefits he gains from mass shootings. Mr. Daniel proudly told Forbes Magazine in 2017 his sales went up after the mass shooting at Sandy Hook

---

[33] Protection of Lawful Commerce in Arms Act, 15 U.S.C. 7902 *et seq.*

Elementary in 2012. Like the Uvalde school shooter, the Sandy Hook shooter was a young adult, 20 years old. Marty Daniel contributes substantiality to the campaigns of politicians who will ensure its assault weapons remain accessible to young adults like the Uvalde school shooter. Unlike other product manufacturers, Daniel Defense is consciously indifferent to the human harms and losses caused by their intentional sales and marketing practices.

86.     Daniel Defense could try to reduce the number of semi-automatic weapons and AR-15 style rifles sold to civilians and young adults but chooses not to. Daniel Defense could stop marketing to and glamorizing guns to children and young adults and enact more prudent merchandising and marketing policies but chooses not to. Daniel Defense could provide educational marketing to the public on why young adults should not buy its weapons but chooses not to. It could analyze the crime and death caused by its weapons and their role in mass shootings but chooses not to. Daniel Defense could be truthful in its advertising and stop using military and youth icons to increase sales but chose not to.

87.     Daniel Defense knows marketing to children and young adults is not in the public interest and increases the risk of death to Americans and children. Daniel Defense knows that doing so leads to mass shootings using their weapons. Daniel Defense makes millions off the sale of assault weapons especially after a mass shooting. Daniel Defense consciously chooses profits over the safety and lives of Americans. In the years before the Uvalde school massacre, the Daniel Defense did nothing to curtail the marketing and sale of guns to American youth. Its business practices are reckless, deliberate, intentional, unfair, unscrupulous, and needlessly endanger American children. Daniel Defense's advertising practices are unlawful under federal law to the deceptive and unfair statements made therein.

88.     Daniel Defense knows its AR-15 style, semi-automatic rifles are unsuited for

home defense, recreation, or casual use and possession. The origin of the AR-15 is the military M-16, specifically designed to kill multiple people fast.  Daniel Defense knows its strategy of marketing directly to youth enables untrained civilians as young as 18 years old the power and ability to inflict unparalleled human carnage on unarmed and unprotected civilians and children. The Uvalde school shooter seamlessly bought the AR-15 style rifle directly from Daniel Defense via its eCommerce website and had it shipped directly to Uvalde, Texas. Daniel Defense has done nothing to protect Americans against their reckless marketing and business practices.

        **D.**      **<u>THE UVALDE SCHOOL SHOOTER</u>**

      89.     The Uvalde school shooter was 18 years old on the day of the massacre. Days after his 18th birthday, he bought 2 AR-15 style, semiautomatic rifles, 60 30-round magazines, and over 2,000 rounds of ammunition. He collected tactical gear and ammunition well before his birthday but could not purchase the firearms legally. According to friends and family, he had no firearm experience and had never shot a gun until the massacre.

      90.     On May 17, 2022, the day after his birthday, the shooter purchased a Smith & Wesson M&P15, AR-15 style, semi-automatic rifle, from Oasis Outback in Uvalde, Texas. Oasis Outback is a local sporting goods store that also serves as a local firearms dealer to complete online purchases made directly from gun manufacturers.

      91.     On May 17, 2022, the shooter bought 1,740 rounds of 5.56mm 75 grain boat tail hollow points for $1,761.50 shipped directly to his house.

      92.     On May 18, 2022, the shooter returned to Oasis Outback to buy 375 rounds of 5.56 caliber ammunition.

      93.     On May 20, 2022, the shooter returned to Oasis Outback to pick up another weapon, an AR-15 style semi-automatic rifle, DDM4 V7, which he bought directly online from Daniel Defense for $2,054.28.





94.     Oasis Outback knew, or reasonably should have known, the shooter was

suspicious and dangerous.  The shooter went to the store three times in four days signaling his

desperation and intent to quickly buy weapons.  In that short period, Ramos picked up or bought

$3,000 worth of guns and ammunition, including two AR-style rifles. Oasis Outback was

required to report the multiple sale of rifles to the Bureau of Alcohol, Tobacco, Firearms, and

Explosives ("ATF") pursuant to a letter issued by the ATF on July 12, 2011. Fulfilling its reporting requirements, however, would not have absolved Oasis Outback of its obligation to block a sale on other relevant grounds.

95.     Oasis Outback knew, or reasonably should have known, the shooter was likely to harm himself or others. Oasis Outback's owner talked to the shooter and asked how he could afford $3,000 worth of guns and ammunition. The owner noticed the shooter was always alone and quiet, all warning signs of a mass shooter. Store witnesses who saw the shooter at Oasis Outback buying expensive AR-15 style weapons and large amounts of hollow point ammunition told the FBI the shooter was "very nervous looking" and "appeared odd and looked like one of those school shooters." Another witness described the shooter's all black clothing as simply giving off "bad vibes." [34]

96.     Oasis Outback sold the shooter the guns and ammunition knowing he was suspicious and likely dangerous to others. The store owner and his staff did not act on their suspicions and block the purchases or notify law enforcement. Because of Oasis Outback's acts and omissions, the shooter was able to assemble a lethal military-grade assault weapon with a 30-round capacity magazine capable of pulverizing many people within minutes with no oversight, licensure, experience, or training.

97.     The shooter had a history of mental and behavioral problems and would cut up his face with knives for fun.[35] Uvalde PD was called multiple times due to conflicts between the shooter and his mother.[36] He would drive around with another friend at night to shoot at random

---

[34] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 36 (Tex. 2022).
[35] Robert Klemko et al., *Gunman bought two rifles, hundreds of rounds in days before massacre*, The Washington Post (May 25, 2022), https://www.washingtonpost.com/nation/2022/025/uvalde-texas-school-shooting-gunman/.
[35] Id.
[36] Id.

people with a BB gun or egg their cars.[37] He wore all black, had long black hair and wore large military boots.[38] The shooter once commented to a friend he wanted to join the Marines to kill people.[39]

98.     The shooter used Yubo and Instagram to send sexually aggressive comments, and threats of kidnap, rape, and death.[40] Multiple teens reported the violent threats made by the account alleged to be the shooter, but nothing ever came of it.[41] In one chatroom, the shooter bragged about buying his guns and then said that "girls deserved to get raped." In late 2021, the shooter ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn on the day of the Robb massacre.[42] He asked friends and family members to buy guns for him since he was underage.[43] No one would buy him the guns.

99.     The shooter networked with local peers in ongoing group chats on Snapchat, and played a range of videogames, including the Call of Duty and Grand Theft Auto series, which glamorize guns and murder. Most of his usernames and even his email address reflected themes of confrontation and revenge. The shooter demonstrated interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online.[44]

100.     The shooter was also known to have issues with truancy at school eventually

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] Alyson Klein, *The Uvalde Shooter Posted Threats on Yubo. What to Know About the App and Others Like It,* Education Week, (June 2, 2022), https://www.edweek.org/leadership/the-uvalde-shooter-posted-threats-on-yubo-what-to-know-about-the-app-and-others-like-it/2022/06.

[41] Silvia Foster Frau, Cat Zakrzewski, Drew Harwell, & Naomi Nix, *Before Massacre, Uvalde Gunman Frequently Threatened Teen Girls Online*, The Washington Post, (May 28, 2022).

[42] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 33 (Tex. 2022).

[43] *Id.* at 34.

[44] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 32 (Tex. 2022).

leading to his drop out.  The School District never followed up on or addressed the truancy.

101.    Beginning in February 2022 the Uvalde PD was called to the shooter's home to address a domestic disturbance with his mother.  Following that, the shooter went to live with his grandparents temporarily while preparing to move to San Antonio.

102.    Also in February 2022, and while still underage, the shooter bought firearms accessories including 60 30-round magazines, a holographic weapon sight, and a Hell-fire Gen 2 snap on trigger system.[45]  A Hellfire trigger system, nearly identical to a bump stock, allows a rifle to fire at a rate like a fully automatic weapon.  The bump stock device was banned after the 2017 Las Vegas mass shooting, but the Hellfire trigger systems is still legal.  The Hell-fire trigger system clamps to the trigger guard behind the trigger and presses a "finger" against the back of the trigger to increase the force that returns the trigger to its forward position, effectively decreasing the time required for the trigger to reset, allowing for a faster follow up shot. The Hell-Fire converts an otherwise semiautomatic firearm into a machine so the shooter can continue firing (even with one hand) without additional physical manipulation of the trigger by the shooter.  In other words, the Hell-Fire gives machine gun power to a civilian *legally.*

103.    Firequest, the manufacturer of the Hellfire Gen 2 Trigger System, states, "All you have to do is squeeze the trigger to shoot at rates up to 900 rpm," which is comparable to AR-15s with bump stocks that can fire between 450 and 900 rounds per minute.  Firequest also claims the Hellfire Gen 2 is "ATF legal and compliant" and is sold with a "certificate of legality."  In fact, Firequest knew the Hellfire Gen 2 trigger system was classified as a "machine gun" under Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") regulations, making it illegal.  Youtube videos linked to Firequest's website and product page for the Hellfire Gen 2 depict an

---

[45] *Id.* at 35.

AR-15 rifle with the Hellfire Gen 2 trigger system firing as a fully automatic rifle.

104.    On February 28, 2022, there was a discussion on Instagram on February 28, 2022, about Salvador Ramos being a "school shooter."[46] Ten days before the shooting, he messaged an individual, "10 more days," to which the person responded, "are you going to shoot up a school or something?" Ramos responded, "No, stop asking dumb questions. You'll see."

**E.    THE UVALDE SCHOOL SHOOTING ON MAY 24, 2022**

105.    The Uvalde school shooting was one of the worst shootings in American history. Regrettably, the School District, its leaders, policymakers, and law enforcement did not prepare its schools, staff, and police for an active school shooting.  The facts below expose a culture of noncompliance with safety protocols, state-mandated school shooter training, disregard for school alerts, and deliberate indifference to the threat of criminal trespassers and school shooters leaving the children and teachers vulnerable to attack.  It should surprise no one the school doors were unlocked leaving the shooter free to enter at his leisure.  Likewise, Uvalde PD and UCISD PD displayed indifference to the requirements of their position as peace officers, safety guardians, and protectors of students and residents of Uvalde.  Like UCISD PD, the Uvalde PD was required by state law to be competent in active shooter protocol and able to execute the required kill tactics to protect innocent civilians.  Neither law enforcement agency complied with basic principles of active shooter training on May 24, 2022.

106.    The morning of May 24, 2022, the shooter sent a Facebook private message to a girl in Germany telling her he shot his grandmother in the head and would shoot up the elementary school.

---

[46] Julie Moreno, *There Were Warnings, Clues About Uvalde School Shooting from Social Media Posts, Investigators Say*, KSAT News, (May 27, 2022). https://www.ksat.com/news/local/2022/05/27/there-were-warnings-clues-about-uvalde-school-shooting-from-social-media-posts-investigators-say/.



107.   After he shot Ms. Gonzales in the face, he left, stole her truck, and started driving the few blocks to Robb Elementary and crashed the truck into a ditch at 11:28 a.m.

108.   Gilbert and Maria Galegos live across the street from Ms. Gonzales on Diaz Street in Uvalde, Texas. They were in the front yard when Ms. Gonzales was shot. They saw her come out of her house bleeding and holding her face. They called 911 located at Uvalde PD twice, first at 11:33 a.m., and a second time at 11:35 a.m. but no one answered. No one from Uvalde PD responded to the shooting.

109.   Uvalde County Sheriff Ruben Nolasco arrived later at Ms. Gonzales' home having first gone to the wrong address and only after being flagged down by a motorist when he was responding to the shooter's crash near the school.[47]   Sheriff Nolasco radioed on the UCSO's

---

[47] Craig Garnett. 911 Calls from Diaz Street Not in UPD Phone Log, August 18, 2022 at 12.

system at 11:35 a.m. he was responding to a woman shot on Diaz Street.  Sheriff Nolasco chose

to stay at the scene on Diaz Street, that was then under control, rather than go to the school to

stop the shooter.

110.    At 11:27 a.m., Robb teacher, Emilia "Amy" Marin exited the school building via

an exterior door in the west hall to retrieve food for a school party leaving the door propped open

with a rock. The School District and its leaders allowed staff to prop open doors for their

convenience, in violation of its own safety protocols.

111.    At 11:28 a.m., the shooter crashed his grandmother's truck into a dry ditch near

Robb Elementary.  Claudia Perez at Hillcrest Memorial Funeral home heard the crash and she

and two funeral home co-workers, Cody Briseno and Gilbert Limones, went outside to assist

after calling 911 at 11:28 am to report the crash.  They approached the crash scene to render aid

but ran back towards the funeral home when the shooter displayed a rifle and shot at them.  Cody

Briseno called 911 a second time at 11:33 am.

112.    At 11:29:40 a.m., teacher Emilia Marin returned through the school's west entry

exterior door kicking the rock from the door she propped open, then pulled it shut while she

continued to look out of the exterior door as she frantically spoke on her cell phone.[48]  Ms. Marin

attempted to enter a door on the south side of the west hallway only to find it locked.[49]  She

knocked on the door, and it was eventually answered by another female, whom she advised of

---

[48] Robb Elementary School Attack Response Assessment and Recommendations, June 30, 2022 ("ALERRT
Report"); *see also* H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th
Session, at 46 (Tex. 2022) ("The surveillance camera inside the west building recorded that someone had propped
open the west door with a rock earlier on May 24. *See* Robb Elementary surveillance video. Apparently in response
to the lockdown alert, a teacher came into the hallway and removed the rock. *Id.* When the gunman arrived, the door
was not propped open by a rock—but because the door was unlocked, he was still able to open the door and enter the
building.")
[49] *Id.*

the emergency.[50] They moved into classrooms to secure their students.[51] The door is a security

door that is supposed to lock automatically when closed.

113.    At 11:30:14 a.m., the shooter, wearing dark clothing and carrying a bag, left the

crash scene and climbed a five-foot chain-link fence onto the school property and walked across

the open grounds between the fence and the teachers' parking lot towards the school buildings on

the west side of the school campus.

114.    Robb Elementary Coach Yvette Silva was outdoors with a group of third graders,

and she spotted the shooter's backpack being tossed over the school fence followed by a person

dressed in black climbing over it. She then saw the person raise a gun and shoot. Coach Silva

thought the shooter was shooting at her, and she ran from the field toward her classroom. She

used her school radio to report: "Coach Silva to office, somebody jumped over the fence and

he's shooting." She ran toward a group of third graders on the school playground, including

Plaintiff G.R., to tell them to lock down. She expected to hear an announcement of a lockdown,

but she did not hear one right away.[52] Meanwhile, the shooter proceeded to the fourth-grade

teachers' parking lot, continuing to fire his gun.

115.    Robb Elementary Principal, Mandy Gutierrez, was in her office when she heard

Coach Silva's report over the radio. Principal Gutierrez attempted to initiate a lockdown on the

Raptor application but had difficulty making the alert because of a bad wi-fi signal.[53] When there

is a threat outside the buildings on the school grounds, the Texas Standard Response Protocol

(SRP) requires school staff to initial an alert "Secure, Lock Out" to alert everyone to get inside

---

[50] Id.
[51] Id.
[52] Committee testimony of Coach Yvette Silva, Robb Elementary (June 16, 2022).
[53] DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).

and secure all outside doors.[54]  If gun shots are heard, the SRP requires an immediate "Lockdown" announcement.[55]  Mandy Gutierrez did not communicate the lockdown alert over the school's intercom. Instead, she called and spoke with Chief Arredondo, who said: "shut it down Mandy, shut it down."[56]  She told head custodian Jaime Perez to ensure all the doors were locked. She initially locked down in her own office, but later moved to the cafeteria.[57]

116.    At 11:31:36 a.m., the shooter is seen on video walking between cars shooting, and a Uvalde PD unit is captured arriving at the crash site.[58]  At 11:31:43, a.m. a UCISD PD officer drove through the west gate near the crash site and across the field to the south side of the building at a high rate of speed.[59]  The shooter was in the parking lot, but the UCISD PD officer did not see him due to his haste. [60]

117.    At 11:31 a.m. a teacher frantically called 911 telling dispatch, "He's shooting!" Gun shots are heard in the background while the teacher, terrified, yelled repeatedly for the kids get to their classrooms.

118.    At 11:32:08 a.m. the shooter reached the west teachers' parking lot adjacent to the building and fired shots through windows into the westmost classrooms before entering the building.

119.    At 11:33 a.m., the shooter entered the school through the back westside door that was unlocked.  The teacher who kicked the rock and shut the propped door, did not check to see

---

[54] *See* Texas School Safety Center, Standard Response Protocol, https://txssc.txstate.edu/videos/srp (last accessed November 10, 2022).
[55] *Id.*
[56] *Id.*
[57] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Chief Arredondo told the Committee he had no recollection of talking to Principal Gutierrez. Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 161 (June 21, 2022).
[58] *Id.*
[59] *Id.*
[60] *Id.* at 15.

that it was locked allowing the shooter easy access inside the school.[61]  Video showed the shooter open and enter the school building unabated.  The exterior doors on the east and south sides of the building were also unlocked so the shooter had several options for entry.[62]





Photo:  School Shooter Entering Robb Elementary.

120.    At 11:34 a.m., only one minute after the shooter entered, Defendant Sgt.

---

[61] ALERRT Report, at 15.
[62] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 2022).

Maldonado parked his TDPS car at Robb Elementary School.

121.     Twenty-four seconds after the shooter entered the school and walked down the

hallway, he shot into the classrooms spraying over 100 bullets in 2 ½ minutes killing and

injuring many innocent victims.  There were no School District police inside the school.  At

11:33:24 a.m., the shooter fired rounds from the hallway toward classrooms 111 and 112.[63]  At

11:33:32 a.m., he entered classroom 111, which was unlocked.[64]  The rate of fire was initially

very rapid then slowed, lasting only a few seconds.[65]  The sound of children screaming was

removed from video recordings released to the public.

122.     At 11:33:37 a.m., the shooter backed out of classroom 111 into the south hallway

and fired shots from the hallway into classroom 112. The shooter then re-entered classroom 111

and continued the shooting spree.  The shooter fired over 100 rounds by 11:36:04 a.m.,

according to audio analysis.[66]

123.     Two minutes, 57 seconds after the shooting began, the first wave of law

enforcement officers entered the school taking positions in the hallway north and south of

classrooms 112 and 111. At 11:35:55 a.m. three Uvalde PD officers entered the school through

the west exterior door into the west hallway.[67]  The officers had external armor, two with

concealable body armor, two rifles, and three pistols.

124.     At 11:36:00 a.m., four additional law enforcement officers arrived, including two

Uvalde PD officers, a Uvalde PD SWATT team commander, and UCISD PD Chief Arredondo.

Chief Arredondo was at his office at the Uvalde High School when he heard "shots fired" on the

---

[63] *Id.*
[64] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at
46 (Tex. 20 22).
[65] *Id.*
[66] *Id.*
[67] ALERRT Report, at 9.

PLAINTIFFS' FIRST AMENDED COMPLAINT

radio. He rushed to Robb Elementary at 11:36 a.m., unprepared, carrying only a Glock 22 handgun. He had no classroom keys, radio, or protective gear. When he got to the school, he dropped his radios near the school fence because they bothered him.[68]  He arrived with another UCISD PD officer and two Uvalde PD officers. They had three external body armor carriers, concealable body armor, and pistols.[69]

125.    Sheriff Nolaso still on Diaz Street was given the shooter's name by his grandmother, Ms. Gonzalez (11:38 a.m. according to body camera footage), which he did not share with the first responders. It was not until 30 minutes later the shooter's name was passed along by Nolasco.

126.    Chief Arredondo was required by the School District's active shooter plan to set up an outside command post as the on-scene commander, but he did not. He told the House Committee:

> [W]hile you're in there, you don't title yourself … .I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as … I'm talking about the command part … the people that went in, there was a big group of them outside that door. I have no idea who they were and how they walked in or anything. I kind of – I wasn't given that direction.
>
> ***
>
> you can always hope and pray that there's an incident command post outside. I just didn't have access to that. I didn't know anything about that.[70]

127.    No officer from Uvalde PD assumed the role of incident commander either, even in the face of Chief Arredondo's failure to do so. A central command away from the immediate

---

[68] Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).
[69] Id.
[70] Texas House Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

action helps coordinate the law enforcement response and centralize and evaluate information and events as they come in to ensure it gets out to key responders on the front lines, and to make decisions and course changes as things develop. Establishing an incident commander is essential for maintaining effective command and control.

128.    Lt. Pargas, the acting Chief of Uvalde PD, told the House Committee that, it was his understanding that officers on the north side of the building understood there were victims trapped inside the classroom with the shooter. And although nobody said it, he, and the officers on the north side of the building were waiting for other personnel from Department of Public Safety or BORTAC to arrive with better equipment like rifle-rated shields.

129.    Captain Joel Betancourt was 70 miles away from Uvalde when the shooting began. While driving to Robb Elementary, Betancourt called the mayor of the City of Uvalde and the Chief of the Uvalde Police Department, and then instructed TDPS officers on the scene that they should remain outside Robb Elementary and establish a perimeter.

130.    The portable radios used by UCISD PD and other law enforcement officers did not work inside the school building, and officers had to step 10 feet away from the school to receive signals. Radios used by Border Patrol agents did work but poorly.[71]

131.    Audio recordings confirm the shooter was actively firing his weapon until 11:36:04 a.m. G.M.'s teacher, Ava Mireles, was killed in front of him. Ms. Mireles called her husband, Ruben Ruiz, a UCISD PD police officer, to tell him she was shot and dying. At 11:36 a.m. Officer Ruiz was seen checking his phone, then a few minutes later, heard telling the other officers his wife was shot. After Ms. Mireles was shot and called her husband, her phone slipped, and a female student grabbed it and called 911. She called several times asking them to send the

---

[71] Texas House Committee testimony of Texas Department of Public Safety Director Steve McCraw (June 21, 2022).

police.

132.     At 11:37:00 a.m. Uvalde PD officers converged on rooms 111 and 112 led by Lt.

Martinez and Sgt. Eduardo Canales but retreated when the shooter fired.[72]  UCISD PD and

Uvalde PD police did not make another attempt at the shooter for more than an hour, until U.S.

Border Patrol officers arrived.[73]

133.     Around 11:41 a.m., more officers arrived, including officers from TDPS.

Defendant Fire Marshal Hernandez entered the building carrying a rifle. Two of the officers on

scene, Deputy Johnny Field, and Deputy Emmanuel Zamora, were instructors at the regional

police academy. Another, J.J. Suarez, was a UCISD School Board member and, upon

information and belief, a reserve officer of the UCISD-PD with more than a decade of law

enforcement experience. All four entered the building.

134.     At this time, TDPS officer Crimson Elizondo lingered outside the building while

others entered. When she did step inside the building, she remained by the doorway and exited in

less than two minutes. At no point did she follow active shooter protocol and participate in the

law enforcement response. TDPS officer Elizondo later admitted, "If my son had been in there, I

would not have been outside. I promise you that."

135.     At 11:43 a.m., Chief Arredondo called for more firepower because he had only a

pistol compared to the shooter's AR-15, 30-round magazines, and bags of ammunition.  He gave

orders to officers to stand down while the shooter was actively shooting teachers and students

trapped in classrooms 111 and 112.  Chief Arredondo later told the public he thought the shooter

was barricaded and no more children were at risk. But audio recordings confirm shooting was

ongoing: 11:40:58 a.m., the shooter fired a shot, at 11:44:00 a.m., the shooter fired another shot,

---

[72] ALERRT Report, at 15.
[73] *Id.* at 17.

and at 12:21:08 p.m., the shooter fired 4 more shots. [74] During each instance, the event was active requiring an immediate action plan. Video footage show hundreds of officers standing with firearms and tactical gear, body armor, and ballistics shields, but no one acted.

136.    By 11:51:20 a.m., law enforcement from various agencies (including Uvalde PD, UCISD PD, Uvalde County Sheriff's Office Deputies, Fire Marshals, Deputies, Southwest Texas Junior College Police Department, and the U.S. Border Patrol) arrived. [75] There were approximately 376 law enforcement officers at the school. [76] Meanwhile, terrified students and teachers trapped inside classrooms with the shooter dialed 911.

137.    At 11:59 a.m. Chief Arredondo, contrary to active shooter protocol, tried to start negotiations with the shooter, who was still unknown to him.

138.    At 12:03 p.m., the first 911 call came from a female child. She called back several times over the next 13 minutes, telling officials there were multiple people dead at 12:16 p.m., she called back and said there was eight to nine students alive.

139.    At 12:19 p.m., a 911 call was placed by a student in an adjoining classroom. The child hung up when another student told her to hang up. Another Robb call came in three minutes later. On this one, the sound of three gunshots can be heard. Due to lack of communication among law enforcement and Chief Arredondo's and Lt. Pargas' failure to set up a command post, Chief Arredondo, and others inside were unaware of the 911 calls.

140.    At 12:21 p.m., after a 37-minute break in shooting, the shooter began firing again from inside the classroom. A team of law enforcement officers with rifles and tactical gear approached the classroom but made no attempt to enter the classroom. Among those that did not

[74] ALERRT Report, at 17.
[75] ALERRT Report, at 8.

attempt to approach the classroom in response to the shots fired was Christopher Kindell of TDPS. He continued to confer with Border Patrol agents instead of rushing the classroom as active shooter protocol requires.

141.    At 12:30 p.m., Defendant TDPS Captain Betancourt arrived (he later told investigators he had not arrived until 12:45 p.m., which was false). Defendant Captain Betancourt instructed state police officers on site to remain outside and establish a perimeter, rather than rush inside, as active shooter protocol requires.

142.    At 12:36 p.m., the initial female student caller dialed 911 again. The student was told to "stay on the line and to be quiet." The student told the dispatcher "He shot the door," and hung up after 21 seconds. Minutes later, the child called to plead: "Please send the police now."

143.    The next 911 calls coincide with when U.S. Border Patrol officers entered the classroom — more than an hour after the shooter's arrival on campus — and shot him. "At 12:51 p.m., it's very loud and it sounds like officers are moving children out of the room," according to DPS Director McGraw. "By that time, the first child was out before the call cuts off."

144.    From 12:21:16 p.m. until 12:34:38 p.m., Chief Arredondo discussed tactical options and considerations including snipers, windows, a master key, and how to get into the classroom with a Uvalde PD officer. They also discussed who had the keys, testing keys, the probability of the door being locked, and if kids and teachers are dying or dead.[77] When the keys arrived, Chief Arredondo tried them, on a different door, but none worked. He never asked the school principal, just feet away, or the head custodian for the master key. He was inside fumbling with keys when he should have been outside at a command post. The House

_____

[77] ALERRT Report, at 9.

Committee investigation revealed that the door to classroom 111 was probably not locked.[78]

145.    By 12:48 p.m., a BORTAC-led group of officers was finally preparing to breach the door. However, Captain Betancourt came over the radio with a message: "Hey, this is D.P.S. Captain Betancourt. The team that's going to make breach, I need you to stand by." Thankfully, his message was ignored.

146.    At 12:50:03 p.m., 77 minutes after the massacre began, U.S. Border Patrol officers breached the door of Room 111 and fatally shot the shooter.[79]  The Border Patrol officers, using a ballistic shield, entered the classroom and shot and killed the shooter after local law enforcement officers, including UCISD PD and Uvalde PD officers waited outside doing nothing for nearly 50 minutes while children repeatedly called 911 pleading for help.  The shooter was standing in front of a closet in the corner of Room 111, and he fired his rifle at the stack of officers coming through the classroom door. The officers fired on the shooter killing him.

    **F.**    **THE SCHOOL DISTRICT AND LAW ENFORCEMENT DID NOT FOLLOW ACTIVE SHOOTER MANDATES AND THEIR OWN POLICIES**

147.    Active shooter protocols for school shootings developed after the 1999 Columbine massacre require all law enforcement responding to a school shooter to immediately target the subject, even if it means putting themselves in harm's way.  In 2019, the Texas Legislature passed House Bill 2195, effective June 14, 2019, requiring all school district police officers to complete an active shooter response training program approved by Texas Commission

---

[78] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 71 (Tex. 2022).
[79] ALERRT Report, at 11.

on Law Enforcement ("TCOLE") and for all districts to develop an active shooter plan.[80] Jon

Rosenthal, Texas House of Representatives, District 135, told National Public Radio, the Uvalde

School District received money from the Texas Legislature specifically for training, for

equipment and for updating the school's security.[81]  Rep. Rosenthal was one lawmaker who

wrote HB 2195 advocating that school police take standardized active shooter training

emphasizing confronting the shooter quickly. The UCISD PD took the course in March 2022.[82]

148.    The active shooter protocols direct officers to "isolate, distract, and neutralize:"

> Officers have three primary goals in responding to an active attack on their school. These
> goals are:
>
> **ISOLATE** – Drive or segregate the attacker in an area where their capacity to harm students,
> staff or visitors is minimized until more first responders arrive.
>
> **DISTRACT** – Engage the attacker so that they have a diminished capacity to hurt students,
> staff or visitors. If they are engaged with the officer(s) they will be less capable of hurting
> innocents. It also buys time for students, staff and visitors to implement their Avoid-Deny-
> Defend (ADD) strategies.
>
> **NEUTRALIZE** – Take away the attacker's capacity to harm other people. This may include
> the use of deadly force, disabling an attacker, or disarming an attacker and taking them into
> custody.

149.    Based on reports, UPD and UCSO officers responding to the school shooting did

not receive adequate active shooter training.  Half of the responding 25 UPD officers, including

acting chief Pargas did not receive the active shooter training and only 20% (8) of the 16 UCSO

---

[80] Tex. H.B. 2195, § 1, 86th Leg., R.S. (2019) ("A school district shall include in its multihazard emergency
operations plan a policy for responding to an active shooter emergency. The school district may use any available
community resources in developing the policy described by this subsection."), codified as Tex. Educ. Code § 37.108.
[81] Id.
[82] *Id.*

officers responding officers did.[83]

150.    Under HB 2195, Chief Arredondo was required to develop and implement an active shooter plan.  On April 15, 2020, he and Director of Student Services, Kenneth Mueller, prepared and adopted, "Annex 1 Active Shooter."[84] The plan recognized that "[t]he district has primary responsibility for the health and safety of students, staff, substitute teachers, and visitors while on district property and shall ***coordinate the law enforcement***, health, and medical services with other first responders.[85]

151.    The School District never assumed a leadership role to establish a centralized command to coordinate the law enforcement response and active shooter tactics and protocols to stop the killing and render medical aid – protocols clearly known to them.  Chief Arredondo knew, by his own written policy, excerpted above, it was his responsibility as Police Chief of the UCISD PD to take command. DPS Director, Col. Steve McGraw, told the Texas Senate on June 21, 2022: "The School District police's response was an "abject failure."[86]  He confirmed: "there were enough armed officers wearing body armor to isolate, neutralize and distract the shooter. It doesn't matter what you are wearing, you go in, windows are also an option."[87]  McGraw was referring to the directives of the active shooter training tactics all school and local police are required to know.

152.    Recognizing Chief Arredondo's obvious incompetence and failure to take

---

[83]  Dalton Huey, <u>Majority of Uvalde Law Enforcement Officers Never Had Active Shooter Training</u> August 10, 2022 (TCOLE records indicate only eight, approximately 20%, of the peace officers at UCSO had ever received active shooter training), <u>https://www.kxan.com/investigations/majority-of-uvalde-law-enforcement-officers-never-had-active-shooter-training</u> (last accessed December 7, 2022)

[84]  *See* Uvalde Consolidated ISD, Annex 1: Active Shooter ¶ 1 ("The Uvalde CISD police department along with the Director of Student Services makes recommendations and creates plans to develop a safe environment and to lead the District to Mitigate, Prevent, Prepare, Respond, and Recover from potential active shooter situations.").

[85]  *Id.* ¶ IV.B.4.f.

[86]  *Id.*

[87]  *Id.*

command, the Uvalde PD, UCSO or TDPS was under an obligation to assume command. The

active shooter protocols instruct all officers that, any law enforcement officer can assume

command, somebody must assume command, and an incident commander can transfer

responsibility as an incident develops. Lt. Mariano Pargas, the acting chief of Uvalde PD on the

day of the massacre in Chief Daniel Rodriquez's absence, never assumed command, neither did

30-year veteran Sheriff Nolasco who first responded to the grandmother's shooting. The lack of

effective command by all on scene law enforcement contributed to loss of life and injuries and

was a moving force in causing the constitutional violations of Plaintiffs and their damages.

153.    The School District and UCISD PD's active shooter policy specifically addressed

campus security and mandated that all outside and inside doors be locked. Regarding securing

doors, the plan required:

> Staff will conduct inspections of classrooms to make sure doors and windows can
> be secured …. Doors to all classrooms will remain locked during instruction and
> the campuses will have one main entry point to the school. Each staff member
> will know the procedures to follow in order to have any door or window repaired
> that will not lock.[88]

154.    The plan further required:

> Teachers are instructed to keep their classroom doors closed and locked at all
> times. Barriers are not to be used. Substitutes shall follow the same policy, with
> campuses ensuring they have access to the classrooms they need throughout the
> day. The Standard Response Protocol are on the back of all our badges issues to
> substitute teachers.[89]

155.    Despite these policies written and adopted by the School District and UCISD PD,

it was common for the School District to intentionally leave doors unlocked or propped opened.

Teachers and others would use door stops, wedges, rocks, and magnets to prevent interior doors

from latching. Substitute teachers were told by School District officials to use the "magnet

---

[88] *Id.* ¶ IV.B.1.b.
[89] *Id.* ¶ IV.B.2.r.

system" to circumvent the locks in violation of school security policy.[90]  It was not uncommon for regular staff not to have keys because they were lost, forgotten, or not given to them due to lack of supply.  It was customary for staff to leave doors unlocked for their convenience.  The School District administrators and police tacitly condoned the staff's conduct and were aware of these unsafe practices but did not treat them as serious infractions requiring immediate correction.[91]  On the morning of the massacre, **after** the School District was aware of the shooter and went on "lock down," the doors still were not checked or locked.  In fact, no one had locked any of the three exterior doors of the west building that day.[92]  This was not unusual.

156.    The House of Representatives, Investigative Committee's July 16, 2022, Interim Report found the door to classroom 111 was usually unlocked, and despite many knowing it was broken, was never repaired.

157.    "Room 111 could be locked, but an extra effort was required to make sure the latch engaged. Many knew Room 111's door had a faulty lock, and school district police had specifically warned the teacher about it. The problem with locking the door had been reported to school administration, yet no one placed a written work order for a repair."[93]

158.    Robb Principal Gutierrez confirmed during her committee testimony that school administration **knew** about the issues with classroom door 111, stating it was reported around

---

[90] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 25-26 (Tex. 2022). Harrison, Uvalde CISD Maintenance and Operations Director (June 16, 2022). Assistant principal Shawna Wolbert, who was not present on campus during the incident, told the Department Fof Public Safety that there was a "magnet system" with magnets provided to substitutes to keep doors from locking. DPS interview of Robb Elementary Assistant Principal Shawna Wolbert (May 28, 2022). Principal Gutierrez said the same thing in her statement to DPS. DPS interview of Robb Elementary Principal Mandy Gutierrez (May 28, 2022).

[91] *Id.*

[92] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 6 (Tex. 2022).

[93] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 4 (Tex. 20 ALERRT Report, at 16.

spring break of 2022.[94] It was known to her and among teachers and students throughout the fourth grade that Room 111's door was always unlocked. Staff regularly entered the unlocked door to access the printer in that room.[95] *No one* placed a work order for the door to be repaired.[96]

159.    The School District had a history of failing to protect students against trespassers. In the last year, there were incidents where the school had to shut down that school because trespassers were on school property. The school never addressed or fixed its security issues.[97]

160.    School alerts and school trespassers were not treated with urgency by the School District and its staff. Moreover, the regularity of school alerts from area "bailouts" created lessened security vigilance.[98] Too many "cry wolves" left the leadership and staff feeling too comfortable and not ready to act in the event of a school shooter. School District administrators and the Uvalde PD initially thought the shooting was likely a "bailout" situation.[99] While "bailouts" are particular to border cities; the incidence of school shootings was common knowledge and occurring in schools across the United States. Compliance with security protocols was urgent, demanding the School District and local police to be hyper vigilant.

161.    Since the 1999 Columbine tragedy, law enforcement departments around the country recognized the urgent need that all officers be trained on school shooter protocols. All

---

[94] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).
[95] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022); see also interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).
[96] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).
[97] *See* Michael Martinez CNN interview. June 2022.
[98] "Bailouts" is a term used in border communities for the increasingly frequent occurrence of human traffickers trying to outrun the police, usually ending with the smuggler crashing the vehicle and the passengers fleeing in all directions. The frequency of these "bailout"-related alarms—around 50 of them between February and May of 2022—contributed to a diminished sense of vigilance about responding to security alerts. *See* H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 6 (Tex. 2022).
[99] The possibility of a bailout "came over my mind at some point … because they happen so often, and there's been a few that were armed." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

Texas Peace Officers certified since 2005 should have received basic active shooter response as part of their basic academy training. The active shooter training commands all police and first responders to put innocent lives above their own and move in and stop the killing. This is regardless of the officers' specialty or usual role. The training refers to the "Priority of Life Scale" where innocent civilians come before all others.

162.    All first responders knew and understood that time was critical during a mass shooting, and any delay meant loss of life due to blood loss. Every second someone is bleeding, decreases their chance of survival. Medical aid must be started immediately to prevent loss of life. The average human body contains 5-6 liters of blood. Children have proportionately smaller amounts. When the body loses approximately half of its normal volume, irreversible shock sets in and the body cannot survive regardless of the medical care it eventually receives. Time is crucial. One teacher died on the way to the hospital, suggesting that taking down the shooter faster might have made a difference. Teacher Elisa Avila in Classroom 109 was shot by a bullet that went through the wall.[100] A pediatrician who treated the victims described small bodies "pulverized" and "decapitated." The bodies of several victims, disfigured beyond recognition, were identified by their DNA; one 10-year-old victim's body was identified based on her green Converse sneakers.[101] All law enforcement and the individual defendants knew that time is critical because of their active shooter training and written policies. Yet, all place the lives of themselves and other officers before the lives of the teachers and children.

---

[100] *See* Texas House Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[101] Nicholas Bogel-Burroughs, An Uvalde pediatrician says he will 'never forget what I saw' after the shooting, N.Y. Times (June 8, 2022), www.nytimes.com/2022/06/08/us/uvalde-pediatrician-shooting.html;Jaclyn Diaz, The story of a Uvalde victim's green shoes captures the White House's attention, NPR (June 7, 2022), https://www.npr.org/2022/06/07/1103577387/matthew-mcconaughey-green-converse-shoes-sneakers-uvalde-maite-rodriguez.

**G.**     **THE GUN DEFENDANTS ARE NOT SHIELDED BY THE PROTECTION OF LAWFUL COMMERCE IN ARMS ACT ("PLCAA") BECAUSE THEY VIOLATED FEDERAL LAWS.**

163.    The Gun Defendants cannot abate any responsibility for this massacre and attempt to hide behind the federal law, The Protection of Lawful Commerce in Arms Act, 15 U.S.C. Sec. 7901, *et. seq.* ("PLCAA"). PLCAA is a federal law that prohibits injured parties from suing gun manufacturers or dealers for personal injuries solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended. PLCAA, however, is unconstitutional, in violation of the Tenth Amendment of the U.S. Constitution.

164.    Assuming PLCAA is constitutional and applies to Plaintiffs' claims against the Gun Defendants, PLCAA is not an absolute bar, but an affirmative defense. Plaintiffs' claims against the Gun Defendants are not prohibited by PLCCA, but expressly allowed. PLCAA allows narrow protection from some claims, while expressly permitting other claims based upon the unlawful or negligent actions of the gun dealer or manufacturer, or violation of a state or federal statute applicable to firearms.

165.    First, the Gun Defendants further violated federal law by negligently transferring and selling firearms to the Uvalde school shooter in violation of 15 U.S.C. § 7903(5)(B). The Gun Defendants sold the AR-15 style rifles, ammunition, and accessories to the Uvalde school shooter when they knew or should have known he was likely to, and did, use the weapons in a manner involving unreasonable risk of physical injury to others. *See* 15 U.S.C. § 7903(5)(B).

166.    Second, the Gun Defendants violated federal law by falsely, unfairly, and deceptively marketing its weapons and trigger systems to consumers in violation of the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, as amended (the "FTC Act"). The FTC Act protects the public from sellers that wrongfully, deceptively, unfairly, and in this case,

unscrupulously, market products, including firearms, to consumers. The FTC Act encompasses the acts of the Gun Defendants because they not only intentionally deceive consumers in their marketing, but they promote, encourage, and glamorize unsafe and illegal conduct that causes injury and death.   The FTC itself has construed the FTC Act as prohibiting practices that are physically dangerous to consumers. *Soto v. Bushmaster Firearms Int'l*, LLC, 331 Conn. 53 (Conn. 2019); *see also* J. Beales III, "*Advertising to Kids and the FTC: A Regulatory Retrospective That Advises the Presen*t," 12 Geo. Mason L. Rev. 873, 876 (2004). The FTC has, on multiple occasions, found violations of the FTC Act when companies have advertised or promoted their products in a manner that is likely to result in physical injury, even in the absence of product sales. *Id.*  As discussed *infra*, the Gun Defendants' marketing and advertising practices violate the FTC Act, which is a predicate exception to PLCAA.  Assuming PLCAA is found constitutional, the Gun Defendants are not entitled to dismissal under PLCAA.

### III.   FIRST CAUSE OF ACTION:
### 42 U.S.C. § 1983
### FIFTH AND FOURTEENTH AMENDMENTS;
### <u>STATE CREATED DANGER AND SPECIAL RELATIONSHIP</u>

*(Against All Government and Individual Defendants)*

167.   Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

168.   The Due Process Clause provides that no state shall deprive any person of life, liberty, or property without due process of law. U.S. Const amend., XIV, § 1

169.   Defendants are liable to Plaintiffs under the Fifth and Fourteenth Amendments of the U.S. States Constitution for using their authority under state law to create a dangerous environment for Plaintiffs, and for restraining the personal liberty of Plaintiffs, while not doing what they were required by law to do to protect Plaintiffs.  Defendants had policies, practices,

and customs of conscious indifference to federal law, federal and state legal mandates, and their own policies and procedures regarding school safety, training, and preparing their schools, staff, and police for a school shooter.

170.   Defendants used their authority to interfere with and prevent others from intervening and responding to the active shooter and protecting Plaintiffs.  By their actions, Defendants restrained the personal liberty of Plaintiffs, and thus assumed a duty of care over Plaintiffs, were in a special relationship to Plaintiffs, and failed to protect Plaintiffs, who were in their care and custody. Such acts and omissions rise to the level of deliberate indifference and conscious indifference in violation of the Plaintiffs' constitutional rights and for which Plaintiffs seeks recovery under 42 U.S.C. §1983.

171.   Defendants also used their authority to hold Plaintiffs in the their custody, and, because of their affirmative acts and omissions, they prevented others from intervening and responding to the active shooter and protecting Plaintiffs, thereby subjecting Plaintiffs to a state-created danger.  Such acts and omissions rise to the level of deliberate indifference and conscious indifference in violation of the Plaintiffs' constitutional rights and for which Plaintiffs seeks recovery under 42 U.S.C. §1983.

A.   **THE SCHOOL DISTRICT CREATED A DANGER TO PLAINTIFFS IN THEIR CUSTODY.**

172.   The Due Process Clause of the United States Constitution imposed upon the School District a duty of care to protect Plaintiffs from immediate harm, *especially* harm it created on May 24, 2022.  Plaintiffs were locked in the School District's custody, and, because of the School District's affirmative acts and omissions, the Plaintiffs were imprisoned, terrorized, and shot at by the school shooter.  Plaintiffs were not free to leave, and in fact their parents were restrained, tased, and handcuffed outside and not allowed to get them from the School District's

custody.

173.    The School District placed the Plaintiffs in immediate danger by their own affirmative acts and omissions.  Because the School District assumed a duty of care to protect Plaintiffs by locking them in, the School District is responsible for their harm.

174.    The School District had a policy, custom, and practice of allowing staff to circumvent security and leave outside doors unlocked, which created a danger to Plaintiffs.  No School District employee locked any of the three exterior doors of the west building the day of the shooting.[102]  A teacher propped open the door the shooter entered just before he came on campus.

175.    Once aware of the shooter, Principal Gutierrez did not alert the teachers using the available Raptor and intercom system resulting in the failure to activate a campus-wide "Secure, Lock Out" or "Lock Down" order required by law and her SRP training leaving news of the shooter to travel inconsistently by word of mouth.  Video footage showed the shooter enter Robb Elementary's west building door previously propped open and head down the hallway to start the massacre at Classrooms 111 and 112.  The shooter entered Classroom 111, that was supposed to be repaired by the School District but was not.  The classroom door was unlocked, and the teacher never received notice of the lockdown.  Eleven children died in Classroom 111.

176.    The School District's affirmative acts and omissions created an immediate danger to Plaintiffs.  The School District was aware the shooter was on campus before he entered the school but failed to secure the school and its doors to protect Plaintiffs in their custody.  The School District ordered Plaintiffs, the staff and students, age 8-10, to be "locked down" in the classrooms and in doing so, assumed responsibility for their care and safety.  Plaintiffs were not

---

[102] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 6 (Tex. 2022).

free to leave. In fact, Plaintiffs' parents and others rushed to the school to enter the school and save their children but were restrained outside by law enforcement.

**B.   THE SCHOOL DISTRICT DID NOT COMPLY WITH SECURITY PROCEDURES.**

177.   The School District had a security policy requiring that all exterior and interior classroom doors be locked.[103]  No outside doors were to be unlocked, propped, or left open. However, the School District, its staff, and police had a dangerous policy, practice, and custom of noncompliance with its own school security policies.  For some teachers, the inconveniences of keeping up with a key outweighed their perception of the risk of leaving doors unlocked.[104] For others, the regularity of school alerts from area "bailouts" created a culture of lax and lessened security vigilance. The School District, its leaders, and staff were not attentive to the real possibility of a school shooter and did not enforce security policies and outright dismissed school alerts as "bailouts."

178.   After the shooting rocks and wedges were found on the ground outside most exterior doors after the massacre evidencing the failure to enforce security.[105]  The staff routinely propped open doors for easy access to and from the parking lot to carry things in and out of school for their convenience.  The School District even suggested circumventing the door locks as a solution for substitute teachers and others who lacked their own keys.[106]

179.   The School District knew not enforcing its school security procedures left children in their custody at risk of death.  The School District was informed of its obligation to

---

[103] Uvalde Consolidated ISD, Annex 1: Active Shooter ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times.").

[104] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 26 (Tex. 2022).

[105] ALTERRT Report, 15.

[106] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session (Tex. 2022).

comply with security and training mandates set by its regulating agencies, including the Texas Education Agency, yet allowed staff to leave doors unlocked, propped, and locking mechanisms disabled.

### C.   THE SCHOOL DISTRICT DID NOT REPAIR BROKEN SECURITY DOORS

180.    The School District had a policy, practice, and custom of not maintaining Robb Elementary's exterior and interior security doors and ensuring they locked correctly.  The House of Representatives, Investigative Committee's July 16, 2022, Interim Report found the door to classroom 111 was usually unlocked, and despite many knowing it was broken was never repaired.[107] The shooter entered the school through the exterior westside door, he walked down the hallway towards classrooms 111 and 112 and entered classroom 111 unabated where eleven children died.

181.    Principal Gutierrez *knew* about the issues with classroom door 111, but never had it fixed.[108]  The school's custodian never received a work order, if he had, he told the House Committee, he would have fixed it.[109]

182.    The School District's failure to maintain and repair its security doors was deliberately indifferent to the rights of Plaintiffs in their care and custody and were moving forces in causing the constitutional violations of Plaintiffs and their damages.

### D.   THE SCHOOL DISTRICT AND PRINCIPAL GUTIERREZ DID NOT USE ALERT SYSTEMS.

183.    The School District's failure to have a working alert system left many teachers without warning of the shooter, including the teacher of classroom 111 who did not receive

---

[107]  H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 4 (Tex. 20  ALERRT Report, 16.
[108]  Texas House Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).
[109]  Texas House Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).

notice of the lock down.[110]  After Principal Gutierrez received notice of the shooter, she tried to order a lockdown on the Raptor application, but the alert did not go through due to a bad wi-fi signal.[111]  The school was known to have bad wi-fi connections.  She could have used the school's intercom system but did not. Many teachers and staff only learned of the shooter by word of mouth, and many got no warning at all.  Under Texas SB11, the Uvalde School District was required to ensure all communication technologies were prepared for an emergency.[112]

184.    Due to the School District's communication equipment inadequacies and Principal Gutierrez's intentional choice to not use the available intercom system, many teachers did not receive news of the school shooter and were unable to take protective measures like securing doors.  The School District's and Principal Gutierrez's policies, practices, and customs were deliberately indifferent to the rights of Plaintiffs and were moving forces in causing the constitutional violations of Plaintiffs and their damages.

**E.   THE SCHOOL DISTRICT DID NOT COMPLY WITH ACTIVE SHOOTER PROTOCOLS**

185.    Active shooter training protocols were required for all local and school law enforcement.  In 2019, the Texas Legislature passed H.B. 2195 and S.B. 11, mandating active shooter training plans and protocols for all school districts staff and school-based law enforcement. All UCISD PD officers had to complete an active shooter response training program approved by Texas Commission on Law Enforcement ("TCOLE").[113] These mandates were urgent, and not discretionary. The School District was responsible for making sure their

---

[110] DPS (Elizondo) interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).
[111] DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).
[112] S.B. 11, 2019 Leg., 86th Sess. (Tex. 2019).
[113] Tex. H.B. 2195, § 2, 86th Leg., R.S. (2019) ("A school district peace officer or school resource officer shall complete an active shooter response training program approved by the Texas Commission on Law Enforcement."), codified as Tex. Educ. Code § 37.0812.

officers had the resources, equipment, communication technologies, and training required to meet its constitutional obligations to provide a safe and secure learning environment for the children and teachers of Uvalde.   The School District received funding from the State of Texas for the training and to update its security equipment and was under an affirmative obligation to follow, implement, oversee, and enforce the state-mandated training.

186.    The School District made decisions about law enforcement resources and training policies, practices, and customs and implemented and executed them through their chief policymakers including Chief Arredondo, the Chief of the UCISD PD.  The School District was aware of the incidence of school shootings across the U.S. for the past decades through news reports, media, police training, and mandates from the TEA on the urgency of school security and law enforcement training to protect students from school shooters. But due to the School District's culture of noncompliance and lackadaisical attitude, it did not enforce the training, it did not update its equipment and communication technologies, the school infrastructure and ability to maintain wifi communications or take seriously the active shooter protocols.

187.    The decisions and failures by the School District, Principal Gutierrez, Chief Arredondo, and officers, expose the School District's deliberate disregard of the state active shooter and school safety protocols. No one from the School District police took steps to "isolate, distract, and neutralize" the shooter or stop the killing evidencing a *de facto* policy of non-compliance with the state school safety and active shooter laws.  The School District, Principal Gutierrez, Chief Arredondo were provided with the training resources by the TEA and Texas School Safety Center along with at least monthly updates and training to reinforce the obligations to ensure school safety.  The School District's failure to comply with the training requirements were moving forces behind and caused the constitutional violations and damages of

Plaintiffs.

**F.   THE SCHOOL DISTRICT'S HIRING AND SUPERVISION POLICIES AND PROCEDURES WERE CONSTITUTIONALLY INADEQUATE.**

188.    The School District and its policy makers, including the Board of Trustees and Superintendent, were responsible for selecting, hiring, and overseeing the School District's police department and its Chief of Police.  The School District and its Board of Trustees appointed Chief Arredondo to run its police force for all the School District's schools in 2020 and put him in command of a team of six officers.  After the shooting, Chief Arredondo resigned from his city council position and was fired by the School District.

189.    As evidenced by the lack of action by Chief Arredondo and his officers, the UCISD PD was neither prepared nor competent to protect the students and staff to defend the attack of a single inexperienced 18-year-old shooter.  The lack of command and response by UCISD PD showcased their ignorance of what their positions required, and the courage needed to stop a shooter.  It was clear they did not learn the active shooter training protocols and did not attend the TEA and Texas School Safety Center's training and updates on school safety.  Chief Arredondo and each of the officers selected by the School District stood by cowardly taking no affirmative steps to stop the shooter.  The police actions evidence the School District's inadequate hiring policies, lack of oversight, and failure to ensure compliance. If the officer selection and oversight policies and practices had been adequate, the School District chief and officers would not have stood by, with protective equipment and firearms, while students and teachers were shot and terrorized.

190.    The School District's failure to hire competent law enforcement coupled with their policies, practices, and customs of not supervising, training, and preparing them for school shooters, amounted to deliberate indifference to the constitutional rights of Plaintiffs and were

moving forces behind and caused the constitutional violations and damages of Plaintiffs.

### G.  INDIVIDUAL LIABILITY OF CHIEF ARREDONDO FOR FAILURE TO TAKE COMMAND AND FOLLOW ACTIVE SHOOTER PROTOCOLS.

191.    Chief Arredondo is individually liable in his official and individual capacities under 42 U.S.C. § 1983 for his decisions and failures on May 24, 2022.  The Chief is not entitled to immunity due to his role as official policymaker for UCISD PD and his deliberate indifference to the rights of Plaintiffs, which were clearly established prior to the shooting.

192.    As the chief of the six-person UCISD PD, Chief Arredondo oversaw safety and security for the School District.  He was responsible for establishing the UCISD PD's active shooter emergency plan, coordinating the first responders' response to an active school shooter, and making certain UCISD PD officers understood the state-mandated active shooter training protocols and stood ready to deploy them. As chief of the UCISD PD, Chief Arredondo was the official policymaker for the UCISD PD, who was delegated responsibility for establishing USISD's active shooter emergency plan and compliance.

193.    Chief Arredondo was one of the first responders. His active shooter plan appointed him the incident commander in any active shooter response. Rather than take command, he stayed inside the school hallway, failing to set up an outside command post where he could effectively provide direction and information to the first responders.  He was without radios (because he dumped them outside) and was unaware of the children's 911 calls from inside the classrooms providing important information on the shooter's whereabouts and actions. He wasted precious time fumbling around for keys.  He never asked the principal or head custodian on site for the master key.  He never needed the keys because the doors were left unlocked.

194.    If Chief Arredondo had implemented the active shooter protocols and had taken

command as he was required to do, as required by his own written policy, officers would not have stood down as they did.  Instead, Chief Arredondo established an on-the-scene official policy of disregarding all state-mandated active shooter policies and adopted flawed policies of: (1) treating the active shooter as a "barricaded suspect"; (2) not establishing a command post; and (3) waiting for other law enforcement agencies to breach the door and gain control of the shooter.  Bizarrely, Chief Arredondo told the House Committee he never thought he was the on-scene commander despite the clear written policy, *he implemented,* directing that he was.

195.    Chief Arredondo made a deliberate choice not to execute his emergency plan ("Annex 1: Active Shooter" plan) take command or mobilize his team – the very life-saving duties he was appointed to fulfill.  Chief Arredondo's decisions contributed to the lack of a swift and effective law enforcement response that could have saved innocent lives and prevented further injuries. Chief Arredondo made the decision to retrain the personal liberty of Plaintiffs, and deliberately kept them from their families, who were prevented from entering the school building by law enforcement who handcuffed, pushed, tackled, threatened, and tasered. Plaintiffs Chief Arredondo's decisions amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

## H.   INDIVIDUAL LIABILITY OF PRINCIPAL GUTIERREZ FOR FAILURE TO COMPLY WITH SCHOOL SECURITY PROCEDURES.

196.    Principal Gutierrez is individually liable in her official and individual capacities under 42 U.S.C. § 1983.  Principal Gutierrez is not entitled to immunity due to her deliberate indifference to the rights of Plaintiffs.

197.    Principal Gutierrez was the Principal for Robb Elementary charged with the duty to enforce school security and active shooter protocols, and to discipline staff for any misconduct

and non-compliance. Ms. Gutierrez allowed staff to leave classroom doors unlocked, propped open, and/or without the latching mechanisms engaged for the convenience of teachers and staff who did not have keys. Principal Gutierrez, as an official policymaker for the School District, was aware of the security non-compliance at Robb Elementary, ratified it, and encouraged it.

198.    Principal Gutierrez was also aware of broken security doors and made no efforts to ensure timely repairs.  Because of Principal Gutierrez' deliberate indifference to school safety, the shooter entered Robb Elementary unlocked outside doors and the unlocked classroom 111. Principal Gutierrez' failure to enforce school security procedures amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

### I.    UVALDE, UVALDE COUNTY, AND TDPS'S DID NOT TAKE COMMAND OR FOLLOW ACTIVE SHOOTER PROTOCOLS.

199.    Defendants are liable to Plaintiffs for constitutional violations of the Fourteenth Amendment for failing to protect Plaintiffs.  Defendants are charged by law with the administration and operation of the Uvalde PD, UCSO, and TDPS including the employment, control, supervision, discipline, training, and practices of employees and law enforcement officers, and with the formulation of policies, practices, and customs.  Defendants' policies, practices, and customs were executed with deliberate indifference to the rights of Plaintiffs and were moving forces in causing the constitutional violations of Plaintiffs and their damages.

200.    Every law enforcement officer in Texas must be trained on active shooter protocols.[114]  The training commands that every peace officer must be willing to risk his or her

---

[114] Tex. H.B. 2195, § 2, 86th Leg., R.S. (2019) ("A school district peace officer or school resource officer shall complete an active shooter response training program approved by the Texas Commission on Law Enforcement."), codified as Tex. Educ. Code § 37.0812.

life without hesitation.[115]  All law enforcement responders were required to distract, isolate, and neutralize the shooter threat, even in tactically complex situations and when they lacked special training.[116]  No officer needed to wait for an order.  Defendants were responsible for ensuring all law enforcement officers had the active shooter training and the resources, equipment, communication technologies required.

201.    Only half of 25 responding Uvalde PD officers and 20% (8) of 16 responding UCSO officers received active shooter training.  Of those trained, they chose not to follow the protocols.  No law enforcement assumed command until more than an hour into the shooting, when U.S. Border Patrol officers arrived.  Defendants' officers were seen standing around with firearms, body armor, and ballistic shields doing nothing while unprotected teachers and students were shot and killed for over an hour.  There were at least 376 officers at the scene versus one inexperienced shooter. No one from any of the responding agencies, other than the border patrol, tried to breach the classroom and take down the shooter.

202.    Defendants' failure to hire competent law enforcement coupled with their policies, practices, and customs of not supervising, training, and preparing them for school shooters, amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

**J.    UVALDE PD DID NOT RESPOND TO 911 CALLS FROM THE SHOOTER'S NEIGHBOR.**

203.    The shooter's neighbor called 911 twice after seeing the shooter's grandmother emerge from the home bleeding and holding her face. No one from Uvalde PD answered the 911 calls to respond to the Diaz St. shooting allowing the shooter to continue towards the school and

---

[115]Federal Bureau of Investigation & ALERRT, Active Shooter Response – Level 1, at STU 1-9 (version 7.2, 2020).
[116] *Id.*

make entry unobstructed.  Uvalde Sheriff Nolasco arrived at the shooter's grandmother's home only after being flagged down by a motorist near Robb Elementary in response to the shooter's crash and chose to stay there rather than following the shooter to the school.

### K.   INDIVIDUAL LIABILITY OF LT. PARGAS FOR FAILURE TO TAKE COMMAND AND EXECUTE ACTIVE SHOOTER PROTOCOLS.

204.    Lt. Mariano Pargas is individually liable under 42 U.S.C. § 1983 for his decisions and failures on May 24, 2022, and is not entitled to immunity due to his deliberate indifference to the rights of Plaintiffs.

205.    Lt. Pargas, the acting chief of Uvalde PD on the day of the massacre, never assumed command despite clear directives from active shooter training protocols to do so.  As discussed throughout this Complaint, Uvalde PD were the first responders and Lt. Pargas was required to assume initial command, and after it was evident the School District did not.  Lt. Pargas assumed Chief Arredondo was in command, although he never confirmed. [117]  Uvalde PD Chief Rodriquez told Lt. Pargas by phone to establish a command post, which he attempted to do at the funeral home across the street.[118] But, because he did not stay at the command post to lead, his command post was woefully inadequate and not in accord with active shooter protocols.

206.    Lt. Pargas' failure to follow his Chief's orders and deliberate decision not to follow active shooter training protocols amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

\\

\\

---

[117] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 59 (Tex. 2022).
[118] Id.

**L.  INDIVIDUAL LIABILITY OF SHERIFF NOLASCO FOR FAILURE TO TAKE COMMAND AND EXECUTE ACTIVE SHOOTER PROTOCOLS.**

207.    Sheriff Nolasco is individually liable in his official and individual capacities under 42 U.S.C. § 1983 for his decisions and failures on May 24, 2022.  The Chief is not entitled to immunity due to his deliberate indifference to the rights of Plaintiffs.

208.    As the elected Sheriff of Uvalde County, Chief Arredondo oversaw the training, hiring, and discipline of Uvalde County's Sheriff's deputies.   Sheriff Nolasco is a 30-year veteran of law enforcement elected to lead the Uvalde County's law enforcement.  He was responsible for implementing and enforcing active shooter training among his department and on the day of the massacre and following the protocols himself.  As Sheriff, he was the official policymaker for UCSO.  Based on information and belief and agency reports, only 20% of the UCSO responders received active shooter training.

209.    Sheriff Nolasco was aware of the shooter moving towards the school when arrived at Diaz Street responding to the grandmother's shooting.  Rather than go to the school to stop the shooter and take command, or otherwise assist with directing the law enforcement response and mobilizing his team, he chose to stay on Diaz Street, a crime scene that was under control.

210.    Sheriff Nolasco made a deliberate choice not to go after the shooter moving toward the school, take command or mobilize his team to take down the shooter.  Sheriff Nolasco's decisions amounted to deliberate indifference to the constitutional rights of Plaintiffs and were moving forces behind and caused the constitutional violations and damages of Plaintiffs.

\\

\\

## IV. SECOND CAUSE OF ACTION:
## 42 U.S.C. § 1983
## FOURTH AND FOURTEENTH AMENDMENTS;
## <u>UNLAWFUL SEIZURE</u>

### (Against All Government and Individual Defendants)

211.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

212.    The individual law enforcement Defendants are liable to Plaintiffs under the Fourth and Fourteenth Amendments of the U.S. States Constitution for using their authority under state law to involuntarily confine Plaintiffs inside the school building while the shooter was actively shooting.  Defendants further used their authority to interfere with and prevent others from intervening and responding to the active shooter and removing Plaintiffs from the dangerous situation.  Such acts and omissions rise to the level of an intentional violation of Plaintiffs' Fourth Amendment rights to be free from unlawful seizure.

213.    The Government Defendants had policies, practices, and customs of conscious indifference to federal law and their own policies and procedures regarding school safety, training, and preparing their schools, staff, and police for a school shooter.  The Government Defendants failed to adequately train, supervise, and discipline the individual law enforcement Defendants regarding how to identify and respond to an active shooter situation. The result was that individual law enforcement Defendants employed by Government Defendants used force to involuntarily confine Plaintiffs and other students and teachers, inside the school building with the shooter, and the individual law enforcement Defendants illegally seized Plaintiffs, in violation of Plaintiffs' Fourth Amendment rights to be free from unlawful seizure.

214.    Further, Defendants Chief Arredondo, Lt. Pargas and Sheriff Nolasco, acting as final policymakers, decided to disregard active shooter policies and instead instituted a policy to

barricade Plaintiffs inside the school building with an active shooter, thus seizing them unreasonably and depriving them of emergency medical and rescue services, the comfort of their loved ones, and significant emotional distress.

215.    By virtue of these actions, and as detailed throughout this Complaint, the Government Defendants and individual law enforcement defendants were deliberately indifferent to the constitutional rights of Plaintiffs.

216.    As a direct and proximate result of the failure to adequately train, supervise, and discipline the individual law enforcement Defendants regarding how to identify and respond to an active shooter situation, Plaintiffs sustained the damages alleged herein.

### V.    THIRD CAUSE OF ACTION: NEGLIGENCE

*(Against all Defendants and John Doe Defendants)*

217.    Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

218.    The School District, City of Uvalde, Uvalde County, UCSO and the individual defendants had a duty to protect Plaintiffs within their care and custody from unreasonable risks of harm.  Defendants further had a duty to act reasonably to avoid, or foresee, the risk that defendants themselves, or their colleagues or subordinates, would commit putting Plaintiffs at further risk of danger and harm.

219.    Defendants breached their duty of care to Plaintiffs by not acting reasonably under the circumstances of such risk, as described above and throughout this Complaint, and/or by failing to discharge their respective duties to enforce state mandates; appropriately select, hire, and train their staff and law enforcement officers; investigate and discipline their staff and officers for misconduct and non-compliance with security procedures; and acting negligently by

authorizing and ratifying security non-compliance, and providing improper training that failed in still the urgency of stopping the killing during an active school shooter event, which resulted in harm to Plaintiffs.  Specifically, but not limited to, Defendants breached their duty of care to Plaintiffs by:

a.   Failing to implement, enforce, and follow state-mandated active shooter protocols;

b.   Failing to provide adequate security measures for students, and teachers;

c.   Failing to follow security policies and procedures;

d.   Failing to maintain the security equipment, doors, and alert systems;

e.   Failing to select, hire, and train competent leaders and law enforcement officers;

f.   Failing to adequately police, patrol, guard, deter, and otherwise provide reasonable protection for students and teachers when defendants knew or should have known of foreseeable criminal acts including school shootings;

g.   Failing to reasonably hire, train, and/or retain and/or supervise adequate security personnel to patrol and/or monitor the premises of the school to protect students, teachers, and staff;

h.   Failing to have proper procedures for hiring, training, and/or supervising employees and police officers or other staff responsible for safety and security;

i.   Failing to have enough security staff in appropriate areas to deter or prevent crime, thereby protecting students, teachers, and staff;

j.   Failing to have adequate mechanisms for security personnel, staff, teachers, students, and others to report real or perceived threats or other security concerns to safeguard themselves or others;

k.  Failing to properly train teachers, administrators, monitors and/or other employees to adequately supervise the school campus in such a way that would prevent or deter acts of violence;

l.  Failing to implement or follow adequate security policies, measures, and procedures necessary to protect students and teachers;

m.  Failing to employ additional or different security measures after being put on direct notice that the security measures in force were ineffective and inadequate;

n.  Failing to implement reasonable crime prevention through structural and infrastructure design to harden the school against foreseeable violent crime such as the subject incident;

o.  Failing to test security measures, building and technology infrastructures to ensure they would work routinely and adequately in the event of a real emergency;

p.  Failing to acknowledge, follow, or implement the findings and recommendations of various agencies and security consultants, which would have lessened or eliminated the risk of security breaches and communication failures;

q.  Failing to develop, implement, or utilize proper and adequate administrative policies consistent with state standards; and

r.  Failing to adequately provide or develop an overall security plan that would meet known industry standards and customs for safety in schools.

220.    Defendant Chief Arredondo breached his duty of care and failed to act as a reasonable Chief of Police and official policymaker for the School District would in similar circumstances by failing to execute his own active shooter plan, execute active shooter protocols,

and failing to take command and coordinate the first responders' response, as required for any school shooting.

221.    Defendant Lt. Pargas breached his duty of care and failed to act as a reasonable Chief of Police and official policymaker for Uvalde would in similar circumstances by failing to mobilize his officers and execute active shooter protocols, and failing to take command and coordinate the first responders' response in three instances: (1) initially as the first responders to arrive at the scene; (2) as directed by Uvalde Chief of Police, Daniel Rodríguez, who was off scene; and (3) when it was clear neither Chief Arredondo, nor any other law enforcement officer, had not taken command.

222.    Principal Gutierrez breached her duty of care and failed to act as a reasonable educator, school principal, and policymaker for Robb Elementary would in similar circumstances by failing to follow and enforce established school security procedures, maintenance protocols, state mandated active shooter protocols and failure to discipline staff for non-compliance.

223.    Sheriff Nolasco breached his duty of care and failed to act as a reasonable Sheriff and official policymaker for Uvalde County would in similar circumstances by failing to respond to the school shooting, establishing a command, mobilize his officers and following active shooter protocols. Sheriff Nolasco further breached his duty of care by not enforcing active shooter training among UCSO officers leaving only 20% of the UCSO responding to shooting with the training.

224.    The Gun Defendants had a duty to market and sell their products in manner not to expose others to reasonably foreseeable risk of harm.

225.    The Gun Defendants had a duty to market and sell their products in a truthful manner and not mislead and deceive consumers about the characteristics, qualities, approval, and

sources of their products.

226.   The Gun Defendants had a duty to market their products, which they knew were dangerous in the hands of young civilians, in a reasonable and prudent manner.

227.   The Gun Defendants further had a duty to exercise reasonable care in selling, offering for sale, selling, marketing, and shipping its firearms, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

228.   The Gun Defendants had a duty to notify the ATF and register the AR-15 purchased by the shooter as a machine gun meeting the ATF criteria.  The Gun Defendants chose to design and sell the Daniel Defense DDM4 V7 with features that allowed it to be easily modified to fire automatically, but manufactured, transferred, and sold the gun in violation of the NFA and the Gun Control Act ("GCA").   The Gun Defendants did not complete the appropriate transfer forms, get approval of the forms by the ATF, pay occupational and transfer taxes and register the firearms with ATF in violation of federal law.  The Gun Defendants, and each of them, breached their duty of care and failed to act as a reasonable weapons manufacturer and seller would in similar circumstances by failing to be truthful in their marketing and selling practices and failing to report the gun as a qualified fully automatic machine gun.

229.   The Gun Defendants, and each of them, breached their duty of care to market and sell their products in manner not to expose others to reasonably foreseeable risk of harm.  The Gun Defendants failed to take steps to prevent sales of their weapons to consumers such as the school shooter, reasonably foreseeable to use, and did use, the weapons to harm others.

230.   The Gun Defendants failed to act as a reasonable marketer and seller would in similar circumstances, by failing to be truthful in their marketing and by directly targeting classes of consumers known to misuse their products and for criminal purposes to harm others.

231.    Daniel Defense's advertising encourages the illegal and dangerous misuse of AR-15-style rifles.  Daniel Defense marketing its AR-15s to the civilian market, including via social media, with violent and militaristic imagery, unfairly and illegally implying that civilians can use the weapons for offensive combat-like missions.  Daniel Defense's advertising is intended to appeal particularly to the thrill-seeking and impulsive tendencies of susceptible adolescents and young men who are attracted to violence and military fantasies.

232.    Daniel Defense's advertising is intended to attract adolescents and young adults knowing this consumer group is more likely to use their weapons irrationally and to harm others given their age, biological development, and history of use in mass shootings.

233.    The shooter's purchase and illegal use of the Daniel Defense DDM4 V7 was a direct result and foreseeable consequence of Daniel Defense's deceptive, misleading, and unfair marketing tactics.  Daniel Defense's conduct was and continues to be negligent, and such negligence was a proximate cause of the Plaintiffs' injuries.

234.    Daniel Defense's conduct of knowingly engaging in deceptive, misleading, and unfair trade practices violated and continues to violate the Federal Trade Commission Act, 15 U.S.C. § 45(a).

235.    Daniel Defense's marketing practices are unfair because they encouraged and continue to encourage the illegal misuse of their AR-15-style rifles and further because they misrepresent the source, characteristic and sponsorship of the products.

236.    Daniel Defense's advertising and selling practices foreseeably caused or were likely to cause substantial injury to foreseeable victims of gun violence such as Plaintiffs.

237.    Oasis Outback had a duty to not to sell the AR-15s, ammunition, and accessories to the 18-year-old Uvalde shooter it knew, based on actual and constructive knowledge, had the

characteristics of a school shooter, and was suspicious and likely to harm himself or others.
Oasis Outback, its owner, and staff, knew, or should have known, due to the shooter's age,
inexperience, appearance, demeanor, and display of young school shooter characteristics, the
shooter intended to use the guns and ammunition to harm others and in fact did so.  Oasis
Outback is a licensed seller of firearms.

238.    Oasis Outback had a duty to notify the ATF of the sale of over $3000 in guns
ammunition including two ARF-15 rifles to a nervous and suspicious 18-year-old who visited the
store three times in four days.

239.    Oasis Outback breached its duty of care and failed to act as a reasonable weapons
manufacturer and seller would in similar circumstances. Oasis Outback's acts and omissions
were negligent, and such negligence was a proximate cause of the Plaintiffs' injuries.

240.    Firequest had a duty to market its products in a truthful manner and not mislead
customers into believing the Hellfire Gen 2 trigger system was legal, when in fact, Firequest
knew, or should have known, the Hellfire Gen 2 trigger system converted an AR-15 to a
"machine gun" under ATF regulations and was therefore illegal and unreasonably dangerous and
illegal. Firequest's acts and omissions were negligent, and such negligence was a proximate
cause of the Plaintiffs' injuries.

241.    As a proximate cause of Defendants' negligence and each of them, Plaintiffs
suffered, and will continue to suffer, physical and emotional damages, increased medical and
mental health care visits, and loss of enjoyment of life.  As a further proximate cause of
Defendants' negligence, Plaintiffs have suffered and will continues to suffer economic losses,
including considerable financial expenses for medical and mental healthcare and treatment, and
diminished income capacity, and will continue to incur these losses and expenses in the future.

## VI.   FOURTH CAUSE OF ACTION:
### NEGLIGENT TRANSFER

### (*Against the Gun Defendants and John Doe Defendant I*)

242.   Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

243.   The Gun Defendants had, at all relevant times, actual or constructive knowledge the AR-15 style rifles sold to the 18-year-old Uvalde school shooter had no reasonable application to lawful uses of firearm (such as military or self-defense) but instead were well-suited and/or intended for misuse.

244.   The Gun Defendants had, at all relevant times, actual or constructive knowledge that young adult males are most commonly the perpetrators of mass shootings, including school shootings, and had actual knowledge at all times of the Uvalde school shooter's date of birth and gender.

245.   Oasis Outback, the store owner, and its staff, had actual knowledge of the Uvalde school shooter's characteristics and dangerous propensities.  Oasis Outback sold two AR-15 style rifles and 375 rounds of ammunition to the shooter on May 17, May 18, and May 20, 2022, and installed a holographic sight on the Daniel Defense AR-15 rifle the shooter used in the shooting.  Another witness described the shooter's all black clothing as simply giving off "bad vibes."  Despite the shooter's young age, inexperience, appearance, display of dangerous characteristics, and profile of a young adult school shooter, Oasis Outback sold the AR-15 rifles and ammunition to him just days after his 18th birthday.  Oasis Outback, its owner, and staff, knew, or should have known, due to the shooter's age, inexperience, appearance, demeanor, and display of young school shooter characteristics, the shooter intended to use the guns and ammunition to injure and kill people.

246.     All Defendants had a duty not to transfer a lethal weapon to a person having and/or displaying dangerous propensities or indicating a propensity to harm and kill others. Oasis Outback had a duty not to transfer the AR-15 used in the school shooting to the shooter given its actual and constructive knowledge the shooter intended to use the gun for harm to others.

247.     As a proximate cause of the Gun Defendants' negligent transfer of guns, ammunition, and accessories to the shooter, the shooter was able to acquire and misuse the weapons causing the school massacre on May 24, 2022.  The Uvalde school shooting was a foreseeable consequence of the Gun Defendants' negligent transfer of the weapons to the shooter.

248.     The Gun Defendants' negligent transfer of the weapons to the shooter caused the Plaintiffs to suffer, and continue to suffer, physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of life.

249.     As a proximate cause of the Gun Defendants' negligent transfer, Plaintiffs have suffered and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

### VII.    FIFTH CAUSE OF ACTION:
### FALSE, DECEPTIVE AND MISLEADING ADVERTISING
### IN VIOLATION OF THE FEDERAL TRADE COMMISSION ACT, 15
### U.S.C. §§ 41-58

#### (Against Daniel Defense and Firequest)

250.     Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

251.     The Federal Trade Commission Act, 15 U.S.C. §§ 41-58 (the "FTC Act"), a

predicate exception to PLCAA, prohibits false, deceptive, misleading, and unfair advertising practices. Defendants' marketing and advertising practices not only are false, misleading, and deceptive, but they promote injury, violence, death, and illegal use and conduct in violation of the FTC Act.

252.    Daniel Defense's advertising practices are infused with military imagery and symbolism and contain statements and omissions likely to mislead consumers acting reasonably under the circumstances to their detriment. Daniel Defense's advertising contains false representations their weapons have military and/or government use, approval, acceptance, sponsorship, and characteristics, which they do not. Daniel Defense affirmatively markets itself as a military weapons supplier and represents to consumers via print, social media, and online advertising that its weapons are used and approved by the military, when they are not. Daniel Defense's advertising depicts combat scenes, military operations, and soldiers telling consumers to "Use What They Use," yet Daniel Defense has no weapons supply contracts with the military as they delibately and falsly lead consumers to believe. Daniel Defense sells handrails to the military, a weapons' accessory, not the firearms depicted in their advertising. Despite the clear statements by Daniel Defense their weapons are used or endorsed by the military, approximately 90 percent of their sales are to civilians. Daniel Defense's statements to consumers declaring their firearms are "tested, proven, and chosen" by the military are false, misleading, and unfair to consumers in vioation of the FTC Act.[119]

253.    Daniel Defense's false, misleading, and unfair representations, statements, and omissions in their advertising are material and intended to induce consumers to purchase the weapons. Daniel Defense knows that creating clout, power, and prestige around a product is

---

[119] *See* advertising photograph at ¶72.

essential to induce a consumer to purchase a product. For weapons' consumers, there is nothing more prestigious than carrying the same weapon carried by the elite military whose task is to defend the country.

254.     Daniel Defense represents in their advertising their weapons are "tested and chosen" by the military but this is not true.  Daniel Defense does nothing to inform consumers of the truth, or that it only has military contracts to sell handrails, not weapons.  Daniel Defense's military-infused marketing and advertising campaigns are false, deceptive, misleading, and unfair to consumers in violation of the FTC Act.

255.     Daniel Defense's marketing and advertising is directed to children, adolescents, and young adult consumers who they know are vulnerable, inexperienced, and more easily manipulated.  Daniel Defense promotes use of its firearms by to children, adolescents, and young adult consumers leading them to believe the firearms are safe for use by them.  Daniel Defense specifically targets this consumer group knowing this group is not emotionally, biologically, or physiologically equipped to handle the grave responsibility of using a lethal semi-automatic weapon capable of injuring and killing others.  Daniel Defense's marketing and advertising does not disclaim that purchase, handling, and use by children, adolescents, and young adult consumers is hazardous to public health and safety, encourages violence, and likely to lead to injury and death to the consumer and others.

256.     Daniel Defense's marketing and advertising uses popular youth culture themes and icons to attract and exploit children, adolescents, and young adults. Daniel Defense uses photographs of children holding AR-15s and images of first-person shooter games, *Call of Duty* and *Fortnite,* and youth icons such as *Star Wars* to target young users through social media posts. Daniel Defense specifically targets this group knowing this consumer group is unqualified

by age or experience to anticipate or appreciate the possibility the representations may be exaggerated or untrue, or the likelihood of harm or death to others. Moreover, there is no caution or disclaimers to the young audience warning them the weapons are not intended for physiologically immature consumers. While military and law enforcement personnel who use AR-15 rifles are highly trained, Daniel Defense knows the children, adolescents, and young adults it targets have no such training and no use for such firearms.

257.   Daniel Defense markets its firearms to children, adolescents, and young adults with images of live combat scenes to promote violence, death, and unsafe and illegal conduct. Daniel Defense does not age restrict its website and takes no action to restrict access to his violence promoting content.

258.   Daniel Defense's uses images of children holding its AR-15s, which is not only boldly promoting illegal conduct, but is unscrupulous, reckless, and outside the bounds of all decency in the consumer marketplace.

259.   Likewise, Firequest's advertising promotes violence, death, and unsafe and illegal conduct. Firequest's online advertising promises its products are legal leading consumers to believe that use of its trigger systems is "ATF certified" inviting consumers to engage in illegal and unsafe conduct in violation of ATF's prohibition of illegal machine guns.

260.   As a result of The Gun Defendants' false, deceptive, misleading, unfair, and unscrupulous conduct, Plaintiffs have suffered and continue to suffer, physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of life. As a further proximate cause of the Gun Defendants 'conduct, Plaintiffs have suffered and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses

and expenses in the future.

## VIII.   SIXTH CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against all Defendants and John Doe Defendants)

261.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

262.    Defendants' conduct acts and omissions, conscious choices, and deliberate indifference to Plaintiffs as alleged throughout this Complaint was intentional and done with reckless disregard for Plaintiffs' health, well-being, safety, and lives.

263.    Defendants' conduct was extreme, outrageous, atrocious, and intolerable in a civilized community. Defendants knew or should have known that their conduct, acts and omissions, and choices would create a high degree of risk of harm to Plaintiffs.  Defendants knew the Plaintiffs' vulnerabilities and susceptibility to harm given their age.   Despite this knowledge, Defendants deliberately proceeded to act, and failed to act, in conscious disregard of and with indifference to that risk.

264.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer severe emotional distress including fear, apprehension, terror, anxiety, panic, worry, stress, night terrors, insomnia, stress induced health effects, post-traumatic stress syndrome, mood disorders, behavioral changes, and loss of security and peace. The depth, intensity, and duration of the mental distress and emotional pain suffered by Plaintiffs is not ordinary, and not what children should have to endure due to the intentional and reckless conduct of the Defendants.

265.    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood.

266.    As a proximate cause of Defendants' negligent transfer, Plaintiffs have suffered and continues to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## IX.    SEVENTH CAUSE OF ACTION:
## PRODUCTS LIABILITY FAILURE TO WARN

### (*Against Motorola*)

267.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

268.    Plaintiff brings this strict liability claim against Motorola for failure to warn of the dangers and risks associated with use of their products.

269.    Defendant's products were defective and unreasonably dangerous because they did not contain adequate warnings or instructions concerning failure during normal use.  These actions were under the ultimate control and supervision of Defendants.

270.    Defendant's products are used for public safety and in public settings and Defendant had a duty to warn of the risks of failure associated with the reasonably foreseeable use of the products and a duty to instruct on the proper and safe use of these products.

271.    At all relevant times, Defendant had a duty to properly research, test, develop, manufacture, inspect, label, market, promote, provide proper warnings, and take such steps as necessary to ensure that its products did not fail during an emergency causing others to suffer unreasonable and dangerous risks and harm. Defendant had a continuing duty to instruct on the proper, safe use of these products especially given that the products were used by schools and first responders.  Defendant as the designer, manufacturer, seller, or distributor is held to the knowledge of an expert in the field.

272.     Defendant could have provided warnings or instructions regarding the full and complete risks of their products because they knew or should have known of the unreasonable risks of harm associated with the use of products and/or failure during use.

273.     Defendant failed to properly investigate, study, research, test, manufacture, and label their products and failed to minimize the dangers to others due to product failures. Defendant knew failing to do so would be catastrophic and prevent schools and first responders from protecting victims such as Plaintiffs during an attack.

274.     Defendant's products reached the intended users without substantial change in their condition as designed, manufactured, sold, distributed, labeled, implemented, and sold by Defendant.

275.     As a result of Defendant's failures to warn, Defendant's products were defective and unreasonably dangerous when they left the possession and/or control of Defendants and used by its consumers on the day of the school shooting.

276.     As a proximate cause of Defendant's conduct, Plaintiffs suffered, and continue to suffer damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## X.      EIGHTH CAUSE OF ACTION:
## PRODUCTS LIABILITY - MARKETING DEFECT

### (Against the Gun Defendants and John Doe Defendant I)

277.     Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

278.     Plaintiff brings this strict liability claim against the Gun Defendants for marketing

defect and the intentional marketing of lethal weapons to untrained civilians and young adults without adequate warnings.

279.    The Gun Defendants aggressively market lethal weapons to youth, civilians, and young adults they know are not competent by maturity, skill, training, or experience to responsibly use an assault weapon such as an AR-15 style rifle, with high-capacity magazines and trigger systems and appreciate the risk of harm to others.  The Gun Defendants have actual or constructive knowledge that AR-15 style rifles, rapid-fire trigger systems, and high-capacity magazines are used by most often by young adults in mass shootings.  The Gun Defendants have actual or constructive knowledge that young adults, due to the process of brain development and biological maturation are not competent emotionally to safely use their products without adequate training, guidance, and/or supervision and/or within the setting of a safe and supervised environment.  The Gun Defendants further have actual or constructive knowledge that the young adult civilian consumers its sells to and/or targets do not have the experience or expertise to appreciate the risk of harm to others if proper warnings, training, guidance, and instruction is not provided.

280.    The Gun Defendants' products fail to warn civilian and young adult consumers that adequate training, guidance, and/or supervision is necessary to ensure the safe use of their products.  Because of the age, inexperience, and vulnerability of the young adult civilian consumers adequate training, guidance, instruction, precaution, and supervision is necessary for safe use of the products.

281.    The Gun Defendants' products fail to warn young adult consumers that use of their products by young adult consumers carries a high risk of harm to self and others given the emotional, physical, and psychological development changes of young adults resulting in mood

and behavior instability and volatility.

282.    The Gun Defendants could provide warnings or instructions regarding the full and complete risks and dangers of use by young adult civilians but chose not to.  The Gun Defendants could market its products with adequate warnings but chose not to.  The products without these warnings are unreasonably dangerous.

283.    The Gun Defendants' products reached the Uvalde school shooter, a young adult civilian, without adequate warnings and were thus unreasonably dangerous.

284.    As a result of Defendants' marketing defects, Defendants products were defective and unreasonably dangerous when they left the possession and/or control of Defendants and used by the Uvalde school shooter on the day of the school shooting.

285.    As a proximate cause of Defendants' marketing defects, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## XI.    NINTH CAUSE OF ACTION:
## NUISSANCE

### (Against the Gun Defendants)

286.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

287.    A private nuisance exists in Plaintiffs' community due to the Gun Defendants' negligent, intentional, and reckless marketing and sale of AR-15 style rifles to young adults and civilians in Uvalde, Texas for the purpose of causing terror, harm, and death in Plaintiffs' community.  The Gun Defendants' conduct caused and continues to cause emotional and

physical harm to Plaintiffs in innumerable ways by creating fear, apprehension and diminishing Plaintiffs' sense of security, peace, and enjoyment of life in their own homes and property in addition to the needless loss of life.

288.    Plaintiffs have an interest in the safe, secure, and peaceful use and enjoyment of their homes and property in Uvalde, Texas. The Gun Defendants took these rights by marketing and selling AR-15 style rifles in Plaintiffs' community, knowing the consequences of their conduct, and foreseeable loss of life and enjoyment of peace, safety, serenity, and security to Plaintiffs.

289.    Daniel Defense is in the business of researching, testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting AR-15 style rifles, including those used by the Uvalde school shooter.

290.    Oasis Outback is a Uvalde, Texas sporting goods store that markets and sells AR-15 style rifles, accessories, and ammunition to young adults and civilians in Plaintiffs' community. On May 17, 2022, the Uvalde school shooter purchased a Smith & Wesson M&P15 AR-15 style rifle from Oasis Outback. On May 18, 2022, he returned to Oasis Outback to buy 375 rounds of M193, 5.56 55-grain round with full metal jacket ammunition. On May 20, 2022, the shooter returned to Oasis Outback to pick up the DDM4 V7 rifle he purchased online from Daniel Defense and used in the Uvalde school shooting. AR-15 style rifles can carry drums or magazines containing up to 100 rounds of ammunition. These rifles can be modified legally to increase the firing rate to the speed of a fully automatic machine gun that is illegal for civilians. The AR-15 style rifles are dangerous to humans and persons living in a community. AR-15 style rifles destroy human bodies, limbs, organs, and tissue, pulverize the human body, explode, and cause immediate death. The only purpose of the rifles is to kill as many as possible in little time

The AR-15 style rifles are not suitable for civilian use and have no utility in the hands of a young untrained adult civilian living in a community such as Plaintiffs.

291.    The Gun Defendants' marketing and sale of AR-15 style rifles in Plaintiffs' community created and continues to create fear, apprehension, terror, injury, loss of life, peace, security, enjoyment, and peace in Plaintiffs' homes and community.

292.    The Gun Defendants only interest in Plaintiffs' community is profit. Except for the gun store, the Gun Defendants have no relationship to Uvalde other than profiting off firearm sales to civilians.  In furtherance of the Gun Defendants' financial interest in Uvalde, the Gun Defendants directly markets to young adult and civilian consumers in Plaintiffs' community with the intent to make money off the community and distribute their weapons for use in the community.

293.    The Gun Defendants know that selling AR-15 style rifles, accessories, and ammunition to young adults and civilian in Plaintiffs' community will cause fear, apprehension, terror, injury, loss of life, peace, security, enjoyment, and peace to Plaintiffs.  The Gun Defendants market and sell AR-15 style rifles, accessories, and ammunition to young adults and civilians in Plaintiffs' community they know are not competent or capable of using the firearms safely. For example, Daniel Defense admits its firearms should not be handled and used by children or untrained civilians. The Gun Defendants know their AR-15 style rifles' only purpose is to kill yet they market and sell them to young adults and civilians anyway.  There is no utility in marketing and selling lethal guns such as AR-15 style rifles and trigger modifications to young adults in Plaintiffs' community.

294.    The Gun Defendants have no processes in place to stop the marketing or sale of AR-15 style rifles to young adults and civilians in Plaintiffs' community.  Defendants could

educate the community and potential consumers of the dangers of use by young adult civilians but choose not to. Defendants could set age restrictions, or training requirements for its firearms, but choose not to. Defendants could stop the sale of AR-15 style rifles to young untrained civilians but choose not to. The Gun Defendants have no processes, guidelines, or procedures in place to reduce or eliminate the physical and emotional harm to Plaintiffs caused by the Gun Defendants' marketing and sales practices. Defendants know that marketing and selling lethal guns, accessories, and trigger modifications result in community violence and increase children's risk of injury, death, anxiety, depression, trauma, and other psychological and physical affects.

295.    The Gun Defendants' marketing and sales strategies are the result of intentional decisions to directly market to young adults and civilians in Plaintiffs' community, including the Uvalde school shooter, without regard for the interests of Plaintiffs in the peaceful use and enjoyment of their homes and property. Defendants' interests are purely for profit, above the safety, wellbeing, interests, and lives of Plaintiffs.

296.    As a result of the Gun Defendants' marketing and selling practices, the Uvalde school shooter bought AR-15 style rifles, accessories, and ammunition directly from Defendants and used the weapons to terrorize, injure, traumatize, and kill Plaintiffs and persons in Plaintiffs' community.

297.    The Gun Defendants knew or should have known that directly marketing and selling distributing AR-15 style rifles to young adults and civilians in Plaintiffs' community involved an extreme degree of risk of interfering with or causing an invasion of Plaintiffs' interest in the safe, secure, and peaceful use and enjoyment of their homes and property.

298.    The Gun Defendants are aware that AR-15 style rifles are used by young adults and civilians in mass shootings. It was foreseeable to Gun Defendants the AR-15 style rifles

purchased by the 18-year-old shooter would be used to terrorize, injure, traumatize, and kill Plaintiffs and persons in Plaintiffs' schools and community. Despite this knowledge, the Gun Defendants sold the rifles to the shooter and others in Plaintiffs' community and continue to do so without regard for the rights of Plaintiffs.

299.     The Gun Defendants' marketing and sale of AR-15 style rifles to young adults and civilians in Plaintiffs' community interfered with and invaded the Plaintiffs' interest in the peaceful use and enjoyment of their homes and property and creates a nuisance causing Plaintiffs' reasonable fear, apprehension, trauma, injury, and terror in the peaceful use and enjoyment of their homes and property. The Gun Defendants' conduct in creating the nuisance and invading Plaintiffs' interests was negligent, reckless, and intentional.

300.     As a proximate cause of the Gun Defendants' conduct, Plaintiffs suffered, and continue to suffer, physical and emotional damages including discomfort, annoyance, fear, anxiety, terror, stress, insomnia, increased medical and mental health care visits, loss of enjoyment of childhood, cognitive affects, loss of peace of mind, post-traumatic stress disorder and related stress induced physical effects, and physical injuries.

301.     As a proximate cause of Defendants' conduct, Plaintiffs have suffered and continues to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

302.     The Gun Defendants' conduct, as described above, was aggravated, outrageous, unreasonable, evil, and beyond all sensibilities. The Gun Defendants market and sell, and continue to market and sell, AR-15 style rifles for use in Plaintiffs' community knowing the dangerous propensities, kill purpose, and history of killings in Plaintiffs' and others' schools and

communities.  The Gun Defendants, by their reckless and outrageous practices regularly puts

Plaintiffs at risk of terror, fear, apprehension, injury, loss of life, peace, security, enjoyment, and

peace with full knowledge that their practices put their profits over the safety and interests of

Plaintiffs.

## XII.   PUNITIVE/EXEMPLARY DAMAGES

### *(Against the Gun Defendants)*

303.   Each Defendant's conduct was done with reckless disregard for human life,

oppression, and malice. Defendants, and each of them, were aware of the serious and

demonstrable risk of serious bodily injury and death associated with their conduct and that such

risks are compounded and worsened by their intentional inaction.  With full knowledge of such

risks, Defendants proceeded causing Plaintiffs to suffer and sustaining severe physical, mental,

and emotional harm.

## XIII.   RELIEF SOUGHT

304.   Wherefore, Plaintiffs respectfully request that the Court enter a judgment as

follows:

a.  A declaratory judgment that defendants' conduct detailed herein was a violation of

plaintiff's rights under the Constitutions and laws of the United States and Texas;

b.  To the extent that the Court finds that Defendants' conduct was authorized by

custom, policy, or practice, and/or the inadequate training, supervision, instruction

and discipline, a declaratory judgment that those customs, policies, or practices,

and/or the inadequate trainings, supervisions, instructions, and disciplines are

unconstitutional under the Fourteenth Amendments to the United States

Constitution, and the analogous provisions of the Texas Constitution.

c.  Permanent injunctive relief to preclude similar acts by defendants at future

gatherings.

d.  An award of past and future economic damages against all Defendants for the harms sustained by Plaintiffs in an amount to be determined according to proof at the time of trial;

e.  An award of general damages against Defendants, and each of them, for the physical, mental, and emotional damages, past and future, according to proof at the time of trial;

f.  An award of punitive and exemplary damages against the Defendants in an amount to be determined according to proof at the time of trial

g.  An award of attorneys' fees pursuant to 42 U.S.C. § 1983 and any other applicable provisions, and

h.  Costs of suit and pre- and post-judgment interest as permitted by law

## XIV.   DEMAND FOR JURY TRIAL

305.    Plaintiffs respectfully demand a trial by jury.

## XV.    SPOLIATION

306.    Plaintiffs require and demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Uvalde school shooting or other violations made the basis of the Complaint and the alleged damages, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

Dated:  December 20, 2022

**BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.**

/s/ *Stephanie Sherman*
Stephanie Sherman
Texas State Bar No. 24006906
ssherman@baumhedlundlaw.com
Monique Alarcon (*Pro Hac Vice*)
California State Bar No. 311650
malarcon@baumhedlundlaw.com
11111 Santa Monica Boulevard, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

**LAW OFICE OF SHAWN C. BROWN**
Shawn C. Brown
Texas State Bar No. 24003613
shawn@shawnbrownlaw.com
540 S. St. Mary's Street
San Antonio, TX 78205
Telephone: (210) 224-8200
Facsimile: (210) 224-8214

***Attorneys for Plaintiffs***

PLAINTIFFS' FIRST AMENDED COMPLAINT